**No. 25-20481**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

IN RE PEARL RESOURCES, LLC; PEARL RESOURCES OPERATING COMPANY, LLC,

Debtors,

DAWN BUCKINGHAM, M.D., Commissioner, Texas General Land Office,
Plaintiff-Appellant/Cross-Appellee,

v.

PEARL RESOURCES, LLC; PEARL RESOURCES OPERATING COMPANY, LLC,
Defendants—Appellees/Cross-Appellants.

---

Appeal from the United States Bankruptcy Court
for the Southern District of Texas; No. 4:20-AP-3169

---

**BRIEF OF APPELLANT**

---

KEMP SMITH LLP
221 North Kansas, Suite 1700
El Paso, Texas 79901
Tel. (915) 533-4424
Fax (915) 546-5360

Ken Slavin
Texas Bar No. 18496100
ken.slavin@kempsmith.com
Valerie R. Auger
Texas Bar No. 24076251
valerie.auger@kempsmith.com

**Attorneys for Appellant**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record. certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1. **Plaintiff-Appellant/Cross-Appellee:**

   Dawn Buckingham, M.D., Commissioner, Texas General Land Office

2. **Defendants-Appellees/Cross-Appellants:**

   Pearl Resources, LLC and Pearl Resources Operating Company, LLC owned by Myra Dria.

3. **Counsel for Plaintiff-Appellant/Cross-Appellee:**

   Ken Slavin and Valerie Auger, Kemp Smith LLP

   Jason B. Binford and J. Casey Roy, Kane Russell Coleman Logan PC; Ken Paxton, Ryan L. Bangert, Darren L. McCarty, Rachel R. Obaldo, Abigail R. Ryan, Texas Attorney General's Office (counsel in bankruptcy court)

4. **Counsel for Defendants-Appellees/Cross-Appellants:**

   Avi Moshenberg and Nick Lawson, Lawson & Moshenberg PLLC

   Dan Miller (deceased), John Quinlan, Kelli Kenney, Eno Peters, McElroy, Sullivan, Miller & Weber LLP; Walter J. Cicack, Jeremy M. Masten, Hawash Cicack & Gaston LLP; Charlie Shelton, Hayward PLLC (counsel in bankruptcy court)

Ken Slavin
Attorney for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves complicated issues related to construction of Texas oil and gas leases and application of sovereign immunity. Oral argument is likely to help the Court evaluate the parties' arguments.

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT .............................................. ii

TABLE OF CONTENTS .................................................................................. iii

TABLE OF AUTHORITIES ........................................................................... viii

JURISDICTIONAL STATEMENT ......................................................................xv

ABBREVIATIONS AND RECORD REFERENCES .......................................... xvi

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......................................1

STATEMENT OF CASE .......................................................................................1

I. Relinquishment Act leases .........................................................................1

II. The State Leases ........................................................................................2

III. Pearl's acquisition of the State Leases ......................................................4

IV. Absence of adequate drilling and reworking operations on the leasehold…………………………………………………………………...5

V. GLO's request for release after partial termination ....................................13

VI. Procedural history .....................................................................................14

SUMMARY OF ARGUMENT ...............................................................................16

ARGUMENT .........................................................................................................17

I. Pearl's monetary-damages claim is barred by the Eleventh Amendment .....17

A. Standard of review .................................................................................17

B. Eleventh Amendment immunity ........................................................ 18

C. The Eleventh Amendment bars Pearl's claims for damages .................. 20

D. Section 106 does not abrogate GLO's immunity .................................. 22

II. The trial court abused its discretion in finding a waiver of immunity to liability ................................................................................................ 23

A. Standard of review .............................................................................. 23

B. Legal standard for determining waiver ................................................ 23

C. The trial court failed to apply the proper legal standard and abused its discretion in finding GLO waived immunity to liability ..................... 25

III. The State Leases did not become part of Pearl's bankruptcy estate .......... 27

A. Section 16 is an unambiguous special limitation, automatically terminating the State Leases for acreage where there was no continuous drilling or reworking operations on a well two years after the expiration of the primary term ................................................ 27

1. Standard of review ........................................................................ 27

2. Oil and gas lease construction ........................................................ 27

3. Under Section 16, the State Leases automatically terminated as to acreage surrounding wells upon which no continuous drilling or reworking operations are occurring two years after the expiration of the primary term ........................................... 28

B. The trial court incorrectly found Pearl was engaged in continuous drilling or reworking operations ......................................................... 33

1. Standard of review ........................................................................ 33

2. Why retained-acreage provisions require continuous drilling and reworking operations .................................................. 34

3. Continuous drilling or reworking operations require the lessee to engage in reasonably diligent efforts to develop the mineral-lease estate to produce oil and gas ....................................35

4. No evidence supports continuous drilling or reworking operations to hold any part of the leasehold other than 320 acres surrounding GS#3..........................................................38

a. The evidence on which the trial court relied does not support continuous drilling operations at GS#2021HA, GS#2022HA, and GS#2211HD on the respective snapshot dates..........................................................39

b. The trial court erred in failing to consider activities at each well on each snapshot date.................................................40

c. The evidence admitted at trial is legally insufficient to support a finding of continuous drilling operations at each well on each snapshot date ........................................................41

i. September 1, 2018-(Lease DD).......................................43

ii. September 7, 2018-(Leases A,D,E,F,G,K,L,M,T,U)........43

iii. September 13, 2018-(Leases P,Q,R)...............................43

iv. October 4, 2018-(Leases C,X,Y).....................................44

v. October 5, 2018-(Lease W).............................................45

vi. October 6, 2018-(Lease V)..............................................45

vii. October 8, 2018-(Lease J)...............................................46

viii. November 8, 2018-(Lease S) ..........................................47

ix. July 26, 2019-(Lease OO)...............................................48

x. August 16, 2019-(Leases PP, RR)....................................48

xi. August 17, 2019-(Lease QQ)..........................................48

xii. August 25, 2019-(Lease SS)...........................................49

xiii. September 9, 2019-(Lease TT).......................................49

5. Pearl's tender of deep rights retention payments did not hold the acreage for GS#2021HA, GS#2022HA, or GS#2211HD..........................................................................49

6. None of the State Leases were part of Pearl's bankruptcy estate ..........................................................................50

7. Partial termination of the State Leases comports with public policy ..........................................................................51

C. The GLO Commissioner acted within his discretion in filing the DTAD of record after Pearl refused to do so.................................51

IV. The trial court erred in awarding Pearl damages.......................................52

A. Standard of review..........................................................................52

B. Texas law governs what damages are recoverable................................52

C. The trial court erred in awarding Pearl damages because the damages claim was barred by immunity and GLO did not otherwise breach or repudiate any of the State Leases..........................55

D. Pearl failed to establish GLO was the proximate or producing cause of its alleged damages..............................................................56

E. Pearl's "damages" are mere speculation and conjecture.......................58

1. "Damages" for increased drilling and facility costs........................58

2. “Damages” for infrastructure repairs ........ 59

3. “Damages” for decreased value ........ 60

CONCLUSION ........ 62

CERTIFICATE OF SERVICE ........ 63

CERTIFICATE OF COMPLIANCE ........ 64

# TABLE OF AUTHORITIES

## Cases

*Abraxas Petroleum Corp. v. Hornburg*,
20 S.W.3d 741 (Tex. App.—El Paso 2000, no pet.). ....................................53

*Amoco Prod. Co. v. Alexander*,
594 S.W.2d 467 (Tex. App.—Houston [1st Dist.] 1979),
modified, 622 S.W.2d 563 (Tex. 1981). .......................................................53

*Amoco Prod. Co. v. Alexander*,
622 S.W.2d 563 (Tex. 1981). ........................................................... 38, 54-55

*Anadarko Petroleum Corp. v. Thompson*,
94 S.W.3d 550 (Tex. 2002). ............................................................30, 31, 32

*Arismendez v. Nightingale Home Health Care, Inc.*,
493 F.3d 602 (5th Cir. 2007)...........................................................23, 25, 26

*Bargsley v. Pryor Petroleum Corp.*,
196 S.W.3d 823 (Tex. App.—Eastland 2006, pet. denied)......................36, 42

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019). ..................................................................33, 51

*Barton v. Resort Dev. Latin Am., Inc.*,
413 S.W.3d 232 (Tex. App.--Dallas 2013, pet. denied)................................61

*Brown v. Humble Oil & Ref. Co.*,
83 S.W.2d 935 (Tex. 1935). ...........................................................................33

*City of Austin v. Paxton*,
943 F.3d 993 (5th Cir. 2019)..........................................................................18

*Clifton v. Koontz*,
325 S.W.2d 684 (Tex. 1959). ..................................................................35. 42

*Cmty. Bank of Raymore v. Chesapeake Expl., L.L.C.*,
416 S.W.3d 750 (Tex. App.—El Paso 2013, no pet.). ..................................31

*Coastal Oil & Gas Corp. v. Garza Energy Trust*,
268 S.W.3d 1 (Tex. 2008). ........................................................................61

*College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999)..................................................................................18

*ConocoPhillips Co. v. Koopmann*,
547 S.W.3d 858 (Tex. 2018)......................................................................36

*Corn v. Miss. Dep't Pub. Safety*,
954 F.3d 268 (5th Cir. 2020).....................................................................17

*Cotherman v. Oriental Oil Co.*,
272 S.W. 616 (Tex. App.—Amarillo 1925, no writ). ...................................53

*Cromwell v. Anadarko E&P Onshore, LLC*,
716 S.W.3d 515 (Tex. 2025)...................................................... 27-28, 30, 51

*Dagnall v. Gegenheimer*,
645 F.2d 2 (5th Cir. 1981)..........................................................................18

*Daniel v. Univ. of Tex. Sw. Med. Ctr.*,
960 F.3d 253 (5th Cir. 2020).....................................................................20

*Duke v. Sun Oil Co.*,
320 F.2d 853 (5th Cir. 1963).....................................................................35

*Ekhlassi v. Nat'l Lloyds Ins. Co.*,
926 F.3d 130 (5th Cir. 2019).............................................................25, 26

*Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*,
554 S.W.3d 586 (Tex. 2018)................................................ 28, 30, 34-35, 40

*Endeavor Energy Res., L.P. v. Energen Res. Corp.*,
615 S.W.3d 144 (Tex. 2020)..............................................................27, 28

*Franklin v. Regions Bank*,
125 F.4th 613 (5th Cir. 2025).....................................................................27

*Frederick v. United States*,
386 F.2d 481 (5th Cir. 1967)....................19, 20

*Ga. Dep't of Human Res. v. Bell*,
528 F. Supp. 17 (N.D. Ga. 1981)....................19

*Haby v. Stanolind Oil & Gas Co.*,
228 F.2d 298 (5th Cir. 1955)....................37

*Hall v. McWilliams*,
404 S.W.2d 606 (Tex. App.—Austin 1966, writ ref'd n.r.e.)....................36, 42

*Hickey v. Spangler*,
358 S.W.2d 216 (Tex. App.—Texarkana 1962, writ ref'd n.r.e.)....................37, 42

*Homoki v. Conversion Servs., Inc.*,
717 F.3d 388 (5th Cir. 2013)....................52

*In re Supreme Beef Processors, Inc.*,
468 F.3d 248 (5th Cir. 2006)....................22

*In re Trang*,
58 B.R. 183 (Bankr. S.D. Tex. 1985)....................50

*Jupiter Oil Co. v. Snow*,
819 S.W.2d 466 (Tex. 1991)....................50

*Kaswatuka v. United States Dep't of Homeland Sec'y*,
7 F.4th 327 (5th Cir. 2021)....................18

*Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011)....................23

*Lee v. United States*,
765 F.3d 521 (5th Cir. 2014)....................24

*Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*,
706 F.3d 622 (5th Cir. 2013)....................24

*Lewis v. Ascension Par. Sch. Bd.*,
806 F.3d 344 (5th Cir. 2015).....................................................................33

*Lovelace v. Sabine Consol., Inc.*,
733 S.W.2d 648 (Tex. App.--Houston [14th Dist.] 1987, writ denied)... 53-54

*Lucas v. United States*,
807 F.2d 414 (5th Cir.1986)....................................................... 23, 24-25, 26

*Marrs & Smith P'ship v. Sombrero Oil & Gas Co., L.L.C.*,
511 S.W.3d 53 (Tex. App.—El Paso 2014, no pet.). ....................................55

*Masterson v. Amarillo Oil Co.*,
253 S.W. 908 (Tex. App.—Amarillo 1923, writ dism'd w.o.j.). ...................37

*Matter of Rose*,
156 F.4th 602 (5th Cir. 2025)................................................................. 52-53

*Motion Med. Tech., LLC v. Thermotek, Inc.*,
875 F.3d 765 (5th Cir. 2017).....................................................................23

*Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*,
414 F.3d 546 (5th Cir. 2005).....................................................................52

*Neuwirth v. Louisiana State Bd. of Dentistry*,
845 F.2d 553 (5th Cir. 1988).....................................................................18

*Pasco v. Knoblauch*,
566 F.3d 572 (5th Cir. 2009).............................................................24, 25

*Perez v. Region 20 Educ. Serv. Ctr.*,
307 F.3d 318 (5th Cir. 2002)................................................................ 18-19

*Petersen v. Robinson Oil & Gas Co.*,
356 S.W.2d 217 (Tex. App.—Houston 1962, no writ). ................................36

*Phillips v. Carlton Energy Group, LLC*,
475 S.W.3d 265 (Tex. 2015)...............................................................36, 54

*PPC Acquisition Co. LLC v. Delaware Basin Res., LLC*,
619 S.W.3d 338 (Tex. App.—El Paso 2021, no pet.)..................28-29, 40-41

*Providence Behavioral Health v. Grant Rd. Pub. Util. Dist.*,
902 F.3d 448 (5th Cir. 2018)......................................................................33

*Pura-Flo Corp. v. Clanton*,
635 S.W.3d 637 (Tex. 2021).......................................................................54

*Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*,
207 S.W.3d 801 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). .54, 60

*R.E. Taylor Syndicate v. James*,
243 S.W. 1105 (Tex. App.—Amarillo 1922, writ ref'd). .............................38

*Ridge Oil Co., Inc. v. Guinn Investments, Inc.*,
148 S.W.3d 143 (Tex. 2004)..................................................................36, 42

*Roberts v. City of Shreveport*,
397 F.3d 287 (5th Cir. 2005)......................................................................26

*Sharifi v. Steen Auto., LLC*,
370 S.W.3d 126 (Tex. App.—Dallas 2012, no pet.)....................................53

*Sossamon v. Texas*,
563 U.S. 277 (2011)..................................................................18, 19, 20

*Stephenson v. Calliham*,
289 S.W. 158 (Tex. App.—San Antonio 1926, no writ)...............................28

*Tawakkol v. Vasquez*,
87 F.4th 715 (5th Cir. 2023)......................................................................20

*Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*,
877 S.W.2d 276 (Tex. 1994).......................................................................61

*Tex. Pac. Coal & Oil Co. v. Barker*,
6 S.W.2d 1031 (Tex. 1928).........................................................................53

*Texas v. Caremark, Inc.*,
584 F.3d 655 (5th Cir. 2009)....................19, 20, 21

*Union Pac. R. Co. v. La. Pub. Serv. Comm'n*,
662 F.3d 336 (5th Cir. 2011)....................18, 25

*Valence Operating Co. v. Anadarko Petroleum Corp.*,
303 S.W.3d 435 (Tex. App.—Texarkana 2010, no pet.)....................37, 42

*Woelffer v. Happy States of Am., Inc.*,
626 F. Supp. 499 (N.D. Ill. 1985)....................20

*Women's Elevated Sober Living L.L.C. v. City of Plano, Tex.*,
86 F.4th 1108 (5th Cir. 2023)....................33

*Woodfield v. Bowman*,
193 F.3d 354 (5th Cir. 1999)....................24

*Worldcall Interconnect, Inc. v. Fed. Commc'ns Comm'n*,
907 F.3d 810 (5th Cir. 2018)....................33

## Constitutional Provisions

U.S. Const. amend. XI....................18

Tex. Const. art. XIV, § 1....................20

## Statutes

11 U.S.C. § 106....................22

28 U.S.C. § 157....................xv

28 U.S.C. § 158....................xv

28 U.S.C. § 1334....................xv

31 Tex. Admin. Code § 9.31(2)....................35

Tex. Civ. Prac. & Rem. Code § 114.001(2)....................26

Tex. Civ. Prac. & Rem. Code § 114.003. ....................26

Tex. Nat. Res. Code § 52.171. ....................2

Tex. Nat. Res. Code § 52.171 et seq. ....................2

Tex. Nat. Res. Code § 52.023. ....................37

Tex. Nat. Res. Code § 52.172. ....................51

## Rules

Fed. R. Bankr. P. 7008....................23

Fed. R. Civ. P. 8(c). ....................23

Fed. R. Civ. P. 52(a)(6)....................33

5th Cir. R. 28.2.1. ....................i

5th Cir. R. 32.2.7. ....................64

## JURISDICTIONAL STATEMENT

The United States Bankruptcy Court for the Southern District of Texas (the "trial court") exercised jurisdiction over this proceeding pursuant 28 U.S.C. §§ 1334 and 157 as a core proceeding pursuant to 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). The trial court entered its final amended judgment disposing of all claims and parties in the proceeding on June 27, 2025. The Commissioner of the General Land Office on behalf of the State of Texas appealed the amended judgment on July 10, 2025, and Pearl Resources LLC and Pearl Resources Operating Company LLC appealed the amended judgment the same day. On July 22, 2025, upon request of Pearl Resources LLC and Pearl Resources Operating Company LLC, the trial court certified the amended judgment for direct appeal under 28 U.S.C. § 158(d)(2), and on October 29, 2025, this Court granted the petition for permission to appeal. This Court has jurisdiction under 28 U.S.C. § 158. The notice of appeals and request for permission to appeal were timely filed within the periods prescribed by the applicable bankruptcy and appellate rules.

## ABBREVIATIONS AND RECORD REFERENCES

**Abbreviations:**

Appellant/Cross-Appellee Commissioner Dawn Buckingham, MD of the General Land Office is referred to individually as "Commissioner."

The General Land Office with the Commissioner are referred to collectively as "GLO."

The State of Texas is referred to as the "State."

Appellees/Cross-Appellants Pearl Resources LLC and Pearl Resources Operating Company LLC are referred to collectively as "Pearl."

Dr. Myra Dria is referred to as "Dr. Dria."

The 27 Relinquishment Act leases the subject of this dispute are referred to collectively as the "State Leases."

A Lease Automatic Custody Transfer unit is referred to as a "LACT unit."

**Record References:**

Citations to the record on appeal refer to record references beginning with "25-20481.[page #]" and are cited as "ROA.[page #]."

References to the bench trial transcript testimony refer to record references beginning with "25-20481.[page #]" and are cited as "ROA.[page #]:[line #]."

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Pearl's breach-of-contract, monetary-damages, and attorney's-fees claim is barred by the Eleventh Amendment.

2. The trial court abused its discretion in finding GLO waived immunity to liability because the trial court applied an improper legal standard and failed to engage in an analysis of whether immunity was raised in a pragmatically sufficient time and whether Pearl was prejudiced or unfairly surprised.

3. The trial court erred in finding in favor of Pearl on the competing trespass-to-try-title claims and against GLO on its request for declaratory relief because (i) legally insufficient evidence supports Pearl was engaged in continuous drilling operations on the date of the State Leases' retained-acreage provision, and (ii) the Commissioner had the contractual right to designate terminated acreage after the State Leases partially terminated due to lack of continuous drilling operations.

4. The trial court erred in awarding Pearl damages in excess of $43 million because GLO was not the proximate or producing cause of Pearl's damages, and the damages are based on legally insufficient, speculative evidence.

## STATEMENT OF CASE

### I. Relinquishment Act leases.

GLO and Pearl's dispute arises from the State Leases, covering 955.22 acres of Relinquishment Act Lands in Sections 20 and 22, Block 8, H&GN RY Survey,

Pecos County, Texas. ROA.24482;20985-21279. The Relinquishment Act, Tex. Nat. Res. Code sec. 52.171 et seq., governs the State Leases, as do the State Leases' express provisions. The State Leases allow lessees to profit from oil and gas production and the State allocates resulting royalty payments and other revenues received to the Texas Permanent School Fund. ROA.37726:15-37727:1; Tex. Nat. Res. Code. § 52.171. GLO administers the State Leases. ROA.24484. All State Leases are identical except for their primary terms. ROA.24484.

**II. The State Leases.**

Each of the State Leases, identified in Mineral File #113155 with alphabetic letters ascribed to each lease, sets forth a primary term within which the lessee may explore for and produce oil and gas. ROA.24485;37757:15-37758:7;37845:16-23. Subject to other provisions, the primary term in 21 State Leases is five years, and the primary term in the remaining 6 State Leases is one year. ROA.20985-21215;21216-21279. The secondary term of each State Lease follows the conclusion of the primary term "as long thereafter as oil and gas, or either of them, is produced in paying quantities from said land." ROA.20985;21216. The primary term may be extended before the secondary term commences under other lease provisions. ROA.20988 (section 14).

Section 16 of each State Lease is a retained-acreage provision, which requires the lessee to exercise diligence as a reasonably prudent operator to drill additional

wells to develop the leasehold. ROA.20988. Under Section 16, the State Leases automatically terminate on the date two years after the end of the primary term except as to limited, described acreage surrounding an oil or gas well capable of producing in paying quantities or upon which there are continuous drilling operations, and only to the depth to which the lessee has to that point drilled (plus 100'). ROA.20989. In addition, under Section 16, after the expiration of two years following the primary term, and upon a bonus payment to the surface owners and the State, the lessee is permitted to retain deep rights (rights below the previously-drilled depth plus 100') for another two years, but only as to depths below the surface acres surrounding those same wells capable of producing in paying quantities or upon which there are continuous drilling operations; all other surface acres and depths below them are terminated on the date two years after the primary term's expiration. ROA.20989. If the State Leases partially terminate under these circumstances, the lessee must execute and record a partial release of the terminated acreage within 30 days. ROA.20989. If the lessee refuses to do so within 30 days of any request, after 90 days the Commissioner in the Commissioner's sole discretion may designate the retained acreage and record the designation in the county where the lease is located. ROA.20989.

## III. Pearl's acquisition of the State Leases.

Pearl is the current lessee under the State Leases. Dr. Dria owns Pearl.[1] ROA.37779:14-17. When Pearl acquired the State Leases, Dr. Dria knew nothing about operating under a Relinquishment Act lease and had no experience fracking or drilling a horizontal well since 2002. ROA.38040:17-24;38339:17-38343:1;38358:22-24.

Pearl knew when it acquired the State Leases the leasehold presented challenges because it was landlocked, traversed by an irrigation ditch, blocked from access by a river, comprised of two noncontiguous parcels, and without road-access. ROA.38337:5-17;38347:2-4. Pearl also did not know the identities of all the surface owners –the persons with the legal right to negotiate the State Leases pursuant to the Relinquishment Act – and did not walk the leasehold to ascertain whether there were any other impediments to development. ROA.38338:15-17;38339:8-16.

When an operator does not have a multi-well drilling program it takes time to obtain a drilling rig. ROA.38382:11-16. Pearl had no such program and did not have resources available to it. ROA.37321:6-24. The cost of a rig per day in 2017 was $13,500. ROA.37953:12-16. It could take between 60 to 90 days to drill a horizontal well, ROA.38197:22-38198:6, or $810,000 to $1,215,000. Pearl only had $250,000

[1] Pearl Resources Operating Co., LLC, owned by Pearl Resources, LLC, acquired a 1% interest in the State Leases effective January 1, 2016. ROA.20958.

in its bank account. ROA.37819:24-37820:9.

## IV. Absence of adequate drilling and reworking operations on the leasehold.

Pearl began to drill five wells on the leasehold: Garnet State #4 ("GS#4"), Garnet State #3 ("GS#3"), Garnet State #2021HA ("GS#2021HA"), Garnet State #2022HA ("GS#2022HA"), and Garnet State #2211HD ("GS#2211HD"). ROA.24485-86. GS#2021HA, GS#2022HA, and GS#2211HD were only spud to a depth of approximately 2000 feet and were neither deep enough nor adequately completed to be capable of producing in paying quantities from the targeted Wolfcamp Formation at approximately 10,000 feet. ROA.34991;35029;35055;37605:1-3;37942:19-23. GS#4 was plugged and abandoned, and only GS#3 produced in any quantities to hold the State Leases after their primary terms concluded and entered their secondary terms – until the date of their partial termination two years after the end of the primary term. ROA.24485. Pearl did not attempt to drill any other wells on the State Leases, and other than GS#3, no other wells ever produced oil and gas. ROA.37319:9-11;37879:12-14;38356:5-7.

Pursuant to Section 16, Pearl's drilling operations vis-à-vis GS#2022HA, GS#2021HA, and GS#2211HD are at issue. Dr. Dria took the position Pearl was "incredibly so" "diligent" in developing the State Leases. ROA.37979:4-7. As to those three wells, however, Pearl only undertook the following preparation and

sporadic maintenance activities:

| DATE | 2021HA | 2022HA | 2211HD |
|---|---|---|---|
| 5/31/2018 | Horizontal well permitted-ROA.34979-80;34983-84;37874:7-37877:18 | | |
| 6/1/2018 | | Horizontal well permitted-ROA.35017-19;37872:17-21 | |
| 6/8/2018 | | | Horizontal well permitted-ROA.35059-60;37878:2-37879:7 |
| 7/21/2018 | | | Spudded well-ROA.35062;35055;37893:14-19;32755;32778;32788;32799-32805;32807-14;32884;32911;32907;32913-16 |
| 7/27/2018 | Spudded well-ROA.34990-91;32877;32889;32893-96;32899;32902;32904;32910 | | Completed spudding-ROA.35055 |
| 7/27/2018-8/8/2018 | Hauled water and waste-ROA.24791-24871;24831-94 | | |
| 8/4/2018 | Completed spudding-ROA.34990- | | |

| DATE | 2021HA | 2022HA | 2211HD |
|---|---|---|---|
| | 91;37893:22-24 | | |
| 8/31/2018 | Removed empty waste bins and rails and returned rented generator-ROA.24829-30;24899;32716 | | |
| **9/1/2018** | **Two years after primary term-Lease DD** | | |
| 9/4/2018 | Frac pit in disrepair; no functioning water pump; quoting cost for another water well-ROA.32989-33002;33005-07 | | Frac pit in disrepair-ROA.32989-33002;33005;33009 |
| **9/7/2018** | **Two years after primary term-Leases A,D,E,F,G,K,L,M,T,U** | | |
| 9/8/2018 | Frac pit repaired-ROA.33015 | | |
| **9/13/2018** | **Two years after primary term-Leases P,Q,R** | | |
| 9/14/2018 | Commenced filling frac pit-ROA.33012 | | Frac pit in disrepair-ROA.33009 |
| 9/17/2018 | | No drill pad-ROA.30013 | |
| 9/19/2018 | Acquired generator due to malfunctioning rentals to fill frac pit-ROA.33020;33238 | | |
| 9/24/2018 | Continued need for another well-ROA.33021 | No drill pad-ROA.33020 | Frac pit in disrepair-ROA.33020 |

| DATE | 2021HA | 2022HA | 2211HD |
|---|---|---|---|
| 9/27/2018 | | | Lined frac pit-ROA.24898 |
| 10/2-16/2018 | Built reserve pit; prepared subgrade-ROA.33282;33037 | | |
| Early 10/2018 | | Commenced construction of reserve pit-ROA.33037 | |
| 10/2/2018 | | | Frac pit repair completed; flowline damaged-ROA.33023-33032 |
| 10/3/2018 | | | Flowline repaired; water on site insufficient-ROA.33035-37 |
| **10/4/2018** | **Two years after primary term-Leases C,X,Y** | | |
| **10/5/2018** | **Two years after primary term-Lease W** | | |
| **10/6/2018** | **Two years after primary term-Lease V** | | |
| 10/7/2018 | Reserve pit not usable due to missing liner-ROA.33037 | Reserve pit not usable due to missing liner; location not prepared for well pad-ROA.33051 | |
| **10/8/2018** | **Two years after primary term-Lease J** | | |
| 10/11-13/2018 | Lined reserve pit-ROA.33243 | | |
| 10/12/2018 | | | Installed control panel-ROA.33288 |
| 10/12-24/2018 | | | Acquired |

| **DATE** | **2021HA** | **2022HA** | **2211HD** |
|---|---|---|---|
| | | | caliche; prepared subgrade for new battery-ROA.24903;33211 |
| 10/12-17/2018 | Prepared subgrade and pad-ROA.33284 | | |
| 10/14-16/2018 | | Lined reserve pit-ROA.33242 | |
| Week of 10/14/2018 | Reserve pit finished and lined-ROA.33050 | Pad constructed-ROA.33051 | |
| 10/22/2018 | | | Diagnosed pump-ROA.33288 |
| 10/27-28/2018 | Commenced drilling for water well-ROA.33595 | | |
| 10/29/2018 | Battery insufficient and expansion work not complete; five steel and fiberglass tanks, associated separation equipment, and LACT unit lacking-ROA.33058-59 | Battery insufficient and expansion work not complete; five steel and fiberglass tanks, associated separation equipment, and LACT unit lacking-ROA.33058-59 | Another battery with new pad and flowlines deemed necessary but work not complete-ROA.33058 |
| 10/30/2018 | | | No sustainable power source for water pump-ROA.33064 |
| 10/31/2018 | Unable to pump water due to | Unable to pump water due to | Unable to pump water due to |

| DATE | 2021HA | 2022HA | 2211HD |
|---|---|---|---|
| | generator issues and drilling not complete on water well-ROA.33174 | generator issues-ROA.33174 | generator issues-ROA.33174 |
| 11/5/2018 | | | Pulled water out of reserve pit to maintain lease road-ROA.33290-91 |
| **11/8/2018** | **Two years after primary term-Lease S** | | |
| 11/11/2018 | Insufficient power to pump water; need to partition and line previously constructed frac pit; installation of additional generator due to failure of other-ROA.33213 | Insufficient power to pump water; need to perform maintenance to frac pit-ROA.33213 | Drained reserve pit to correct bad construction-ROA.33213 |
| 11/12/2018 | | | Hydrovaced drill cuttings due to improper reserve pit installation in 2016-ROA.33285 |
| 11/14/2018 | Completed water well-ROA.33285, 33292 | | |
| 11/16/2018 | Completed pump installation and wellhead on water well-ROA.33289 | | |
| 11/26/2018 | Unable to pump | Unable to pump | Added water to |

| DATE | 2021HA | 2022HA | 2211HD |
|---|---|---|---|
| | water due to generators and fuel supply-ROA.33285 | water due to generators and fuel supply-ROA.33285 | frac pit-ROA.33286 |
| 11/28/2018 | | Spudded well-ROA.33298-33311;33313-15;33320;35020;37873:22-37874:6;37893:25-37894:25 | |
| 12/17/2018 | Acquired three generators due to high failure rate of rental generators-ROA.33322 | | |
| 12/21/2018 | | Completed spudding-ROA.35029;37893:25-37894:25 | |
| 12/30/2018 | No water to frac and more maintenance to frac pits-ROA.33322 | | |
| Late 12/2018-early 1/2019 | Brine water tank empty-ROA.33322 | Brine water tank empty-ROA.33322 | Brine water tank empty-ROA.33322 |
| 1/2019 | Insufficient water for drilling and completion; need for additional pits for water; maintenance of existing frac pits- | Insufficient water for drilling and completion; need for additional pits for water; maintenance of existing frac pits- | |

| DATE | 2021HA | 2022HA | 2211HD |
|---|---|---|---|
| | ROA.33999-33401;33416-18 | ROA.33999-33401;33416-18 | |
| 1/8-2/6/2019 | Construct mega frac pit-ROA.24907-19;33502-15;33451-69 | Construct mega frac pit-ROA.24907-19;33502-15;33451-69 | |
| 1/24-3/14/2019 | Repair generator for pumps used to pump water for drilling and completion-ROA.33516-18 | | |
| 2/2019 | Engaged drilling manager to develop Approval for Expenditure ("AFE")-ROA.37948:9-37949:14;37954:10-15;37961:23-24 | | |
| 2/4/2019 | Additional pits not complete or lined-ROA.33435 | Additional pits not complete or lined-ROA.33435 | |
| 2/21-3/1/2019 | Continued construction of mega frac pit-ROA.33501 | | |
| 3/4/2019 | Additional pits not complete and no bids for liner-ROA.33471 | Additional pits not complete and no bids for liner-ROA.33471 | |
| 3/20/2019 | Pits lacking liner-ROA.33475-77 | Pits lacking liner-ROA.33475-77 | |
| 4/11/2019 | Obtained quote for power due to insufficient power-ROA.33534-38 | | |
| 5/2019 | AFE developed-37948:9-37949:8;37956:10-15;37961:23-24 | | |
| 5/2019 | Obtained bid for drilling rig-ROA.37887:25-37888:4 | | |
| 5/15/2019-6/4/2019 | Power installed on section 20-ROA.33540;335 | | |

| DATE | 2021HA | 2022HA | 2211HD |
|---|---|---|---|
| | 42;33547 | | |
| 7/26/2019 | Two years after primary term-Lease OO | | |
| 8/16/2019 | Two years after primary term-PP,RR | | |
| 8/17/2019 | Two years after primary term-Lease QQ | | |
| 8/25/2019 | Two years after primary term-Lease SS | | |
| 9/9/2019 | Two years after primary term-Lease TT | | |

## V. GLO's request for release after partial termination.

On October 16, 2019, after considering the known facts regarding Pearl's lack of drilling operations toward drilling a well capable of producing from the target formation, GLO requested Pearl to provide partial releases of the terminated acreage, and the depths under that acreage, pursuant to Section 16. ROA.24486;22107. GLO stated if partial releases were not provided within the allotted time, the referenced acreage and depths would be recorded as terminated. ROA.22107.

Pearl disputed GLO's position the State Leases partially terminated. ROA.37642:24-37643:8;37668:2-37669:8. Pearl's attorney sent information and materials to GLO purporting to show none of the State Leases had partially terminated. ROA.24649-67. GLO reviewed the information Pearl provided but was unpersuaded, so on December 20, 2019, pursuant to Section 16 GLO informed Pearl all acreage under the State Leases had terminated except for 320 acres surrounding GS#3. ROA.22110-11;37670:21-25. GLO again requested Pearl to provide partial releases for the terminated acreage and depths. ROA.22110-11. After Pearl refused, on February 3, 2020, the Commissioner – within the Commissioner's sole discretion

and pursuant to the Commissioner's express right under Section 16 – executed the Designation of Terminated Acreage and Depths ("DTAD") and filed it of record February 11, 2020, in Pecos County. ROA.24728-34.

## VI. Procedural history.

On March 3, 2020, Pearl sought Chapter 11 bankruptcy protection and subsequently scheduled six of the State Leases as property of Pearl's bankruptcy estate. ROA.197;1352-53.

On May 28, 2020, the Commissioner on behalf of the State filed a Complaint seeking a declaration the State Leases scheduled by Pearl partially terminated by operation of law before Pearl filed its bankruptcy petition and were not part of Pearl's bankruptcy estate. ROA.193-98. Pearl filed counterclaims, asserting the State Leases remained in effect, seeking to quiet title, alleging trespass-to-try-title, and requesting a declaration the DTAD was invalid. ROA.229-76. Over GLO's protest, the trial court permitted Pearl to add a breach-of-contract claim for which Pearl sought monetary damages and attorney's fees. ROA.919-36. In answer, GLO asserted offset of the damages-claim for Pearl's breach of the State Leases. ROA.1533-39.

The case proceeded to a bench trial over six days commencing April 29, 2024, and ending September 17, 2024. ROA.36783. Following trial, the trial court found none of the State Leases partially terminated and were part of Pearl's bankruptcy estate; granted judgment in favor of Pearl on the trespass-to-try-title, quiet-title, and

breach-of-contract claims; granted GLO offset; found Pearl incurred damages of $43,155,644: $16,293,915 for increased drilling costs, $21,152,000 from decreased well-value, $2,206,000 for increased facility costs, and $3,504,133 for infrastructure repair, offset by GLO's damages of $2,578,633, for a total of $40,577,031; and concluded sovereign immunity barred Pearl's recovery of $40,577,031. ROA.36783-84;36806;36809-11. The trial court subsequently entered its judgment. ROA.36813-16.

On Pearl's request to alter or amend the judgment, ROA.36817-24, the trial court found GLO waived immunity to liability by failing to plead it and awarded Pearl $40,577,031. ROA.36955-57. The trial court entered its amended judgment June 27, 2025. ROA.36966-68. GLO timely appealed to the district court. ROA.5-11. Pearl filed a notice of cross-appeal and then requested certification of a direct appeal to this Court, which the trial court granted, ROA.68-70;37046-37176, and this Court allowed.

## SUMMARY OF ARGUMENT

The Eleventh Amendment and sovereign immunity to suit bar Pearl's breach-of-contract, monetary-damages, and attorney's-fees claim against GLO. GLO did not waive immunity to suit because it never affirmatively sought monetary damages from Pearl – GLO only alleged offset after the trial court erroneously permitted Pearl to pursue a money-damages claim against GLO. Pearl's claim cannot sound in recoupment because GLO never affirmatively sought money damages from Pearl.

Notwithstanding GLO did not waive immunity to suit, the trial court erred in finding GLO waived immunity to liability. The trial court found GLO waived immunity to liability when GLO failed to plead it; however, failure to plead is not the legal standard for determining waiver of an affirmative defense. GLO raised immunity at a pragmatically sufficient time, given immunity is a legal issue and Pearl did not demonstrate prejudice or unfair surprise. The trial court evaluated neither the pragmatic sufficiency of when GLO raised immunity nor whether Pearl was unfairly surprised or prejudiced, and therefore, the trial court abused its discretion in finding waiver.

As for GLO's request for declaratory relief and trespass-to-try-title claim, the undisputed evidence established Pearl's minimal site preparation and maintenance activities did not legally constitute continuous drilling operations as required by Section 16 to hold acreage surrounding GS#2021HA, GS#2022HA, or GS#2211HD,

and the State Leases terminated as to that acreage. Section 16(C) – pursuant to Pearl's express grant when it executed the State Leases – allowed the Commissioner within the Commissioner's sole discretion to execute and file the DTAD. Section 16(C) and the Commissioner's DTAD was "binding upon Lessee for all purposes." Because the State Leases automatically terminated prior to Pearl seeking bankruptcy protection, ownership reverted to the State, and the State Leases never became a part of Pearl's bankruptcy estate.

Finally, even had GLO waived immunity, there is no legally sufficient evidence to support a damages award in Pearl's favor in excess of $43 million. No evidence of damages exists because Pearl only presented speculative conjecture developed by a self-interested witness – Dr. Dria. Her testimony fails to take into account Pearl could not afford to develop the leasehold, which impediment was the cause of the State Leases' partial termination and Pearl's purported "damages." Further, Dr. Dria never evaluated risk to formulate her speculative damages opinions.

## ARGUMENT

### I. Pearl's monetary-damages claim is barred by the Eleventh Amendment.

#### A. Standard of review.

Whether Eleventh Amendment immunity bars claims against a state, its agency, or its official is subject to *de novo* review. *Corn v. Miss. Dep's Pub. Safety*, 954 F.3d 268, 273 (5th Cir. 2020). The test to determine if immunity has been waived

is a stringent one, *see College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999), and the scope of any waiver is strictly construed in favor of the sovereign, *Sossamon v. Texas*, 563 U.S. 277, 285 (2011). Waiver cannot be implied, *College Sav. Bank*, 527 U.S. at 682, as "eleventh amendment rights of a state are sufficiently jurisdictional to be asserted for the first time on appeal," *Dagnall v. Gegenheimer*, 645 F.2d 2, 3 (5th Cir. 1981), in particular "because of the strong federalism concerns behind the amendment." *Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553, 555 (5th Cir. 1988). A party bringing an affirmative claim bears the burden of demonstrating the trial court's jurisdiction, including establishing waiver of immunity when a party raises lack of jurisdiction. *Kaswatuka v. United States Dep't of Homeland Sec'y*, 7 F.4th 327, 329 (5th Cir. 2021).

### B. Eleventh Amendment immunity.

The Eleventh Amendment immunizes a state from suit by its own citizens. U.S. Const. amend. XI; *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). "Eleventh Amendment immunity operates like a jurisdictional bar, depriving federal courts of the power to adjudicate suits against a state." *Union Pac. R. Co. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011). Sovereign immunity enforces constitutional limitations on the power of federal courts over states. *Sossamon*, 563 U.S. at 284. "A state's waiver of sovereign immunity in state court does not mean the state has waived Eleventh Amendment immunity in federal court." *Perez v.*

*Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 332 (5th Cir. 2002).

A state, however, may waive immunity by conduct. *See Sossamon*, 563 U.S. at 284. Where affirmative relief is sought, waiver of immunity occurs as to a defendant's claims that assert recoupment and arise from the same transaction or occurrence of the government's suit, to the extent it defeats the government's claim – but not to the extent of a judgment involving relief different in kind or nature or in excess of the government's claim – and immunity is not waived as to claims different in form or nature than that sought by the government, or claims exceeding an amount of that sought by the government. *See Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967); *Texas v. Caremark, Inc.*,584 F.3d 655, 659 n.1 (5th Cir. 2009) (applying *Frederick* to states).

Any waiver is limited "to compulsory counterclaims . . . ; that is, those 'arising out of the same transaction or occurrence which is the subject matter of the government's suit.'" *Caremark, Inc.*, 584 F.3d at 659 (quoting *Frederick,* 386 F.2d at 488); *see also Ga. Dep't of Human Res. v. Bell*, 528 F. Supp. 17, 26 (N.D. Ga. 1981) (limiting counterclaim asserted defensively to recoupment for purpose of defeating/diminishing state's recovery but not for obtaining affirmative judgment against state). Immunity is not waived for "permissive counter-claims, 'which do not meet the "same transaction or occurrence test" nor to [counter-claims] of a different form or nature than that sought by it as plaintiff nor to [counter-claims] exceeding

an amount that sought by it as plaintiff.'" *Caremark, Inc.*, 584 F.3d at 659 (quoting *Frederick*, 386 F.2d at 488). "[A] waiver of sovereign immunity to other types of relief does not waive immunity to damages: [T]he waiver of sovereign immunity must extend unambiguously to such monetary claims." *Sossamon*, 563 U.S. at 285 (internal quotation marks and citation omitted). When a state agency affirmatively brings a claim for declaratory relief in federal court, it does not waive immunity to suit as to any counterclaims for relief other than recoupment or offset. *See Woelffer v. Happy States of Am., Inc.*, 626 F. Supp. 499, 503 (N.D. Ill. 1985) (holding state agency claim for declaratory relief did not waive immunity for injunctive-relief claim).

Eleventh Amendment immunity in federal court extends to private suits against state agencies and state officials sued in their official capacity. *Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 256 (5th Cir. 2020); *Tawakkol v. Vasquez*, 87 F.4th 715, 718 (5th Cir. 2023). It is uncontested GLO is an arm of the state entitled to immunity protection under the Eleventh Amendment. *See* Tex. Const. art. XIV, § 1; ROA.36785.

### C. The Eleventh Amendment bars Pearl's claims for damages.

GLO has consistently maintained sovereign immunity pertaining to any suit not germane to its request for declaratory relief. ROA.4663;35158. The trial court acknowledged GLO was entitled to sovereign immunity, and Pearl acknowledged it

"kind of knew it was coming" because "[i]t always gets brought up." ROA.20893;37422:19-21.

GLO's Complaint sought declaratory relief. ROA.197-98. GLO subsequently amended its pleading to include a trespass-to-try-title claim and to assert breach-of-contract defensively as an offset. ROA.1537-39. The only issues GLO proceeded to trial on were the request for declaratory relief, the trespass-to-try-title claim, and the affirmative offset-defense.

GLO's request for declaratory relief and trespass-to-try-title claim did not seek monetary damages so Pearl was not permitted to assert a counterclaim for breach-of-contract to recover damages against GLO. *Caremark, Inc.*, 584 F.3d at 659. But even if GLO had sought money damages, Pearl was only able to assert a breach-of-contract claim in recoupment, and only up to any amount GLO may have recovered from Pearl. *Id.* Pearl at no time was permitted to recover damages in excess of what GLO may have sought from Pearl. *Id.*

The evidence establishes GLO never sought money damages. Indeed, Pearl conceded as much:

> The GLO's initial suit was not seeking any financial recovery. Rather, it was seeking declaratory relief. The GLO thereafter sought a breach of contract "only for the purposes of setoff." . . . . In other words, the GLO was not seeking affirmative monetary relief and did not initiate a breach of contract suit against Pearl . . . . The GLO let that ship sail multiple times, not the least of which is when the GLO made it clear that breach of contract was not intended to lead to an affirmative recovery.

ROA.36849. GLO's waiver of immunity only extended to the request for declaratory relief and trespass-to-try-title claim. Because GLO did not waive immunity for breach-of-contract, the trial court erred in awarding Pearl damages. This Court should reverse the trial court's amended judgment awarding Pearl damages and should render a take-nothing judgment against Pearl on the breach-of-contract claim.

**D. Section 106 does not abrogate GLO's immunity.**

Section 106, Title 11 of the United States Code, abrogates sovereign immunity of a governmental unit to the extent certain provisions of the Bankruptcy Code are implicated or the governmental unit files a proof of claim. *See* 11 U.S.C. § 106(a)-(b). Section 106's waiver is limited and does not create any substantive claim beyond those existing under the Bankruptcy Code, federal bankruptcy rules, or nonbankruptcy law. *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 254 (5th Cir. 2006). This limitation reflects Congress's intent to create "a level playing field between sovereign entities and other participants in bankruptcy court by abrogating sovereign immunity." *Id.* at 253-54. Pearl conceded GLO did not file a proof of claim, ROA.1353, and none of the other provisions referenced in section 106(a) apply to this case.

## II. The trial court abused its discretion in finding waiver of immunity to liability.

### A. Standard of review.

A district court's ruling a party waived a defense is reviewed for abuse of discretion. *Motion Med. Tech., LLC v. Thermotek, Inc.*, 875 F.3d 765, 771 (5th Cir. 2017). A district court abuses its discretion "when it makes an error of law or applies an incorrect legal standard." *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011).

### B. Legal standard for determining waiver.

While state substantive law determines which affirmative defenses must be pleaded, *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir.1986), federal procedural rules "provide the manner and time in which defenses are raised and when waiver occurs." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 610 (5th Cir. 2007) (internal quotation marks and citation omitted).

Federal Rule of Civil Procedure 8 applies in adversary proceedings. *See* Fed. R. Bankr. P. 7008. Although Rule 8 states a party must plead affirmative defenses, *see* Fed. R. Civ. P. 8(c), when a defense is raised in the trial court so as to not cause unfair surprise, any technical failure to comply with the rule is not fatal to asserting the defense. *See Arismendez*, 493 F.3d at 610. Put another way, "a defendant does not waive an affirmative defense if it is raised at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond." *Id.* (internal quotation

marks and citation omitted). It is within the trial court's discretion "to determine whether the party against whom the unpleaded affirmative defense has been raised has suffered prejudice or unfair surprise." *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 633 (5th Cir. 2013). A trial court must undertake a fact-specific analysis. *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999). "[T]he prejudice inquiry considers whether the plaintiff had sufficient notice to prepare for and contest the defense." *Lee v. United States*, 765 F.3d 521, 525 (5th Cir. 2014) (internal quotation marks and citation omitted).

Even if a party does not assert immunity for more than 52 months, the defense remains viable. *See Pasco v. Knoblauch*, 566 F.3d 572, 577-78 (5th Cir. 2009). The Court must analyze whether the plaintiff was prejudiced and cannot merely presume prejudice because of the duration of time that has passed. *Id.* at 577. The Court must evaluate the overall context of the litigation, and if there is no evidence of prejudice and the plaintiff has sufficient time to respond, a finding of no waiver is appropriate. *Id.*

*Lucas v. United States* examined whether the government waived a statutory-damages-cap defense. 807 F.2d at 417. The government did not raise the defense until trial, and the plaintiff argued the government was required to do so. *Id.* This Court found the government did not affirmatively plead the defense, but it raised it at a pragmatically sufficient time, the plaintiffs were not prejudiced in their ability

to respond because it was raised following the relevant damages testimony, and the issue was "purely a legal issue which can be resolved without the need for factual proof." *Id.* at 418. This Court has recognized an exception to waiver when pure questions of law are implicated. *See Ekhlassi v. Nat'l Lloyds Ins. Co.*, 926 F.3d 130, 138 (5th Cir. 2019). Whether a state agency or official enjoys immunity is a question of law. *See Union Pac. R. Co.*, 662 F.3d at 339.

### C. The trial court failed to apply the proper legal standard and abused its discretion in finding GLO waived immunity to liability.

The trial court applied the wrong legal standard in conducting its waiver analysis for whether GLO waived immunity to liability. The trial court's analysis was based only on "whether the GLO expressly pled sovereign immunity as an affirmative defense."[2] ROA.36957. Rather than undertake the requisite two-prong analysis, *see Arismendez*, 493 F.3d at 610, the trial court simply looked to the pleading and found immunity was not pleaded. ROA.36957. The trial court did not engage in a determination of whether immunity was raised at a pragmatically sufficient time or whether Pearl suffered unfair surprise or prejudice. ROA.36951-65. Because the trial court applied an incorrect legal standard, it abused its discretion.

Moreover, even if the trial court had applied the correct standard, Pearl did

[2] As a practical matter, Pearl did not assert waiver for failure to plead as a defense until after the trial court entered its judgment. ROA.36819.

not and cannot satisfy the standard. GLO raised its capacity as a sovereign prior to and during the trial. ROA.4463;35158;37398:19-37400:5. At trial, Pearl conceded it "kind of knew it was coming" because "[i]t always gets brought up." ROA.37422:19-21. Raising the issue both prior to and during trial was at a "sufficiently pragmatic time." *Arismendez*, 493 F.3d at 610; *Knoblauch*, 566 F.3d at 577–78; *Lucas*, 807 F.2d at 418. This is particularly true given the purely legal nature of the issue. *See Lucas*, 807 F.2d at 418; *Ekhlassi*, 926 F.3d at 138.

And at trial, although Pearl argued GLO waived immunity when it filed suit, ROA.37423:2-23 – an incorrect statement of the law, *see* Argument Part I – at no time did Pearl raise or make a showing of unfair surprise or prejudice. In post-trial briefing, Pearl merely argued (incorrectly) the State has blanketly waived liability for breach of contract claims, but made no showing of unfair surprise or prejudice. *See* ROA.36817-24;36843-49.

This Court may reverse and render in GLO's favor on the issue of immunity to liability, *see Roberts v. City of Shreveport*, 397 F.3d 287, 289 (5th Cir. 2005) (reversing and rendering based on application of quasi-immunity), because the Texas Legislature has not waived immunity to liability for oil and gas leases in which no services are provided to GLO. *See* Tex. Civ. Prac. & Rem. Code §§ 114.001(2) & 114.003.

## III. The State Leases did not become part of Pearl's bankruptcy estate.

### A. Section 16 is an unambiguous special limitation, automatically terminating the State Leases for acreage and depths where there was no continuous drilling operations on a well two years after the expiration of the primary term.

#### 1. Standard of review.

A contract's interpretation and whether it is ambiguous are legal questions subject to *de novo* review. *Franklin v. Regions Bank*, 125 F.4th 613, 622 (5th Cir. 2025).

#### 2. Oil and gas lease construction.

"An oil and gas lease is a contract, so its construction is governed by general principles that govern[ing] . . . construction of contracts." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 147-48 (Tex. 2020) (internal quotation marks and citation omitted). The Court must look to the lease's plain, grammatical language to ascertain what an ordinary person using the same language in the same circumstances would understand them to mean. *See id.* at 148. The lease must be interpreted in light of the business activity to be served to avoid unreasonable constructions when possible. *See id.*

Oil and gas leases are subject to special rules of construction. *Id.* A special limitation in an oil-and-gas lease is a term that "provides that the lease will automatically terminate upon the happening of a stipulated event." *Cromwell v.*

*Anadarko E&P Onshore, LLC*, 716 S.W.3d 515, 524 (Tex. 2025) (internal quotation marks and citation omitted). "[C]ontractual language will not be held to automatically terminate the leasehold estate unless that language . . . is so clear, precise, and unequivocal" and "can be given no other reasonable construction than one which works such result." *Energen Res. Corp.*, 615 S.W.3d at 148-49 (internal quotation marks and citation omitted). "[O]il and gas leases shall be strictly construed in favor of the lessor." *Stephenson v. Calliham*, 289 S.W. 158, 159 (Tex. App.—San Antonio 1926, no writ).

#### 3. Under Section 16, the State Leases automatically terminated as to acreage upon which no continuous drilling operations were occurring two years after the expiration of the primary term.

Section 16 is a retained-acreage provision. A retained-acreage provision states after a specified event the lease will terminate as to the mineral-lease estate except for certain described acreage, often working in tandem with ongoing-production or good-faith, continuous development provisions. *See Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 597-98 (Tex. 2018). The Texas Supreme Court has emphasized a retained-acreage provision captures "at a particular moment in time" the amount of acreage a lessee may retain upon the provision's triggering event. *Id.* at 600. A retained-acreage provision may be either a "snapshot" in time or a "rolling" provision. *PPC Acquisition Co. LLC v. De. Basin Res., LLC*, 619 S.W.3d

338, 352 (Tex. App.—El Paso 2021, no pet.). A snapshot date is the point in time when production in paying quantities or continuous drilling operations are evaluated to determine which acreage is retained and which is automatically released. *See id.* A snapshot provision like the one in the State Leases is triggered only once, typically at the end of the primary term or when continuous operations cease, resulting in the release of unretained acreage at that date. *Id.* In the State Leases, the snapshot date was two years after the end of the primary term. In contrast, a "rolling" provision may be triggered multiple times during the life of a lease, requiring the lessee to continually release acreage based on a triggering event. *Id.* A retained-acreage provision is not considered rolling unless it contains "clear and unequivocal language" requiring the lessee to relinquish acreage on a rolling basis. *Id.*

Section 16 provides:

> (A) VERTICAL. <u>In the event this lease is in force and effect two (2) years after the expiration date of the primary or extended term it shall then terminate as to all of the leased premises</u>, EXCEPT (1) 40 acres surrounding each oil well capable of producing in paying quantities and 320 acres surrounding <u>each gas well capable of producing in paying quantities</u> (including a shut-in oil or gas well as provided in Paragraph 14 hereof), <u>or a well upon which Lessee is then engaged in continuous drilling or reworking operations</u> . . . .

ROA.20988-89 (emphasis added). This provision imposes a special limitation because in clear and unequivocal terms it provides for automatic termination of the State Leases at a date certain for acreage where there is no drilled well capable of production in paying quantities or upon which there are no continuous drilling

operations at a well. *See Cromwell*, 716 S.W.3d at 524.

The trial court found Section 16 was unambiguous but incorrectly concluded it created two snapshot dates – one at the conclusion of the secondary term and one two years after the expiration of the secondary term. ROA.36792-93. The trial court's construction of Section 16 is incorrect, as the trial court misapprehended the State Leases' habendum clause and the secondary term's duration.

The habendum clause defines the duration of a mineral estate, *Cromwell*, 716 S.W.3d at 522, and divides the lease's duration into two parts – a primary and secondary term. *Discovery Operating, Inc.*, 554 S.W.3d at 597. The primary term lasts for a fixed duration stated in the lease, and the secondary term continues the lease after the primary term expires "for as long thereafter as oil, gas or other mineral is produced." *Id.* (internal quotation marks and citation omitted). A typical lease that lasts "as long as oil or gas is produced" automatically terminates when production permanently ceases during the secondary term. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002).

The habendum clause in 21 of the State Leases provides a fixed five-year primary term and in the other 6 State Leases a fixed one-year primary term. ROA.20985;21226. In all 27 of the State Leases the secondary term is for "as long thereafter as oil and gas, or either of them, is produced in paying quantities from said land." ROA.20985;21226. The secondary term in the State Leases begins at the

conclusion of the primary term and continues indefinitely – subject to partial termination on the snapshot date – so long as oil and gas is produced in paying quantities. *Thompson*, 94 S.W.3d at 554.

The secondary term is not an "extended" term, nor does an "extended" term follow the secondary term. An extended term is an extension of the primary term and is additional time beyond the original primary term created through specific lease provisions. The secondary term continues production, while an extended primary term is an additional fixed period beyond the primary term created by special lease provisions before the lease would otherwise enter its secondary term or terminate. *See, e.g.*, *Cmty. Bank of Raymore v. Chesapeake Expl., L.L.C.*, 416 S.W.3d 750, 756-57 (Tex. App.—El Paso 2013, no pet.) (contractual provision extending primary term on compliance with lease option). For example, the State Leases' Section 14 is an extended term provision because the lessee may extend the primary term by paying a shut-in royalty. ROA.20988;21229.

Pearl has never asserted it extended the primary term of any State Lease under one of the State Leases' provision permitting extension. Therefore, the snapshot date under Section 16 is two years after the expiration of the primary term:

| **Lease** | **Expiration of Primary Term** | **Snapshot date: Two Years after Expiration of Primary Term** | |
|---|---|---|---|
| DD | 9/1/2016 | 9/1/2018 | ROA.21206-15 |
| A,D,E,F, G,K,L,M, T,U | 9/7/2016 | 9/7/2018 | ROA.20985-94;21009-18;21019-28;21029-38;21039-48;21059-68;21069-78;21079-88;21129-39;21140-49 |
| P,Q,R | 9/13/2016 | 9/13/2018 | ROA.21089-98;21099-21108;21109-18 |
| C,X,Y | 10/4/2016 | 10/4/2018 | ROA.20995-21008;21178-91;21192-21205 |
| W | 10/5/2016 | 10/5/2018 | ROA.21164-77 |
| V | 10/6/2016 | 10/6/2018 | ROA.21150-63 |
| J | 10/8/2016 | 10/8/2018 | ROA.21049-58 |
| S | 11/8/2016 | 11/8/2018 | ROA.21119-28 |
| OO | 7/26/2017 | 7/26/2019 | ROA.21216-25 |
| PP,RR | 8/16/2017 | 8/16/2019 | ROA.21226-36;21248-58 |
| QQ | 8/17/2017 | 8/17/2019 | ROA.21237-47 |
| SS | 8/25/2017 | 8/25/2019 | ROA.21259-69 |
| TT | 9/9/2017 | 9/9/2019 | ROA.21270-79 |

The trial court's construction of Section 16 to set a first snapshot date at the secondary term's conclusion and a second snapshot date two years after the secondary term's expiration is not plausible because the conclusion of the secondary term would mean the State Leases terminated due to no production in paying quantities. *See Thompson*, 94 S.W.3d at 554. With the State Leases terminating at the end of the secondary term, Pearl would own no interest in any of the leasehold because the State Leases would no longer be operative – there would be no reason to retain acreage in Pearl's favor because Pearl would no longer have any interest in

the leasehold. Section 16's language is plain – the snapshot date is two years after the expiration of the primary term. The trial court legally erred in construing Section 16 to create two snapshot dates.

### B. The trial court incorrectly found Pearl was engaged in continuous drilling operations.

#### 1. Standard of review.

Findings of fact made after a bench trial are reviewed for clear error and legal issues are reviewed *de novo*. *Providence Behavioral Health v. Grant Rd. Pub. Util. Dist.*, 902 F.3d 448, 455 (5th Cir. 2018); *see also* Fed. R. Civ. P. 52(a)(6). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *Id.* (internal quotation marks and citations omitted), or when "it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this [C]ourt is convinced that the findings are against the preponderance of credible testimony." *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 353 (5th Cir. 2015) (internal quotation marks and citation omitted). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Worldcall Interconnect, Inc. v. Fed. Commc'ns Comm'n*, 907 F.3d 810, 818 (5th Cir. 2018), *as revised* (Nov. 15, 2018) (internal quotation marks and citations omitted). When the trial court applies an improper legal standard in making factual findings,

factual findings are reviewed *de novo*. *Women's Elevated Sober Living L.L.C. v. City of Plano, Tex.*, 86 F.4th 1108, 1111 (5th Cir. 2023).

### 2. Why retained-acreage provisions require continuous drilling operations.

The Texas Legislature has passed certain acts "which specifically declare the public policy of this state with respect to the development and protection of oil and gas." *Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 940-41 (Tex. 1935).

> Texas has a strong public policy not to hinder the exploration and development of oil and gas. And Texas has long recognized the principle that parties are free to contract as they see fit as long as their agreement does not conflict with public policy. We recognize the important public policy favoring the exploration and development of oil and gas.

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 495 (Tex. 2019).

Retained-acreage provisions requiring continuous development arose out of the impediments a "habendum-only" lease posed to Texas's public policy favoring oil and gas exploration. During a lease's secondary term, if the smallest amount of production on a fraction of the leasehold occurs, the lease will continue as to the entire leasehold. *See Discovery Operating, Inc.*, 554 S.W.3d at 597. Allowing a lessee to hold a lease with marginal production conflicts with Texas public policy and a lessor's "desire that the operator fully develop the lease and produce as much as possible to maximize the lessors' royalties" because "the dominant purpose of a

lease is to discover and produce oil and gas . . . ." *Id.* (internal quotation marks and citation omitted). Texas public policy and the lessor's objective under a habendum-only lease conflict with the lessee's objective if the lessee opts not to develop the entire leasehold. *Id.* A retained-acreage provision balances the interests of the lessor and lessee in this regard. *Id.* By including a retained-acreage provision, a lessor encourages a lessee to fully develop the lesaehold by requiring the lessee to engage in reasonably diligent continuous development or risk losing the opportunity to produce the entire leasehold. *Id.* at 598.

**3. Continuous drilling or reworking operations require the lessee to engage in reasonably diligent efforts to develop the leasehold to produce oil and gas.**

The Texas Administrative Code defines a drilling operation as activities aimed at obtaining initial production from a well, starting with a drilling permit and preliminary work, and continuing diligently toward completion. 31 Tex. Admin. Code § 9.31(2). When determining what constitutes continuous drilling operations, the Court must "trim [its] sails as closely as possible to the rationale developed in authoritative Texas decisions." *Duke v. Sun Oil Co.*, 320 F.2d 853, 859-60 (5th Cir. 1963).

A lessee's obligation to develop "is measured by the rule of reasonable diligence or what an ordinarily prudent and diligent operator would do." *Clifton v. Koontz*, 325 S.W.2d 684, 695 (Tex. 1959). Operators make an implied covenant "to

develop a lease by drilling an initial well and reasonably develop after production has been obtained," "measured under the reasonably prudent operator standard." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 871 n.6 (Tex. 2018). Preparatory acts may suffice but only if done with good-faith intent and diligence to complete a well. *Petersen v. Robinson Oil & Gas Co.*, 356 S.W.2d 217, 220 (Tex. App.—Houston 1962, no writ).

Mere maintenance or minimal activity is insufficient. For example, routine pump maintenance does not constitute sufficient operations. *Hall v. McWilliams*, 404 S.W.2d 606, 609 (Tex. App.—Austin 1966, writ ref'd n.r.e.). Driving a stake, obtaining a permit, and attempting to pay surface damages during a 25-day cessation period is inadequate to sustain a lease. *Ridge Oil Co., Inc. v. Guinn Investments, Inc.*, 148 S.W.3d 143, 158-60 (Tex. 2004).

> [L]ong-stroking the existing oil well in November 1997; laying a pipeline to the gas wells (beginning in November 1997 and completing on January 20, 1998); doing electrical work on the lease; allowing the electricity to remain on; installing, checking, and repairing flow lines; replacing a tank; and allowing all of the equipment to remain on the wells

are insufficient "drilling operations" because preparatory activities must be performed with the intent to proceed diligently to the actual work of drilling and completion. *Bargsley v. Pryor Petroleum Corp.*, 196 S.W.3d 823, 826 (Tex. App.—Eastland 2006, pet. denied).

Flaring a well, negotiating a gas sales contract, cleaning the location, filling

slush pits, and construction of pits and firewall used in burning gas, negotiating a pipeline to connect a well to a gathering system, obtaining a right-of-way, and retaining an attorney to secure a permit also do not constitute either drilling or reworking operations. *Hickey v. Spangler*, 358 S.W.2d 216, 219 (Tex. App.—Texarkana 1962, writ ref'd n.r.e.). "Backroom preparations," like preparing an AFE, receiving topographic maps, staking locations, photographing well sites, obtaining a title-instrument list, holding meetings to discuss locations and how to build on them, obtaining cost estimates, preparing preliminary run-sheets, and having permits issue, are not sufficient, even if drilling commences after the deadline. *Valence Operating Co. v. Anadarko Petroleum Corp.*, 303 S.W.3d 435, 440-41 (Tex. App.—Texarkana 2010, no pet.).

Economic impracticality of engaging in drilling operations is no excuse, *Haby v. Stanolind Oil & Gas Co.*, 228 F.2d 298, 306 (5th Cir. 1955).

> It is presumed that a party will not assume an obligation which [it] is not able to perform. Whether such inability exists at the time of the execution of the contract or arises subsequently, unless there is a stipulation relieving the party under such circumstances from performance he is not excused.

*Masterson v. Amarillo Oil Co.*, 253 S.W. 908, 912 (Tex. App.—Amarillo 1923, writ dism'd w.o.j.).

The Texas Natural Resources Code mandates good faith in drilling operations. Tex. Nat. Res. Code § 52.023. Pearl as lessee had an obligation "to conduct

operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease." *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex. 1981). Diligence in prosecuting drilling

> does not mean the doing of assessment work. It does not mean the pursuit of capital to prosecute the work. It does not mean any attempted holding, by cabin, lumber pile or unused derrick. It means the diligent, continuous prosecution of the work, with the expenditure of whatever money may be necessary to the end in view.

*R.E. Taylor Syndicate v. James*, 243 S.W. 1105, 1108 (Tex. App.—Amarillo 1922, writ ref'd) (quotation marks and citation omitted).

#### 4. No evidence supports continuous drilling or reworking operations to hold any part of the leasehold other than 320 acres surrounding GS#3.

Although the trial court erroneously concluded Section 16 created two snapshot dates, it use the correct date to determine whether Pearl was engaged in continuous drilling operations – two years after the expiration of the primary term. ROA.36791-93; *see* Argument Part III(A)(3). That said, the trial court erred in concluding Pearl's activities constituted sufficient "drilling operations" at GS#2021HA, GS#2022HA, and GS#2211HD to hold the acreage around these wells.

**a. The evidence on which the trial court relied does not support continuous drilling operations at GS#2021HA, GS#2022HA, and GS#2211HD on the respective snapshot dates.**

As a preliminary matter, in support of finding Pearl was engaged in continuous drilling operations, the trial court relied on Dr. Dria's testimony from May 1, 2024, and May 2, 2024, and pages 2 to 9 of Pearl's Exhibit D-47. ROA.36796 nn.80-83. Pages 2 to 9, however, were not admitted into evidence; rather, those pages were only admitted as a demonstrative exhibit. ROA.37919:2-7. The trial court does not cite to any evidence underlying the demonstrative exhibit. ROA.36796 nn.80-83. To the extent the trial court's finding of continuous drilling operations was based on pages 2 to 9, Exhibit D-47, that reliance was error.

The trial court also cited to large swaths of Dr. Dria's trial testimony to conclude Pearl was undertaking continuous drilling operations by engaging in infrastructure development – dirt work, fencing, pumping water, purchasing diesel fuel for generators for pumping water, renting generators for pumping water, making repairs to a frac tank, and painting fences. ROA.36796 & nn.80-83. At trial, however, Dr. Dria did not specify when these activities occurred on the leasehold or in connection with which wells. Although Dr. Dria generally testified about these matters, ROA.37879:15-37881:1;37886:5-23;37889:15-37890:2;37900:2-11; 37897:5-18;37900:22-37901:3;37898:6-17;37898:16-37899:24;37906:14-37908:6; 37900:12-15;37909:11-37910:2;37919:14-37920:1;37926:2-25;37927:13-37928:1;

37921:8-37922:4;37923:12-16;37928:2-37930:8, she never specified any particular dates on which these activities actually occurred, or where, to permit the trial court to properly evaluate whether they constituted continuous drilling operations on the respective snapshot date for each well. As Dr. Dria did not specify the dates these activities occurred, it was not possible for the trial court to evaluate whether the activities constituted sufficient continuous drilling operations on each snapshot date based on her testimony alone, but Dr. Dria's testimony is the only other source of evidence cited by the trial court. Absent dates associated with the activities, the trial court had no evidentiary basis to conclude the activities were continuous drilling operations sufficient to hold the acreage on the snapshot dates.

**b. The trial court erred in failing to consider activities at each well on each snapshot date.**

The trial court also failed to consider the activities on the leasehold at each well on each snapshot date. Section 16 specifically requires an evaluation of continuous drilling operations upon "a well." ROA.20998. The trial court does not appear to have engaged in an analysis regarding drilling operations as to each well specifically. For instance, for Leases OO, PP, RR, QQ, SS, and TT, the trial court identifies activities in which Pearl was engaged but does not specify as to which wells. ROA.36796. It also is not clear if the trial court evaluated the activities at each well on each snapshot date. ROA.36796 (lumping together different snapshot dates); *see Discovery Operating, Inc.*, 554 S.W.3d at 600; *PPC Acquisition Co. LLC*, 619

S.W.3d at 352. Therefore, the trial court failed to undertake the proper analysis to determine if the State Leases partially terminated due to lack of continuous drilling operations at each well on the snapshot dates.

**c. The evidence admitted at trial is legally insufficient to support a finding of continuous drilling operations at each well on each snapshot date.**

The evidence of drilling operations presented at trial is legally insufficient to support Pearl was engaged in continuous drilling operations at each well on each snapshot date to avoid termination of the State Leases as to the acreage surrounding GS#2021HA, GS#2022HA, and GS#2211HD. The only activities Pearl engaged in were tantamount to maintenance or token efforts to hold the acreage. Pearl did not have the financial wherewithal to drill, ROA.37819:24-37820:9;37953:12-16;38197:22-38198:6, and Pearl did the bare minimum to give the appearance it was engaged in drilling operations when in reality it was merely undertaking backroom preparations, maintenance of pre-existing infrastructure, and correcting mistakes it had previously made. Except for GS#3, Pearl never had a drilling rig under contract capable of drilling to the target formation, which would be required to produce any oil and gas from any of the locations on which Pearl claims it was active. ROA.37336:4-10;38213:6-214:18. At best, Pearl's efforts were sporadic on-again-off-again maintenance and repairs and did not comport with Pearl's obligation as a

prudent operator to develop the leasehold. *See Clifton*, 325 S.W.2d at 695. The purported "drilling operations" at the wells, like the "operations" in *Hall*, 404 S.W.2d at 609; *Ridge Oil Co., Inc.*, 148 S.W.3d at 158-60; *Bargsley*, 196 S.W.3d at 826; *Hickey*, 358 S.W.2d at 219; *Valence Operating Co.*, 303 S.W.3d at 440-41, were no more than backroom preparations or sporadic maintenance, tangentially related to bringing a well into production. Contrary to the picture Pearl attempted to paint at trial, Pearl did not engage in continuous drilling operations.

Further, it is apparent from the nature of the activities occurring on the leasehold in connection with the wells, *see infra*, Pearl was not engaged in good-faith, reasonably diligent efforts to obtain production and did not comply with its duty as a prudent operator to drill a well to production. In 2017, an operator on a section adjacent to Pearl's section was able to survey, permit, spud, and complete a well between June 25, 2017, and November 15, 2017. ROA.38300:17-24. Similarly, a second operator also adjacent to Pearl's section was able to survey, permit, spud, and complete a horizontal well between September 19, 2018, through July 30, 2019. ROA.38300:5-13.

A careful analysis of the evidence presented at trial as to each well on each snapshot date demonstrates Pearl was not engaged in continuous drilling operations, and therefore, there was no breach or repudiation of the State Leases as a matter of law and the State Leases terminated:

#### i. September 1, 2018-(Lease DD)

GS#2021HA. No operations were occurring. Spudding was completed 28 days earlier. ROA.34990-91;37893:22-24. Pearl had removed a waste bin and returned a generator, ROA.24829-30;24899;32716, equipment Dr. Dria testified was necessary to bring a well into production.

GS#2022HA. No activities were occurring or had occurred at the well for more than 92 days. ROA.35017-19;37872:17-21.

GS#2211HD. No activity had occurred at the well for more than 30 days, when the rig was discharged after spudding was completed. ROA.35055.

#### ii. September 7, 2018-(Leases A, D, E, F, G, K, L, M, T, U)

GS#2021HA. The only activity was the repair of a frac pit, which Pearl had failed to adequately shore up to prevent damage from rain. ROA.32989-33002;33005. Pearl did not have a functioning water pump or the water necessary to drill, and it had to obtain a quote for the cost of another water well. ROA.33006-07.

GS#2022HA. No activity was occurring and no activity had occurred for more than 98 days. ROA.35017-19;37872:17-21.

GS#2211HD. The only activity was the repair of a frac pit. ROA.32989-33002;33005.

#### iii. September 13, 2018-(Leases P,Q,R)

GS#2021HA. No activity was occurring. Pearl was still quoting the cost of

drilling a water well, the water pump was not working, and no water was added to the frac pit until after the snapshot date. ROA.32989-33002;33005-07;33012. Pearl did not acquire a generator needed to run power to the water pump until September 19, 2018. ROA.33020;33238.

GS#2022HA. No activity was occurring on the well, no activity had occurred for more than 104 days, and there was no well pad. ROA.30013;35017-19;37872:17-21.

GS#2211HD. The only activity was the repair of a frac pit, which Pearl failed to properly shore up to prevent damage from rain, which remained in disrepair after the snapshot date. ROA.24898;32989-33002, 33005;33020.

**iv. October 4, 2018-(Leases C,X,Y)**

GS#2021HA. The only activity occurring was the start of construction on a reserve pit two days before the snapshot date, and the only prior activity was the purchase of a generator and filling a frac pit in mid-September. ROA.33012;33020;33238;33282. A necessary water well had not been drilled and the battery was insufficient to engage in drilling. ROA.33058;33595.

GS#2022HA. The only activity was construction of a reserve pit, although it is not clear from the evidence when construction began. ROA.33037. The location still had not been prepared for a well pad. ROA.33051.

GS#2211HD. No activities were occurring. As of October 2, 2018, Pearl had

repaired the frac pit it previously failed to maintain and had repaired a flowline it negligently cut on October 3, 2018. ROA.33023-37. At the time, the water pump necessary for fracking was not working and a new battery was still required. ROA.33288;24903;33211.

**v. October 5, 2018-(Lease W)**

GS#2021HA. The only activity occurring was the construction of a reserve pit, which was started just three days prior, and the purchase of a generator to help fill a frac pit in mid-September. ROA.33012;33020;33238;33282. The necessary water well had not been drilled and the battery was insufficient to engage in drilling. ROA.33595;33058.

GS#2022HA. The only activity was construction of a reserve pit, although it is not clear from the evidence when construction began. ROA.33037. The location still lacked a well pad. ROA.33051.

GS#2211HD. No activities were occurring. Pearl had repaired the frac pit it had previously failed to maintain as of October 2, 2018, and repaired a flowline on October 3, 2018, it had negligently cut, but the water pump needed for fracking was not working and a new battery was required. ROA.24903;33023-37;33211;33288.

**vi. October 6, 2018-(Lease V)**

GS#2021HA. The only activity occurring was the construction of a reserve pit, which was started just four days before the snapshot date, with the only activity

prior to that having been the purchase of a generator and filling a frac pit in mid-September. ROA.33012;33020;33238;33282. The necessary water well was not drilled and the battery was insufficient to engage in drilling. ROA.33595;33058.

GS#2022HA. The only activity occurring at the well was the continued construction of a reserve pit. ROA.33037. The location still did not have a well pad. ROA.33051.

GS#2211HD. No activities were occurring. Pearl had repaired the frac pit it had previously failed to maintain as of October 2, 2018, and repaired a flowline on October 3, 2018, it had negligently cut, but the water pump necessary for fracking was not working and a new battery was still necessary. ROA.24902;33023-37;33211;33288.

**vii. October 8, 2018-(Lease J)**

GS#2021HA. The only activity occurring was the continued construction of a reserve pit, which was missing a liner that was not installed until after the snapshot date. ROA.33037;33243. Drilling of the water well Pearl deemed was necessary had not commenced. ROA.33006-07;33595. The battery was insufficient, and necessary equipment, including steel and fiberglass tanks, associated separation equipment, and the LACT unit was not installed. ROA.33058-59.

GS#2022HA. The only activity occurring was continued construction of a reserve pit. ROA.33037. Pearl still had not constructed a well pad to spud the well,

and the reserve pit was still missing a liner for it to be used to engage in drilling. ROA.30337;33051;33242. Notwithstanding the well had not even been spudded, the battery was insufficient and necessary steel and fiberglass tanks, associated separation equipment, and LACT unit were missing from the site. ROA.33058-59.

GS#2211HD. No activities were occurring. Pearl had repaired the frac pit as of October 2, 2018, and repaired a flowline it negligently cut on October 3, 2018, but the water pump necessary for fracking was not working and a new battery was still required. ROA.24903;33023-37;33211;33288.

**viii. November 8, 2018-(Lease S)**

GS#2021HA. The only activity occurring was the completion of a water well. ROA.33595. The battery was insufficient and needed to be expanded, and five steel and fiberglass tanks and associated separation equipment and LACT unit were lacking. ROA.33058-59. Pearl was unable to pump water due to continued generator issues. ROA.33174;33213.

GS#2022HA. Approximately three weeks prior to the snapshot date, the well pad had finally been constructed; however, the battery was insufficient and needed to be expanded, and five steel and fiberglass tanks and associated separation equipment and LACT unit were lacking. ROA.33051;33058-59. Pearl was not able to pump water due to ongoing generator issues. ROA.33174.

GS#2211HD. No activities were occurring. Although caliche had been

acquired to prepare a pad for a battery and new flowlines that were needed, the pad had not been constructed and there was no sustainable power source to pump water at the well. ROA.24903;33211;33058;33064;33174. The only other activity was pulling water out of reserve pits – the same reserve pits Pearl had struggled to fill with water for drilling – to maintain the lease road. ROA.33290-91.

**ix. July 26, 2019-(Lease OO)**

There were no activities occurring at GS#2021HA, GS#2022HA, or GS#2211HD on July 26, 2019. The only activity Pearl was engaged in at that time was backroom preparations of conferring with a drilling manager and updating the AFE. ROA.37948:9-37949:8;37954:10-15;37961:23-24. Although Pearl sought bids for a drilling rig in May 2019, Pearl never entered into a contract for a drilling rig, which is significant because Dr. Dria admitted contracting a rig could take quite a while, particularly for an operator like Pearl, who had limited resources. ROA.37321:6-24;37335:23-37336:10;37338:13-22;37344:10-20;37887:25-37888:4; 38382:11-16.

**x. August 16, 2019-(Leases PP, RR)**

No activities were occurring at GS#2021HA, GS#2022HA, or GS#2211HD. *See* Argument Part III.B.4.C.ix.

**xi. August 17, 2019-(Lease QQ)**

No activities were occurring at GS#2021HA, GS#2022HA, or GS#2211HD.

*See* Argument Part III.B.4.C.ix-x.

**xii. August 25, 2019-(Lease SS)**

No activities were occurring at GS#2021HA, GS#2022HA, or GS#2211HD. *See* Argument Part III.B.4.C.ix-xi.

**xiii. September 9, 2019-(Lease TT)**

No activities were occurring at GS#2021HA, GS#2022HA, or GS#2211HD. *See* Argument Part III.B.4.C.ix-xii.

* * *

These activities, even when viewed in the collective, do not constitute continuous drilling operations as a matter of law. When properly viewed at the time of the snapshot date, they are legally insufficient to hold acreage at any of the wells.

**5. Pearl's tender of deep rights retention payments did not hold the acreage for GS#2021HA, GS#2022HA, or GS#2211HD.**

Pearl made deep rights retention payments; however, those payments did not hold the acreage surrounding or under GS#2021HA, GS#2022HA, or GS#2211HD. Section 16(C) only allows deep rights retention payments to hold depths for wells on acreage "retained in Paragraph 16(A) above." ROA.20989. The only acreage retained under the State Leases was in connection with GS#3, which was producing in paying quantities at each snapshot date. No acreage around any of the other wells was retained under section 16(A) because there was no production from that acreage

and there is legally insufficient evidence to support Pearl was engaged in continuous drilling operations at each well on each snapshot date. *See* Argument Part III.B.4.c. The only deep rights Pearl retained were under the 320 acres retained by GS#3.

**6. None of the State Leases were part of Pearl's bankruptcy estate.**

The evidence establishes Pearl was not engaged in continuous drilling operations at GS#2021HA, GS#2022HA, or GS#2211HD as of each snapshot date. Under section 16(A) the State Leases terminated as to all of the acreage except the 320-acre proration unit for GS#3. ROA.20988. When a lease under which a debtor is the lessee terminates prior to the time the debtor seeks bankruptcy relief, the lease does not become property of the bankruptcy estate. *See In re Trang*, 58 B.R. 183, 184 & 1899 (Bankr. S.D. Tex. 1985) (debtor cannot assume lease terminated prior to seeking bankruptcy relief). The terminated acreage and depths under the State Leases terminated prior to Pearl filing its March 3, 2020, bankruptcy petition and were not part of Pearl's bankruptcy estate. When the State Leases partially terminated, ownership of the leasehold reverted to the State. *See Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468 (Tex. 1991). The trial court erred in finding in favor of Pearl on its quiet-title and trespass-to-try-title claims and against GLO on its request for declaratory relief and trespass-to-try-title claim.

#### 7. Partial termination of the State Leases comports with public policy.

Concluding partial termination occurred does not deprive Pearl of its opportunity to continue to produce GS#3; however, allowing Pearl to hold the State Leases based on its token efforts to engage in continuous "drilling operations" denigrates Texas's public policy of not hindering the exploration and development of oil and gas. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 495. Permitting Pearl to hold the entire leasehold on such paltry evidence deprives not only the State of revenue that benefits the Permanent School Fund, but also the surface owners, who are permitted to share in royalties from Relinquishment Act leases. *See* Tex. Nat. Res. Code § 52.172. Therefore, finding partial termination supports Texas public policy.

### C. The Commissioner acted within his discretion in filing the DTAD of record after Pearl refused to do so.

Upon cessation of continuous drilling operations in connection with GS#2021HA, GS#2022HA, and GS#221HD, the State Leases terminated, except for the 320 acres surrounding GS#3. ROA.20988; *Cromwell*, 716 S.W.3d at 524. Section 16(C) required Pearl to execute partial releases for the terminated acreage within 30 days after partial termination upon GLO's request. ROA.20989. Pursuant to section 16(C), if the lessee fails or refuses to do so after 90 days, the Commissioner in his "sole discretion" may designate the released acreage and file the designation of

record in the county where the lease is located. ROA.20989.

On October 16, 2019, GLO informed Pearl of the partial termination and requested Pearl to provide GLO with partial releases of the terminated acreage. ROA.22107;24486. Pearl refused to do so after 90 days, so on February 3, 2020, the Commissioner executed the DTAD and filed it of record February 11, 2020. ROA.24728-34. Consequently, the Commissioner was within his discretion to execute and file the DTAD because the acreage had terminated, Pearl refused to prepare and file partial releases, and 90 days had passed since the State Leases had terminated.

**IV. The trial court erred in awarding Pearl damages.**

**A. Standard of review.**

Legal conclusions underlying an award of damages are reviewed *de novo* and factual findings are reviewed for clear error. *Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 552 (5th Cir. 2005).

**B. Texas law governs what damages are recoverable.**

Texas law governs what damages are recoverable, while federal procedure governs the sufficiency of the evidence supporting a damages award. *Homoki v. Conversion Services, Inc.*, 717 F.3d 388, 398 (5th Cir. 2013). Damages must be measured by a legal standard able to guide the fact-finder in a determination of what would compensate the injured party. *Matter of Rose*, 156 F.4th 602, 613 (5th Cir.

2025).

Just compensation for actual loss is "[t]he universal rule for measuring damages for the breach of a contract," and a party should be awarded no more and no less than its actual damages. *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 760 (Tex. App.—El Paso 2000, no pet.). "Expectancy damages . . . award damages for the reasonably expected value of the contract," *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex. App.—Dallas 2012, no pet.), and are "measured by [a party's] anticipated receipts and losses caused by the breach less any cost or other loss he has avoided by not having to perform." *Abraxas Petroleum Corp.*, 20 S.W.3d at 760. A nonbreaching party may only be awarded damages that "are the natural and proximate result of the breach." *Cotherman v. Oriental Oil Co.*, 272 S.W. 616, 621 (Tex. App.—Amarillo 1925, no writ).

It is axiomatic damages arising from breach of an oil and gas lease must be proven with reasonable certainty. *Tex. Pac. Coal & Oil Co. v. Barker*, 6 S.W.2d 1031, 1034 (Tex. 1928). The nonbreaching party must show with reasonable certainty it has been deprived of the value of its portion of a certain quantity worth a certain amount that it otherwise would have received had there been no breach. *Amoco Prod. Co. v. Alexander*, 594 S.W.2d 467, 477-78 (Tex. App.—Houston [1st Dist.] 1979), *modified*, 622 S.W.2d 563 (Tex. 1981). "[S]peculation stacked upon speculation" is no evidence. *Lovelace v. Sabine Consol., Inc.*, 733 S.W.2d 648, 656

(Tex. App.—Houston [14th Dist.] 1987, writ denied).

This reasonable certainty standard has been extended to include property valuations based on projected income streams. In *Phillips v. Carlton Energy Group, LLC*, 475 S.W.3d 265, 280 (Tex. 2015), the Texas Supreme Court held "the requirement of reasonable certainty of proof applies when lost profits are not sought as damages themselves but are used to determine the market value of property for which recovery is sought." "[T]he purpose of the requirement is to prevent recovery based on speculation." *Id.*

Evidence "dependent on uncertain and changing market conditions, and based on risky business opportunities and the success of an unproven enterprise" is speculative and insufficient to prove damages with reasonable certainty. *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 808 & 825 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). A damages model that fails to take into account the risk of failure to produce renders the damages-calculation uncertain and speculative. *Id.* at 822. Moreover, "[f]uture-damages awards must be ascertained using objective facts, figures, or data, and there must be evidence a contract will continue in the future." *Pura-Flo Corp. v. Clanton*, 635 S.W.3d 637, 640-41 (Tex. 2021) (internal quotation marks and citation omitted). "[E]xpert testimony, free of conjecture and speculation, is proper and necessary to determine and estimate damages in the highly specialized field of oil and gas." *Alexander*, 594 S.W.2d at

477.

A party seeking to recover for repudiation of a lease must establish the repudiation was the producing cause of any damages. *Marrs & Smith P'ship v. Sombrero Oil & Gas Co., L.L.C.*, 511 S.W.3d 53, 59 (Tex. App.—El Paso 2014, no pet.). Producing cause is "efficient, exciting, or contributing cause, which in the natural sequence, produced injuries or damages complained of, if any." *Id.* (internal quotation marks and citation omitted).

**C. The trial court erred in awarding Pearl damages because the damages claim was barred by immunity and GLO did not otherwise breach or repudiate any of the State Leases.**

As a practical matter, the trial court erred in awarding Pearl damages because Pearl's damages-claim was barred by immunity. *See* Argument Parts I & II. Even if the damages claim was not barred, the trial court erred in awarding Pearl damages because (i) the evidence was legally insufficient to support Pearl was engaged in continuous drilling operations at each well on each snapshot date and (ii) the Commissioner was within his contractual rights under Section 16(C) to designate terminated acreage and depths and to file the DTAD when Pearl refused to do so. Therefore, there was no evidence of any breach or repudiation of the State Leases by GLO and no basis on which the trial court could award Pearl damages. *See* Argument Part III.

### D. Pearl failed to establish GLO was the proximate or producing cause of its alleged damages.

Dr. Dria blames all of Pearl's damages, including increased drilling costs, decreased well-value, increased facility costs, and infrastructure repair, on GLO's purported "repudiation" of the State Leases. ROA.37887:18-24. As a factual matter, GLO did not repudiate the State Leases – the State Leases partially terminated by their own terms two years after the end of their primary terms because Pearl failed to engage in continuous drilling operations. *See* Argument Part III.B.4.c.

That aside, Pearl failed to establish it was capable of bringing the wells into production had GLO not "repudiated" the State Leases. As a practical matter, Dr. Dria's damages forecast assumes Pearl would have been able to drill a productive horizontal well when she had not attempted to do so since 2002, and when in the six years Pearl held most of the State Leases Pearl was only able to ever drill one vertical well capable of producing in paying quantities – GS#3. ROA.24485; ROA.38040:17-24;38339:17-38343:1;38358:22-24. From the time Pearl spudded the last of the three wells, GS#2022HA, to the time GLO requested Pearl to execute and file partial releases of the terminated acreage, nearly a year had passed. ROA.24486;22107;33298-33311;33313-15;33320;35020;37873:22-37874:6;37893:25-37894:25. In other words, Pearl was not capable of bringing a second well into production for nearly a year – or more – after it spudded the three wells, and more than two years after GS#3 on June 30, 2017, was capable of

producing in paying quantities. ROA.24485.

Further, there was no evidence presented from which it could be inferred Pearl had the financial capacity to either drill the wells to the target depth or to bring the wells into production. Dr. Dria had bid for completion rigs in May 2019 and then rebid again in December 2019. ROA.37335:23-37336:10;37338:13-22;37344:10-20;37887:25-37888:4;37888:6-37889:7. But Pearl never actually executed a contract for a rig capable of drilling to the target depth. ROA.37336:4-10. The reason is plain: Pearl lacked the financial capacity to do so. Evidence at trial established it would cost between $810,000 and $1,215,000 just to drill for a period of 60 to 90 days, and Dr. Dria conceded Pearl only had $250,000 in its bank account. ROA.37819:24-37820:9;37953:12-16;38197:22-38198:6. Dr. Dria also admitted she could not obtain private equity or institutional funding for Pearl. ROA.23133:7-23136:5. Pearl's financial incapability was the cause of any "damages" – not any breach or repudiation of the State Leases.

Moreover, Dr. Dria conceded infrastructure repairs were necessitated by natural forces that plagued the leasehold, as well as vandalism and third-party interference – none of which was attributable to GLO – prior to any purported repudiation. ROA.37921:8-37922:1. Finally, Pearl's incompetence in undertaking activities underscores the dubiousness of Pearl ever bringing any of the three shallow, spud wells into production in paying quantities as a reasonably diligent and

prudent operator would and should. Pearl repeatedly had to rebuild reserve and frac pits due to errors in construction, including where the pits were built and how, and Pearl was unable to adequately assess what facilities were needed at the wells to drill and produce and was repeatedly forced to shift strategy and build additional facilities it had failed to identify it needed. ROA.32989-33002;33005-07;33009;33020;33032;33058-59;33213;33285;33322;33999-33401;33416-18. As of the snapshot dates under the State Leases there simply is no credible evidence Pearl would have successfully drilled any of the three wells to depth for production, and therefore, Pearl failed to present legally sufficient evidence GLO was the proximate or producing cause of Pearl's damages. Therefore, the trial court erred in awarding Pearl damages.

### E. Pearl's "damages" are mere speculation and conjecture.

#### 1. "Damages" for increased drilling and facility costs.

Pearl's purported damages for increased drilling and facility costs are based on two AFEs appended to her report. ROA.25003-04;25006;25221;25225;25243; 25246. At trial, however, Dr. Dria testified the numbers on which she relied in the AFE were only "approximate." ROA.37959:2-5. She also testified she would typically include a contingency of 10 to 20 percent, but neither AFE she considered included a contingency, and where Dr. Dria did apply a contingency, it was only 5 percent – out of line with her own testimony. ROA.25225-29;37959:5-19. Further,

Dr. Dria testified it was rare for the AFE to match expenditures. ROA.37997:12-17. And components of the AFE could be "wildly off mark." ROA.37998:12-24. Dr. Dria conceded AFEs are inherently estimates and not definitive or guaranteed actual costs and should only be understood as planning estimates that rarely align exactly with actual outcomes. Consequently, there is an inadequate foundation for her opinions regarding the increased drilling and facilities costs when she herself agrees the numbers on which she relied were inherently unreliable. Therefore, the trial court erred in awarding Pearl $16,293,915 in increased drilling costs and $2,206,000 in increased facility costs.

**2. "Damages" for infrastructure repairs.**

As for Pearl's claim for infrastructure repairs damages, Dr. Dria's opinions are flawed. Dr. Dria's damages-analysis appears to attribute all of the costs — including the repair and rebuilding of frac pits, reserve pits, water wells, storage vessels, separators, flowlines, and well pads — entirely to the damage from lack of use, vandalism, or interference since December 2019. Dr. Dria, however, failed to take into account or deduct the costs of routine, ongoing infrastructure repairs that Pearl would have had to perform in the ordinary course of oilfield operations, regardless of the actions of GLO. Although Dr. Dria stated "significant infrastructure damage ha[d] occurred due to the lack of use since December 2019" and provided a list and costs, ROA.25288, at no point did she distinguish which portion of the required

repairs would have been expected as recurring or routine even if Pearl's operations had not been interrupted. As Dr. Dria failed to factor out costs Pearl would have incurred if there was no purported "interference," the trial court clearly erred in awarding Pearl infrastructure repair damages of $3,504,133.

**3. "Damages" for decreased value.**

Finally, Dr. Dria's prognostication of decreased-value damages is conjecture. First, Dr. Dria assumes the State Leases would still be in effect. Dr. Dria's opinions are underlaid by the ill-founded assumption Pearl either would have been able to develop a well, which the evidence shows was unlikely, *see* Argument Part IV.D, or that GS#3, which held the State Leases through their primary terms, would have continued to produce in paying quantities. Both are speculation.

Second, Dr. Dria's analysis of decreased value fails to pass muster under Texas law because it fails to account for the general risk of failure to produce — the possibility of drilling dry holes or encountering non-productive wells. *See Ramco*, 207 S.W.3d at 825. A clear indication of this inherent risk is GS#4, which Pearl had to plug and abandon before it was drilled to the target formation depth. ROA.37861:6-17. Her damages model for the three wells is built on the assumption that but for GLO's purported interference, all drilling operations would have been successful and led to production that matches her forecast.

For instance, in Appendix B of her report, Dr. Dria bases performance on the

history of 13 immediate offset horizontal wells and in one case a set of nearby 5,000-foot wells. ROA.25234-42. Dr. Dria uses this historical data to construct expectations for future production and revenue, but the expectations establish projected outcomes as if each well drilled would achieve average results, without adjustment for the possibility a well may never produce. Rather than applying any risk adjustment, the entirety of her forecast is predicated on successful drilling and completion – as if each well would produce precisely according to expectation, without factoring in a possibility of drilling failure.

Nowhere in her report or at trial did Dr. Dria engage in any risk-adjusted analysis quantifying the likelihood of failure to produce or use previous failure rates to discount the results of her analysis. In the oil and gas industry there is marketplace volatility and rapidly changing technologies that affect production. *See Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 6-7, 13, 16, & 19-20 (Tex. 2008). Future prices, production volumes, discount rates, market conditions, inflation, and cost projections are all inherently speculative. *See Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 281 (Tex.1994); *Barton v. Resort Dev. Latin Am., Inc.*, 413 S.W.3d 232, 239 (Tex. App.—Dallas 2013, pet. denied). The complex interaction of these factors demonstrates the uncertainty inherent in decreased well-value calculations. As Dr. Dria failed to engage in any meaningful risk analysis, her opinions are speculation. Therefore, the trial court erred in awarding Pearl

$21,152,000 for decreased well value because the evidence to support the award was pure conjecture.

## CONCLUSION

This Court should reverse the trial court's Amended Judgment and render judgment granting the Commissioner's request for declaratory relief and trespass-to-try-title claims and that Pearl taking nothing on its asserted claims.

Respectfully submitted,

**KEMP SMITH LLP**
221 North Kansas, Suite 1700
El Paso, Texas 79901
(915) 533-4424 (Telephone)
(915) 546-5360 (Facsimile)

By:________________________________

KEN SLAVIN
State Bar No. 18496100
ken.slavin@kempsmith.com
VALERIE AUGER
State Bar No. 24076251
valerie.auger@kempsmith.com

Attorneys for Appellant, Dawn Buckingham, MD, Commissioner, Texas General Land Office

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed electronically and that notice of this filing will be sent to the following by operation of the Court's electronic filing system on February 25, 2026:

Avi Moshenberg
avi.moshenberg@lmbusinesslaw.com
Nick Lawson
nick.lawson@lmbusinesslaw.com
Lawson & Moshenberg PLLC
2301 Commerce Street
Houston, Texas 77002
(713) 449-9644

KEN SLAVIN

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th Cir. R. 32.2.7(b).

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th Cir. R. 32.2.7(b)(3), THE BRIEF CONTAINS:

   A. 12,940 words

2. THE BRIEF HAS BEEN PREPARED:

   A. In proportionally spaced typeface using:

      Software Name and Version: Microsoft Word, Version 2602

      in (Typeface Name and Font Size): Times New Roman 14 point

3. IF THE COURT SO REQUESTS, THE UNDERSIGNED WILL PROVIDE AN ELECTRONIC VERSION OF THE BRIEF AND/OR A COPY OF THE WORD OR LINE PRINTOUT.

4. THE UNDERSIGNED UNDERSTANDS A MATERIAL MISPREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5th Cir. R. 32.2.7, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

KEN SLAVIN