**No. 25-20481**

In the United States Court of Appeals
for the Fifth Circuit

IN RE PEARL RESOURCES, LLC; PEARL RESOURCES OPERATING COMPANY, LLC

*Debtors*,

DAWN BUCKINGHAM, M.D., GLO, TEXAS GENERAL LAND OFFICE,

*Plaintiff – Appellant/Cross-Appellee*,

*v.*

PEARL RESOURCES, LLC; PEARL RESOURCES OPERATING COMPANY, LLC,

*Defendants – Appellees/Cross-Appellants.*

On Appeal from the United States Bankruptcy Court
for the Southern District of Texas
Case No. 4:20-AP-3169

**BRIEF OF APPELLEES/CROSS – APPELLANTS**

AVI MOSHENBERG
Texas Bar No. 24083532
avi.moshenberg@lmbusinesslaw.com
LAWSON & MOSHENBERG PLLC
2301 Commerce Street, Suite 200
Houston, Texas 77002
(713) 449-9644
***Counsel to Appellees/Cross-Appellants***

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal.

**Appellant/Cross-Appellee:**

Dawn Buckingham, M.D., Commissioner, Texas General Land Office (the "GLO")

**Counsel for Appellant/Cross-Appellee:**

Ken Slavin and Valerie Auger, Kemp Smith LLP
Jason B. Binford and J. Casey Roy, Kane Russell Coleman Logan PC; Ken Paxton, Ryan L. Bangert, Darren L. McCarty, Rachel R. Obaldo, Abigail R. Ryan, Texas Attorney General's Office (counsel in bankruptcy court)

**Appellees/Cross-Appellants:**

Pearl Resources, LLC and Pearl Resources Operating Company, LLC (together "Pearl"), owned by Dr. Myra Dria.

**Counsel for Appellees/Cross-Appellants**

Avi Moshenberg and Nick Lawson, Lawson & Moshenberg PLLC

By: */s/ Avi Moshenberg*
Avi Moshenberg
Attorney of Record for Appellee

## Statement Regarding Oral Argument

Pearl Resources does not believe oral argument is needed here, as the review of the bankruptcy court's bench trial and judgment can be decided on the papers.

## Table of Contents

Certificate of Interested Persons ..........2

Statement Regarding Oral Argument ..........3

Table of Contents ..........4

Table of Authorities ..........7

Issues Presented ..........11

1. Sovereign Immunity (for Appellant's Arguments I & II)..........11
2. Property of the Estate and Damages (for Appellant's Arguments III & IV)..........11
3. Cross-Appeal: The Offset-Well Breach..........11

Statement of the Case..........12

1. The GLO declares 27 of Pearl's 35 state leases partially terminated, and Pearl petitions for bankruptcy as the dispute unfolds. ..........12
2. The GLO invokes federal jurisdiction to litigate its dispute with Pearl in the bankruptcy court..........14
3. The bankruptcy court renders a judgment for Pearl, awarding over $40 million in damages...........16
4. The GLO appeals and Pearl cross-appeals, and this Court grants direct review. 17

Summary of the Argument..........18

Response to Appellants' Brief ..........20

1. The bankruptcy court correctly declined to recognize the untimely and meritless immunity defense the GLO invokes in its opening brief...........20
   A. Immunity to Suit: The GLO waived immunity by voluntarily invoking federal jurisdiction over its claims and defenses. ..........20
      (1) The GLO cannot claim immunity to suit on appeal after it voluntarily invoked federal jurisdiction over the merits of Pearl's counterclaim....21
      (2) The GLO's immunity-from-suit argument fails even if it had been raised below because Pearl's counterclaims arise from the same transaction or occurrence as the GLO's affirmative claims. ..........28

(3) Section 106 does not affect GLO's waiver of immunity to suit. ..........32

B. Immunity to Liability: The GLO waived immunity to liability by failing to plead it and also by contracting with Pearl. ..........33

2. The Court should affirm the bankruptcy court's judgment because the evidence showed the state leases are part of Pearl's bankruptcy estate. ..........36

A. The evidence supported the finding that Pearl was engaged in continuous drilling operations on the relevant snapshot dates. ..........38

(1) Pearl was engaged in continuous drilling operations for the 21 leases with 2018 snapshot dates. ..........42

(2) The evidence shows that Pearl was engaged in continuous drilling operations for the remaining six leases with 2019 snapshot dates. ..........51

(3) The GLO's contrary arguments fail. ..........55

B. Because the leases did not partially terminate, the GLO's DTAD was unauthorized, and the leases entered the estate. ..........60

3. The evidence supports the bankruptcy court's finding that the GLO's breach damaged Pearl by over $43 million. ..........62

A. The evidence supports the bankruptcy court's finding that the GLO was the producing cause of Pearl's damages. ..........63

B. The evidence supports the bankruptcy court's finding that the GLO damaged Pearl by over $43 million. ..........67

(1) The drilling-cost and facility-cost numbers rest on industry-standard estimates that the GLO's expert did not meaningfully dispute. ..........67

(2) The infrastructure-repair damages were supported by the evidence. ..........70

(3) The evidence shows that the decreased-well-value number compares the same wells' value at two points in time. ..........73

Cross-Appeal ..........78

1. The 100-day clock started on May 17, 2018, when the Whiskey River well was deemed to be producing in commercial quantities. ..........79

2. Because Pearl "began the drilling" of the offset well within 100 days, it did not breach Paragraph 17 of the lease. ..........83

Conclusion ........................................................................................................86
Certificate of Service ........................................................................................87
Certificate of Compliance ..................................................................................87

# Table of Authorities

## Cases

*Valence Operating Co. v. Anadarko Petroleum Corp.*,
303 S.W.3d 435 (Tex. App.—Texarkana 2010, no pet.) .................................... 60

*Hall v. McWilliams*,
404 S.W.2d 606 (Tex. App.—Austin 1966, writ ref'd n.r.e.) ............................... 60

*Amoco Prod. Co. v. Alexander*,
594 S.W.2d 467 (Tex. Civ. App.—Houston [1st Dist.] 1979, pet. granted)......... 78

*Arismendez v. Nightingale Home Health Care, Inc.*,
493 F.3d 602 (5th Cir. 2007)........................................................................... 34

*Bargsley v. Pryor Petroleum Corp.*,
196 S.W.3d 823 (Tex. App.—Eastland 2006, pet. denied).................................. 60

*Barton v. Resort Dev. Latin Am., Inc.*,
413 S.W.3d 232 (Tex. App.—Dallas 2013, no pet.). .......................................... 76

*Carty v. State Off. of Risk Mgmt.*,
733 F.3d 550 (5th Cir. 2013)...............................................................33, 34, 35, 36

*In re Chen*,
227 B.R. 614 (D.N.J. 1998)............................................................................. 33

*Coastal Oil & Gas Corp. v. Garza Energy Trust*,
268 S.W.3d 1 (Tex. 2008) ........................................................................... 66, 75

*College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999) ........................................................................................ 30

*Dagnall v. Gegenheimer*,
645 F.2d 2 (5th Cir. 1981)............................................................................... 28

*Ford Motor Co. v. Dep't of Treasury of State of Indiana*,
323 U.S. 459 (1945) ........................................................................................ 25

*Georgia Dep't of Hum. Res. v. Bell*,

528 F. Supp. 17 (N.D. Ga. 1981) ........................................................................ 23

*Haby v. Stanolind Oil & Gas Co.*,
228 F.2d 298 (5th Cir. 1955)............................................................................ 57

*Hess Corp. v. Schlumberger Tech. Corp.*,
26 F.4th 229 (5th Cir. 2022)........................................................................ 41, 50

*Int'l Truck & Engine Corp. v. Bray*,
372 F.3d 717 (5th Cir. 2004)............................................................................ 26

*Jupiter Oil Co. v. Snow*,
819 S.W.2d 466 (Tex. 1991) ............................................................................ 62

*Kaswatuka v. U.S Dep't of Homeland Sec'y*,
7 F.4th 327 (5th Cir. 2021.)............................................................................. 29

*Kothmann v. Boley*,
308 S.W.2d 1 (Tex. 1957) ................................................................................ 66

*Lapides v. Bd. of Regents of Univ. Sys. of Georgia*,
535 U.S. 613 (2002) ........................................................................ 22, 25, 30, 31

*Marrs & Smith P'ship v. Sombrero Oil & Gas Co.*,
511 S.W.3d 53 (Tex. App.—El Paso 2014, no pet.) ............................................. 66

*Masterson v. Amarillo Oil Co.*,
253 S.W. 908 (Tex. App.—Amarillo 1923, writ dism'd w.o.j.). .......................... 57

*Matter of Royal Alice Props., L.L.C.*,
159 F.4th 355 (5th Cir. 2025)........................................................................... 21

*Meyers ex rel. Benzing v. Texas*,
410 F.3d 236 (5th Cir. 2005).......................................................................passim

*Montano v. Texas*,
867 F.3d 540 (5th Cir. 2017)............................................................................ 21

*In re Nikoloutsos*,
199 F.3d 233 (5th Cir. 2000)............................................................................ 32

*Pasco v. Knoblauch*,
566 F.3d 572 (5th Cir. 2009) ........ 34

*Phillips v. Carlton Energy Grp.*, LLC,
475 S.W.3d 265 (Tex. 2015) ........ 70, 74, 75, 76

*Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*,
207 S.W.3d 801 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). ........ 75, 76

*Ridge Oil Co. v. Guinn Invs., Inc.*,
148 S.W.3d 143 (Tex. 2004) ........ 39

*Rostan Sols., LLC v. Corpus Christi Indep. Sch. Dist.*,
No. 2:22-CV-00122, 2025 WL 2799320 (S.D. Tex. Sept. 30, 2025) ........ 35

*Saenz v. Gomez*,
899 F.3d 384 (5th Cir. 2018) ........ 37

*Sossamon v. Texas*,
563 U.S. 277 (2011) ........ 30

*Teleresource Corp. v. Accor N. Am., Inc.*,
427 S.W.3d 511 (Tex. App.—Fort Worth 2014, pet. denied.) ........ 66

*Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*,
877 S.W.2d 276 (Tex. 1994) ........ 62, 76

*Tex. Pac. Coal & Oil Co. v. Barker*,
6 S.W.2d 1031 (Tex. 1928). ........ 77, 78

*Texas Dep't of Transp. v. Jones*,
8 S.W.3d 636 (Tex. 1999) ........ 33, 34

*Texas Nat. Res. Conservation Comm'n v. IT-Davy*,
74 S.W.3d 849 (Tex. 2002) ........ 35

*Texas v. Caremark, Inc.*,
584 F.3d 655 (5th Cir. 2009) ........ 23, 29, 31

*Tooke v. City of Mexia*,

197 S.W.3d 325 (Tex. 2006) ....... 35

*In re Trang*,
58 B.R. 183 (Bankr. S.D. Tex. 1985) ....... 62

*Wisconsin Dep't of Corr. v. Schacht*,
524 U.S. 381 (1998) ....... 24

**Statutes**

11 U.S.C. § 106 ....... 32, 33

Tex. Civ. Prac. & Rem. Code § 114.003 ....... 35

Tex. Civ. Prac. & Rem. Code §§ 114.001 ....... 35

11 U.S.C. § 541 ....... 36, 62

**Rules**

Fed. R. Bankr. P. 7052 ....... 37

Fed. R. Civ. P. 52 ....... 37, 41, 50

**Regulations**

31 Tex. Admin. Code § 9.31. ....... 39, 46

## Issues Presented

### 1. Sovereign Immunity (for Appellant's Arguments I & II)

A State waives immunity from suit by invoking federal jurisdiction and defending on the merits, and waives immunity from liability by contracting or by failing to plead it. The GLO sued, defended against Pearl's contract claim on the merits (including engaging in discovery and moving for summary judgment) and litigated through a six-day trial—never raising immunity from suit, and raising immunity from liability at closing. Did the GLO waive both immunities?

### 2. Property of the Estate and Damages (for Appellant's Arguments III & IV)

The leases here terminate if Pearl was not engaging in continuous drilling operations on the snapshot dates. Using the GLO's own dates and witnesses, the bankruptcy court found Pearl was engaged in continuous drilling operations, that the leases did not terminate, and that the breach caused Pearl $43,155,664 in damages. Was that judgment based on these fact-findings clearly erroneous?

### 3. Cross-Appeal: The Offset-Well Breach

Paragraph 17 required that Pearl only *begin* drilling an offset well within 100 days after the neighboring well began producing in commercial quantities. Commercial production was established when the completion report was validated on May 17, 2018, and Pearl spudded its offset well 71 days later. Did the bankruptcy court err in holding that Pearl breached by not completing the well in that time and then awarding the GLO $2,578,633 in offset damages?

## Statement of the Case

### 1. The GLO declares 27 of Pearl's 35 state leases partially terminated, and Pearl petitions for bankruptcy as the dispute unfolds.

Pearl's dispute with the Texas General Land Office arises from 35 oil-and-gas leases issued for Sections 20 and 22 in the H&GN Ry. Survey, Block 8, Pecos County, Texas, covering 955.22 acres.[1] The leases were issued under the Relinquishment Act, where the surface owner acts as the State's agent in negotiating and executing oil-and-gas leases on the land.[2] All 35 leases are on the same GLO-promulgated lease form.[3] There are multiple surface owners on Sections 20 and 22, which are not contiguous.[4] Each lease grants the lessee an express primary term to explore and produce oil and gas.[5] Those terms vary in duration—two leases run three years, six run one year, and the rest run five years from each lease's effective date.[6]

Pearl is a Houston-based oil-and-gas operator and lessee under the State Leases.[7] Before the dispute, Pearl was conducting drilling operations on the

---

[1] ROA.36784.

[2] ROA.36784–85.

[3] ROA.36785.

[4] ROA.36785.

[5] ROA.36786.

[6] ROA.36786.

[7] ROA36786.

leasehold—permitting, staking, and spudding wells on Sections 20 and 22, building out infrastructure to bring them to production, and producing oil and gas with one well already complete.[8]

On October 16, 2019, the GLO sent Pearl a letter asserting that 27 of the 35 leases were terminating—spanning all but the 320 acres.[9] On December 20, 2019, the GLO sent a second letter that said the leases had partially terminated and demanding that Pearl execute partial releases.[10] Pearl disputed both letters, and did not file the releases.[11]

In February 2020, the GLO filed a Designation of Terminated Acreages and Depths in the real-property records of Pecos County, identifying the Alleged Terminated Acreage.[12] Soon after, Pearl filed for bankruptcy under Chapter 11.[13]

---

[8] ROA.35207:24–35208:8, 36785–87.

[9] ROA.36787.

[10] ROA.36787.

[11] ROA.36787.

[12] ROA.36787.

[13] ROA.36785.

### 2. The GLO invokes federal jurisdiction to litigate its dispute with Pearl in the bankruptcy court.

While the bankruptcy was pending, the GLO filed an adversary proceeding against Pearl.[14] The GLO sought a declaratory judgment that the State Leases had partially terminated by operation of law before the petition date and thus weren't property of Pearl's bankruptcy estate.[15] Pearl answered and asserted three counterclaims—to quiet title, for trespass to try title, and for breach of contract.[16] The GLO responded with two counterclaims of its own against Pearl: breach of contract (alleging Pearl failed to drill an offset well) and trespass to try title.[17]

Throughout, the GLO litigated the merits of its claims and Pearl's counterclaims—and never once raised Eleventh Amendment sovereign immunity or contested the court's jurisdiction. After Pearl counterclaimed, the GLO moved to dismiss Pearl's claims on the merits without raising sovereign immunity or challenging jurisdiction.[18] It twice answered Pearl's counterclaims, pleading affirmative defenses and counterclaims of its own, again without raising immunity

[14] ROA.36784.

[15] ROA.36784.

[16] ROA.229–42.

[17] ROA.36783–36784, .36798–36799, .36807–36808.

[18] *See* ROA.974, .979.

or jurisdiction.[19] It filed consents to the bankruptcy court's authority to enter judgment, without caveating that the court lacked jurisdiction on immunity grounds.[20] It participated in discovery on the merits.[21] And it even asked the bankruptcy court to grant summary judgment on the merits of Pearl's claims—once more without raising sovereign immunity or lack of jurisdiction.[22]

Ahead of trial, the GLO moved to exclude Pearl's expert, again without raising sovereign immunity or challenging jurisdiction.[23] The parties then tried the case over six days.[24] And in closing argument, the GLO raised sovereign immunity to liability, but it still did not object to jurisdiction or claim immunity to suit.[25] Just the opposite, in raising immunity to liability at closing, the GLO expressly confirmed that the court had jurisdiction: "[T]he GLO does not dispute that it has subjected itself to the jurisdiction of this Court."[26]

---

[19] *See* ROA.277–82, .987–94, .1526–41.

[20] Case No. 4:20-AP-3169, at Docs. 24, 68; ROA.920.

[21] *See* ROA.1933, .1941 n.35; *see also* Case No. 4:20-AP-3169, at Doc. 151.

[22] ROA.1933, .1948–1952; ROA.4644–4663.

[23] ROA.5407–5430; ROA.20843.

[24] ROA.36785.

[25] ROA.36636:19–36637:14.

[26] ROA.36637:4–6.

### 3. The bankruptcy court renders a judgment for Pearl, awarding over $40 million in damages.

After trial, the bankruptcy court issued its first Memorandum Opinion on February 28, 2025.[27] It found for Pearl on its breach-of-contract counterclaim and awarded Pearl $43,155,664 in damages.[28] It also found for the GLO on the GLO's own breach-of-contract counterclaim and awarded it $2,578,633 in damages, which offset Pearl's award and left a net recovery to Pearl of $40,577,031.[29] But the bankruptcy court also held that while the GLO had waived sovereign immunity to suit, it had not as to liability.[30] And on that basis, it held that Pearl's $40,577,031 recovery was "barred by sovereign immunity"—zeroing Pearl out.[31]

Pearl moved to alter or amend the judgment under Rule 59(e), contending that the GLO had waived immunity to liability.[32] The GLO, for its part, did not move to reconsider the ruling that it had waived immunity to suit.[33]

---

[27] ROA.36783.

[28] ROA.36784.

[29] ROA.36784.

[30] ROA.36784.

[31] ROA.36784.

[32] ROA.36952.

[33] ROA.36955–56 (finding "GLO waived immunity from suit to the exten[t] required for the lawsuit's complete determination, which includes the adjudication of Pearl's applicable counterclaims.") (cites omitted).

On June 27th, the bankruptcy court issued a second Memorandum Opinion granting Pearl's motion and finding that the GLO had waived immunity to liability as well as to suit.[34] The court therefore struck its prior finding that Pearl's recovery was barred and determined that Pearl's $40,577,031 award "is now recoverable" from the GLO.[35] Applying all offsets, the Court rendered a judgment for Pearl of $40,178,678.40.[36]

**4. The GLO appeals and Pearl cross-appeals, and this Court grants direct review.**

After the bankruptcy court entered its amended judgment, the GLO noticed its appeal, and Pearl noticed its conditional cross-appeal.[37] At Pearl's request, the bankruptcy court certified the amended judgment for direct appeal to this Court under 28 U.S.C. § 158(d)(2), and this Court granted permission to appeal.[38]

---

[34] ROA.36951, 36956–57, 36966–68.

[35] ROA.36957.

[36] ROA.36965.

[37] ROA.36966–68; ROA.5–11; ROA.61; ROA.68–70.

[38] ROA.13; Doc. 6.

## Summary of the Argument

The General Land Office tried this case for six days, lost on nearly every issue, and now leads its appeal with the one argument it never properly raised below—sovereign immunity. That alone tells the Court most of what it needs to know. Immunity is the GLO's flagship argument; the rest of its brief is a collection of disagreements with findings the GLO invited the bankruptcy court to make.

The immunity argument fails twice over. The GLO waived immunity from suit by invoking the court's jurisdiction, litigating the merits, and pressing its own counterclaim for compensatory royalties—choosing a federal ruling on the merits over the immunity it now urges on appeal. And it waited until closing argument to spring immunity from liability, a defense it never pleaded. The court had every right to reject a defense raised that late. And the defense is meritless regardless, because a State waives immunity from liability both by contracting with a private party, as the GLO did here, and by failing to plead it, as Texas law requires.

The rest of the appeal asks this Court for a mulligan. Having heard the witnesses, the bankruptcy court found Pearl engaged in continuous drilling operations on each snapshot date—like spudding three horizontal wells, building the water, power, and pit infrastructure they required, and fencing the site as the leases expressly demand. Those are fact findings, reviewed only for clear error. The GLO

shows no clear error—only that it would weigh the evidence differently. That's no ground for reversal. Just the opposite, it's why appellate courts defer to the factfinder who sat through trial.

The GLO's challenge to the damages award fares no better. The bankruptcy court found that the GLO's wrongful termination of the leases caused Pearl's losses, and it awarded only what Pearl proved—its increased drilling and facility costs, the diminished value of its wells, and the cost of repairing its infrastructure. Yet it rejected outright the two largest categories of damages Pearl sought. After applying offsets, the bankruptcy court entered a judgment in Pearl's favor for over $40 million. A factfinder that disciplined deserves deference, not second-guessing.

The cross-appeal is the mirror image. Unlike the GLO's fact-bound complaints, Pearl raises a pure question of contract interpretation, reviewed *de novo*. Here, the court misconstrued the leases. Paragraph 17 obligated Pearl to *begin* drilling an offset well within 100 days of the triggering event, and Pearl began spudding (initial drilling) the well in that period. But the court held that Pearl breached the lease and awarded offset damages because Pearl didn't *complete* drilling in that time. That offset should be removed.

In the end, the GLO asked for its day in court and got it. It chose where to file, how to plead, what to argue, and when. A losing strategy is not reversible error. The

GLO is not entitled to a redo simply because it's unsatisfied with the factfinder's rulings. This Court should affirm the judgment in Pearl's favor and remove only the offset against Pearl's recovery.

## Response to Appellants' Brief

### 1. The bankruptcy court correctly declined to recognize the untimely and meritless immunity defense the GLO invokes in its opening brief.

The GLO's brief starts by claiming two types of sovereign immunity: (A) immunity from suit under the Eleventh Amendment, and (B) immunity from liability under Texas state law. As discussed below, neither kind is available here.

#### A. *Immunity to Suit:* The GLO waived immunity by voluntarily invoking federal jurisdiction over its claims and defenses.

The function of an appeal is not to answer legal questions in the first instance, but rather to review a lower court's ruling to determine whether it committed a reversible error. But the GLO's briefing on immunity from suit is remarkably abstract, and it notably fails to challenge any specific ruling the bankruptcy court made below.

That failure is not an accident. Rather, it's a consequence of the GLO's failure to raise immunity from suit in the proceedings below. Instead, it fully participated in those proceedings and affirmatively invoked the bankruptcy court's jurisdiction over its affirmative claims and its defenses to Pearl's counterclaims. Because the

GLO failed to raise immunity from suit, the bankruptcy court never made a ruling on the subject for the GLO to challenge on appeal. Thus, GLO's brief argues immunity from suit in the abstract without tying it to any ruling below.

That failure is independently fatal because this Court's function in bankruptcy appeals is to "sit[] as a court of review, not of first view."[39] And even apart from that problem, the GLO's arguments fail for three reasons: (1) the GLO invoked federal jurisdiction over its defense to Pearl's counterclaims, (2) the GLO invoked federal jurisdiction through its own affirmative claims, and (3) the GLO's citation to irrelevant Bankruptcy Code provisions doesn't change that analysis.

**(1) The GLO cannot claim immunity to suit on appeal after it voluntarily invoked federal jurisdiction over the merits of Pearl's counterclaim.**

The GLO expressly concedes that it waived immunity to suit when it filed its adversary complaint against Pearl.[40] But the GLO seeks to limit the effect of that waiver, arguing for the first time on appeal that it waived sovereign immunity with respect to its own claims but maintained Eleventh Amendment immunity as to

---

[39] *Matter of Royal Alice Props., L.L.C.*, 159 F.4th 355, 361 (5th Cir. 2025) (quoting *Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017)).

[40] *Appellee's Br.* 22 (acknowledging "GLO's waiver of immunity" as to its "request for declaratory relief and trespass-to-try-title claim").

Pearl's counterclaims. Apart from its substantive defects,[41] this argument fails because it was not raised below. That is independently fatal to the GLO's claim of immunity to suit for two reasons.

First, the GLO incorrectly assumes Eleventh Amendment immunity automatically prevented the bankruptcy court from exercising jurisdiction over Pearl's counterclaims unless the GLO specifically waived immunity to those claims. In voluntary-invocation cases, that's not how waiver works.[42] As the Fifth Circuit explained in *Meyers*, "the Eleventh Amendment does not automatically destroy a federal court's jurisdiction over a claim; rather, it grants the state a legal power to assert a sovereign immunity defense, which it may raise or waive."[43] In such cases, immunity is only an issue when the state affirmatively "raises its sovereignty objection or defense."[44] If the state fails to do so, "the court can ignore" sovereign immunity and "need not raise the defect on its own."[45]

---

[41] *See Response*, Part 1(A)(2) (explaining why the GLO's immunity-from-suit argument fails even if had been properly raised below).

[42] *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 622 (2002) ("[T]he Eleventh Amendment waiver rules are different when a State's federal-court participation is involuntary.").

[43] *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 245 (5th Cir. 2005).

[44] *Id.* at 245.

[45] *Id.*

Here, the GLO did not raise its Eleventh Amendment immunity to suit objection below. Indeed, the GLO's only reference to immunity did not mention immunity to suit, but instead made a grossly untimely reference to immunity from liability.[46] So this isn't a case like *Caremark*[47] or the GLO's other authority,[48] which involved immunity defenses that were raised and decided ***before*** the state sought a ruling on the merits of its defense. Rather, this is a case in which the state actor responded to a counterclaim on the merits and fully participated in litigation without any attempt to invoke sovereign immunity to suit. In rejecting the GLO's belated invocation of immunity to liability, the bankruptcy court correctly determined that the defense was barred by the GLO's failure to raise its immunity defense before its

[46] ROA.36636:19–36637:14; ROA.36702, ¶ 63.

[47] *Texas v. Caremark, Inc.*, 584 F.3d 655, 657 (5th Cir. 2009) (states moving to dismiss affirmative defense "on the grounds of sovereign immunity," arguing defense was really a counterclaim); *see id.* (resolving immediate appeal from the denial of the immunity defense under the collateral-order doctrine).

[48] *See Georgia Dep't of Hum. Res. v. Bell*, 528 F. Supp. 17, 26 (N.D. Ga. 1981) (raising immunity to a counterclaim for monetary damages in a summary-judgment motion before court reached merits of counterclaim); *Frederick v. U.S.*, 386 F.2d. 481, 486 (5th Cir. 1967) (immunity raised in a motion to dismiss); *Woelffer v. Happy States of Am., Inc.*, 626 F. Supp. 599, 503 (N.D. Ill. 1985) (same).

closing argument at trial.[49] And under *Meyers*, the bankruptcy court was right to "ignore" the question of immunity to suit because the GLO never raised it at all.[50]

Second, and more fundamentally, the GLO cannot claim sovereign immunity to Pearl's counterclaims because the GLO affirmatively invoked the bankruptcy court's jurisdiction on the merits of those claims. Again, *Meyers* is instructive. There, the Fifth Circuit recounted the history of the Supreme Court's immunity-to-suit jurisprudence, including a time when states could raise immunity "for the first time on appeal."[51] Under that former rule, states could to take a heads-I-win-tails-you-lose approach to immunity by voluntarily defending against the merits of a claim in a trial court but then invoking immunity on appeal if the defense was unsuccessful.[52] But as *Meyers* explained, that is no longer the law. In recognition of the "seriously unfair results" that occur when states are allowed to "both invoke federal jurisdiction and claim immunity from federal suit in the same case," the

---

[49] ROA.36956–36957 (noting bankruptcy court's "comprehensive review" of pleadings showed GLO never pleaded immunity to liability).

[50] *Meyers*, 410 F.3d at 245.

[51] *Id.*

[52] *Id.* (quoting *Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 393 (1998) (Kennedy, J., concurring)).

Supreme Court's decision in *Lapides* overruled prior authority that let states defend on the merits in the trial court and reserve their immunity arguments for appeal.[53]

Under *Meyers* and *Lapides*, the GLO sacrificed its right to invoke immunity to suit by affirmatively invoking the bankruptcy court's jurisdiction over Pearl's counterclaims. It did so repeatedly throughout the case.

The GLO's invoking federal jurisdiction over Pearl's counterclaim started with the pleadings. After Pearl filed its counterclaim for damages, the GLO moved to dismiss Pearl's claims on the merits without ever raising sovereign immunity or lack of jurisdiction.[54] It also twice answered Pearl's counterclaims on the merits, pleading denials, affirmative defenses, and counterclaims that never mention sovereign immunity or lack of jurisdiction.[55] It filed two consents to the bankruptcy

---

[53] *Meyers*, 410 F.3d at 245 (referring to "the rule of [*Ford Motor Co. v. Dep't of Treasury of State of Indiana*, 323 U.S. 459 (1945)], and other cases, which had said the Eleventh Amendment bar may be asserted for the first time on appeal"); *id.* at 247 (explaining that the Supreme Court overruled *Ford* in *Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 623 (2002), because *Ford* was "inconsistent with the basic rationale of the voluntary invocation principle").

[54] *See* ROA.979–81 (seeking dismissal of Pearl's claims); ROA.987 (asserting affirmative defense to Pearl's breach-of-contract claim); ROA.994 (seeking denial of all relief sought in Pearl's counterclaims).

[55] *See* ROA.277–82, .1526–41. (admitting and denying Pearl's allegations and, in later answer, asserting affirmative defenses on the merits).

court's power to enter a judgment, making no caveat regarding a jurisdictional defect or sovereign immunity.[56]

When the pleadings closed, the GLO participated in discovery on the merits[57] then moved for summary judgment on the merits of Pearl's claims—also without ever raising sovereign immunity or lack of jurisdiction.[58] Under the Fifth Circuit's decision in *Int'l Truck & Engine Corp.*, this summary-judgment motion was independently fatal to any claim of immunity to suit because the GLO "[sought] summary judgment on the merits before raising sovereign immunity" in a motion to dismiss.[59]

---

[56] Case No. 4:20-AP-3169, at Docs. 24, 68; ROA.920.

[57] ROA.4654 ("Even taking Pearl's assertions in its own discovery responses and deposition testimony as true" activities were not continuous drilling activities); *see also* Case No. 4:20-AP-3169, at Doc. 151 (deposition notice Pearl's expert).

[58] ROA.1933, .1948–1952, .4656 ("The GLO is Entitled to Summary Judgment on Pearl's Breach of Contract Claim Because Pearl Can Not Prove an Essential Element of That Action." and seeking summary judgment on Pearl's other counterclaims); ROA.1946–1948, .1952–1956, .4654–4656, .4658–4663 (seeking summary judgment on GLO's claim and Pearl's damages). To be clear, in the motion, the GLO argues that Pearl's affirmative defenses of limitations, laches, or estoppel don't apply against the sovereign, but nowhere in any of its summary-judgment motions or reply does it argue any sort of sovereign immunity from suit or similar lack of jurisdiction; instead it sought a summary judgment on the merits of Pearl's claims. *See* ROA.4663, at ¶ 67.

[59] *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 720 n.4 (5th Cir. 2004) ("A state cannot simultaneously proceed past the motion and answer stage to the merits and hold back an immunity defense." (cleaned up)), *opinion corrected on denial of reh'g,* 380 F.3d 231 (5th Cir. 2004); *see also* ROA.36811 (discussing how under

The GLO's waiver of sovereign immunity to suit persisted. Ahead of trial, it moved to exclude the testimony of Pearl's expert on the merits, again without raising sovereign immunity to suit or lack of jurisdiction.[60] Then it participated in a six-day trial on the merits, which ended with a closing argument that raised immunity to liability—but still not immunity to suit.[61] In fact, when raising sovereign immunity to liability in closing, the GLO clarified that the bankruptcy court had jurisdiction: "the GLO does not dispute that it has subjected itself to the jurisdiction of this Court." [62] And after the bankruptcy court first held that the GLO waived immunity from suit[63] the GLO did not seek reconsideration. Only after the bankruptcy court reconsidered its ruling on immunity from liability and rendered a judgment for Pearl did the GLO raise sovereign immunity to suit in its opening brief in this Court. So far as the bankruptcy court was concerned, immunity to suit was never raised at all.

---

*Int'l Truck & Engine Corp.* "filing a motion for summary judgment on the merits before raising Sovereign Immunity waives the assertion of sovereign immunity.").

[60] *See* ROA.20843–44 (discussing GLO's motion to exclude Pearl's expert); ROA.20849 (deciding GLO's motion to exclude expert); ROA.5407–5430 (GLO's motion to exclude Pearl's expert).

[61] ROA.36636:19–36637:14.

[62] ROA.36637:4–6.

[63] *See* ROA.36955–36956 ("As this Court noted in its Memorandum Opinion, the GLO waived immunity from suit to the extend required for the lawsuit's complete determination, which includes the adjudication of Pearl's applicable counterclaims.") (cites omitted).

At every step below, the bankruptcy court exercised its jurisdiction at the GLO's request in order to consider the GLO's defenses to the merits of Pearl's counterclaims. Having received the day in court that it affirmatively sought in the proceedings below, the GLO cannot now rely on overruled authority[64] to contend that the bankruptcy court should have ***refused*** to rule on the GLO's defenses and declined *sua sponte* to entertain the counterclaim based on an immunity-to-suit defense the GLO never raised.

Accordingly, the bankruptcy court committed no error when it declined to address the immunity-to-suit argument the GLO failed to raise below, and the GLO cannot invoke immunity to suit as grounds for reversal on appeal.

**(2) The GLO's immunity-from-suit argument fails even if it had been raised below because Pearl's counterclaims arise from the same transaction or occurrence as the GLO's affirmative claims.**

As discussed, the GLO waived its right to invoke immunity from suit by voluntarily defending against Pearl's counterclaims without objecting to jurisdiction. But even if the GLO had properly raised its Eleventh Amendment arguments below, the outcome would be the same. The GLO's immunity-to-suit

[64] *See Appellant's Br.* 18 (quoting *Dagnall v. Gegenheimer*, 645 F.2d 2, 3 (5th Cir. 1981), to argue that GLO can raise Eleventh Amendment immunity for first time on appeal); *Dagnall*, 645 F.2d at 3 (relying on overruled *Ford* and its progeny).

defense still fails based on the waiver that occurred when the GLO invoked the federal jurisdiction over its own claims and counterclaims.

As the GLO acknowledges, when a state waives immunity by seeking affirmative relief in federal court, it also waives its immunity "to compulsory counterclaims" that "aris[e] out of the same transaction or occurrence which is the subject matter of the government's suit."[65] Here, the GLO doesn't dispute that Pearl's breach-of-contract claim is based on the same transaction or occurrence. So it logically follows then that the GLO's adversary complaint waived immunity with respect to that counterclaim as well. Still, the GLO employs three strategies to resist this conclusion. Each fails.

First, the GLO misplaces the burden by insisting that Pearl has the burden to establish the GLO's waiver of immunity.[66] But the GLO's citation says the burden shifts "[w]hen a defendant raises lack of subject-matter jurisdiction in a motion to dismiss."[67] Here, the GLO didn't raise immunity to suit in a motion to dismiss or otherwise, so the burden never shifted to Pearl to establish waiver.

---

[65] *Appellant's Br.* 19 (quoting *Caremark*, 584 F.3d at 659 (cleaned up)).

[66] *Appellant's Br.* 18 (citing *Kaswatuka v. U.S Dep't of Homeland Sec'y*, 7 F.4th 327, 329 (5th Cir. 2021)).

[67] *Kaswatuka*, 7 F.4th at 329.

Next, the GLO relies on *College Savings* and *Sossamon* to contend that waivers of sovereign immunity are "strictly construed" and subject to a "stringent" standard that favors the sovereign.[68] But those cases dealt with arguments that the states' immunity was waived by statute, not by their voluntary invocation of federal jurisdiction.[69] As the Supreme Court explained in *Lapides*, those cases turn on a different standard than cases involving "waivers effected by litigation conduct" because "waiver in the litigation context rests upon . . . the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages."[70] Thus, the GLO's waiver of its immunity should be judged by the standard set out in *Lapides* and *Meyers* for waivers based on voluntary conduct,[71]

---

[68] *See Appellant's Br.* 17 (citing *College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999), and *Sossamon v. Texas*, 563 U.S. 277, 285 (2011)).

[69] *College Savings*, 527 U.S. at 676 (noting state's alleged construction waiver of immunity from a case "in which the State has affirmatively invoked [federal] jurisdiction"); *Sossamon*, 563 U.S. at 293 (holding "that States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver").

[70] *Lapides*, 535 U.S. at 620.

[71] *See Response*, Part 1(A)(1) (discussing *Lapides* and *Meyers*).

not the "different" standard that applies to involuntary waivers based on states' non-litigation conduct.[72]

Finally, the GLO cites *Caremark* to claim its invocation of federal jurisdiction didn't waive immunity for "[counter-claims] exceeding an amount sought by it as plaintiff."[73] But *Caremark's* analysis focused on whether an affirmative defense was actually a compulsory or permissive counterclaim, and it was interlocutory in nature; it didn't involve a government that defended damage claims on the merits through trial without raising a jurisdictional objection.[74] Thus, *Caremark* is not instructive here. More to the point, the GLO offers no reason to exclude counterclaims for money damages from the general rule of the voluntary-invocation cases, which do "not turn upon the nature of the relief sought" and rest upon a "principle [that] remains sound as applied to suits for money damages."[75] And in any event, the GLO's argument rests on the false premise that the GLO did not seek money damages. As the record shows, the GLO did assert a contract claim for money damages "in the amount of $2,190,523.86—***or any other amount as determined by***

[72] *Lapides*, 535 U.S. at 622 ("[T]he Eleventh Amendment waiver rules are different when a State's federal-court participation is involuntary.")

[73] *Appellant's Br.* at 19–20 (quoting *Caremark, Inc.*, 584 F.3d at 659 (alteration by the GLO)).

[74] *Caremark*, 584 F.3d at 659.

[75] *Meyers*, 410 F.3d at 243.

***this Court***."[76] Thus, the GLO's invitation to imagine what would happen in a case where it had not sought damages is hypothetical. Under the GLO's own logic, its immunity waiver extends to counterclaims seeking the damages the GLO sought in its counterclaim—damages in "any" amount "determined by [the bankruptcy court]."[77]

Thus, even if the GLO had responded to Pearl's counterclaim by invoking immunity to suit, its argument would have still failed because the GLO affirmatively invoked federal jurisdiction over its own claims and counterclaims against Pearl.

**(3) Section 106 does not affect GLO's waiver of immunity to suit.**

The GLO's final argument contends that its immunity to suit was not abrogated under Section 106 because it never filed a proof of claim. The GLO's argument leaps in logic by assuming its adversary complaint isn't also a proof of claim. As this Court has held, adversary complaints can qualify as informal proofs of claim,[78] and the GLO doesn't explain why its adversary complaint shouldn't be treated as one that waives immunity under § 106(b).

---

[76] ROA.1541.

[77] ROA.1541.

[78] *See In re Nikoloutsos*, 199 F.3d 233 (5th Cir. 2000) (adopting five-part test to determining whether initiation of adversary qualifies as a proof of claim).

And even if the GLO's argument about § 106 was correct, it wouldn't affect the GLO's waiver of immunity through its litigation conduct. As discussed, the GLO waived its immunity to suit when it invoked the bankruptcy court's jurisdiction over its own claims and its defense to Pearl's counterclaims,[79] and that waiver is fatal to the GLO's claim of immunity whether Section 106 applies or not.

**B. *Immunity to Liability:* The GLO waived immunity to liability by failing to plead it and also by contracting with Pearl.**

The Court should likewise hold that the GLO waived sovereign immunity to liability. There are two independent grounds for finding that the GLO waived its immunity to liability: first, by failing to plead immunity to liability as an affirmative defense; second, by entering into a contract with Pearl.

On the first point, this Court's decision in *Carty* is dispositive.[80] There, this Court clarified that, unlike immunity from suit, immunity from liability is governed by state law and that under Texas law, "sovereign immunity from liability is treated

[79] *See Response*, Parts 1(A)(1)–(2); *see also In re Chen*, 227 B.R. 614, 623 (D.N.J. 1998) (state waived sovereign immunity when it "filed its own adversary complaint . . . and, thus, sought the aid of a federal court in resolving the merits of its claim").

[80] *Carty v. State Off. of Risk Mgmt.*, 733 F.3d 550, 554–55 (5th Cir. 2013), *certified question answered,* 436 S.W.3d 298 (Tex. 2014) (citing *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)).

as an affirmative defense to liability: 'it must be pleaded or else it is waived.'"[81] Here, the GLO never pleaded sovereign immunity to liability as an affirmative defense or even as a defense for that matter. It was precisely for that reason that the bankruptcy court, citing *Carty*, held that the GLO waived immunity to liability.[82] The GLO insists that the bankruptcy court should've done a surprise-or-prejudice analysis. But the two cases it cites for support, *Pasco* and *Arismendez*, were not cases that dealt with sovereign immunity to liability.[83] The GLO offers no sovereign-immunity cases for support for its argument. In fact, relying on the GLO's two cases only invites error because—like the GLO—both apply Federal Rule of Civil Procedure 8 to determine whether an affirmative defense was waived. Yet this Court in *Carty* instructed that *Texas law* decides whether a party waives sovereign immunity to liability.[84] And under Texas law, sovereign immunity "must be pleaded or else it is waived."[85]

---

[81] *Carty*, 733 F.3d at 554–55 (quoting *Texas Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638 (Tex. 1999)).

[82] ROA.36956.

[83] *Pasco v. Knoblauch*, 566 F.3d 572, 577–78 (5th Cir. 2009); *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 610 (5th Cir. 2007).

[84] *Carty*, 733 F.3d at 554–55.

[85] *Id*. (cites and quotes omitted).

As to the second point, regardless of pleadings standards, the GLO waived its sovereign immunity to liability by contracting. Texas law here is settled: "By entering into a contract, a governmental entity necessarily waives immunity from liability, voluntarily binding itself like any other party to the terms of agreement, but it does not waive immunity from suit."[86] The GLO therefore waived its immunity *from liability* by contracting with Pearl.

The GLO's cites to Tex. Civ. Prac. & Rem. Code §§ 114.001 and 114.003 do not change this analysis. Those provisions address when a governmental entity waives liability ***from suit*** under state law: "§ 114.003. Waiver of Immunity to Suit for Certain Claims."[87] But the issue is when, under Texas law, a governmental entity waives immunity ***from liability***. The answer is, when it enters into a contract.[88] To answer when immunity **from suit** is waived, *Carty* instructs that the federal

---

[86] *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006); *see also Texas Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002) ("When the State contracts with a private party, it waives immunity from *liability.*"); *Rostan Sols., LLC v. Corpus Christi Indep. Sch. Dist.*, No. 2:22-CV-00122, 2025 WL 2799320, at *4 (S.D. Tex. Sept. 30, 2025) ("A governmental entity waives immunity from liability when it voluntarily enters into a contract.").

[87] Tex. Civ. Prac. & Rem. Code § 114.003.

[88] *Tooke*, 197 S.W.3d at 332.

standards in *Meyers* apply.[89] And for the reasons stated earlier, under the *Meyers* standard, the GLO also waived immunity from suit.

Accordingly, the Court should affirm the bankruptcy court's judgment that the GLO waived sovereign immunity as to both suit and liability.

**2. The Court should affirm the bankruptcy court's judgment because the evidence showed the state leases are part of Pearl's bankruptcy estate.**

The Court should also reject the GLO's argument that Pearl's leases are not part of Pearl's bankruptcy estate. This argument turns on whether Pearl was engaged in continuous drilling operations on the relevant snapshot dates. If so, the leases didn't partially terminate, and they passed into Pearl's bankruptcy estate.[90] The bankruptcy court found, after a six-day trial, that Pearl was engaged in continuous

---

[89] *Carty*, 733 F.3d at 554, n.9 (citing *Meyers,* 410 F.3d at 243).

[90] *See* 11 U.S.C. § 541(a)(1) (estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case"); *see also* ROA.36797–98 (holding by bankruptcy court).

drilling operations.[91] That finding is supported by the record (much of it from the GLO's own witnesses[92]) and it's reviewed for clear error.[93]

In appealing the bankruptcy court's fact-findings, the GLO spends much of its brief entertaining a legal debate over when the snapshot dates occurred under the leases. For practical purposes, that debate is more academic than actual. The court held that because the later potential snapshot dates for every disputed lease fall *after* Pearl's bankruptcy filing, the operative question was whether Pearl was engaged in continuous drilling operations on the earlier dates the GLO advanced.[94] In other words, the court *used the GLO's dates*. The GLO concedes the bankruptcy court used the "correct" dates.[95] So whatever the better reading of the leases, the judgment

---

[91] ROA.36797 ("Accordingly, the Court finds the activities set forth in the foregoing chart are drilling operations and were continuing drilling operations on the applicable dates because each activity was designed to, and being conducted for the purpose of obtaining, initial production from a well.").

[92] *See, e.g.* ROA.35459:3–23; ROA.35460:22–23; ROA.35463:2–11; ROA.35499:7–9; ROA.35499:10–24.

[93] *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact … must not be set aside unless clearly erroneous"), made applicable by Fed. R. Bankr. P. 7052; *see also Saenz v. Gomez*, 899 F.3d 384, 390 (5th Cir. 2018) (reviewing bankruptcy court's fact-findings for clear error).

[94] ROA.36792–94.

[95] *Appellant's Br.* 38 ("Although the trial court erroneously concluded Section 16 created two snapshot dates, it use[d] the correct date to determine whether Pearl was engaged in continuous drilling operations – two years after the expiration of the primary term.").

rests on a finding made as of the GLO's proposed snapshot dates. That means the issue comes down to whether there's evidence of continuous drilling operations on those dates to support the bankruptcy court's fact-findings. There is plenty.

### A. The evidence supported the finding that Pearl was engaged in continuous drilling operations on the relevant snapshot dates.

The evidence of continuous drilling operations clears the small hurdle needed to affirm the bankruptcy court's findings. The factual determination as to whether Pearl was engaged in continuous drilling operations stems from Section 16 of the leases. Section 16(A) specifically holds acreage on the snapshot date if the lessee was *either* producing in paying quantities *or* "engaged in continuous drilling or reworking operations:"[96]

> **16. RETAINED ACREAGE.** Notwithstanding any provision of this lease ıo the contrary, after a well producing or capable of producing oil or gas has been completed on the leased premises, Lessee shall exercise the diligence of a reasonably prudent operator in drilling such additional well or wells as may be reasonably necessary for the proper development of the leased premises and in marketing the production thereon.
>
> **(A) VERTICAL.** In the event this lease is in force and effect two (2) years after the expiration date of the primary or extended term it shall then terminate as to all of the leased premises, EXCEPT (1) 40 acres surrounding each oil well capable of producing in paying quantities and 320 acres surrounding each gas well capable of producing in paying quantities (including a shut-in oil or gas well as provided in Paragraph 14 hereof), or a well upon which Lessee is then engaged in continuous drilling or reworking operations, or (2) the number of acres included in a producing pooled unit pursuant to Texas Natural Resources Code 52.151-52.154, or (3) such greater or lesser number of acres as may then be allocated for production purposes to a proration unit for each such producing well under the rules and regulations of the Railroad Commission of Texas, or any successor agency, or other governmental authority having jurisdiction. If at any time after the effective date of the partial termination provisions hereof, the applicable field rules are changed or the well or wells located thereon are reclassified so that less acreage is thereafter allocated to said well or wells for production purposes, this lease shall thereupon terminate as to all acreage not thereafter allocated to said well or wells for production purposes. Notwithstanding the termination of this lease as to a portion of the lands covered hereby, Lessee shall nevertheless continue to have the right of ingress to and egress from the lands still subject to this lease for all purposes described in Paragraph 1 hereof, together with easements and rights-of-way for existing roads, existing pipelines and other existing facilities on, over and across all the lands described in Paragraph 1 hereof ("the retained lands"), for access to and from the retained lands and for the gathering or transportation of oil, gas and other minerals produced from the retained lands.

The bankruptcy court applied the regulatory definition of "drilling operations," which "consists of all the activities designed and conducted in an effort

[96] *See e.g.,* ROA.20988.

to obtain initial production from a well."[97] Drilling operations, the bankruptcy court explained, "encompass[] more than just 'drilling'"; they are activities undertaken toward obtaining production.[98] By contrast, "drilling" is the narrow act of boring the hole.[99] So, as the figure below depicts, drilling is one of many types of activities that qualify as continuous drilling operations:[100]

---

[97] ROA.36795 (quoting 31 Tex. Admin. Code § 9.31(b)(2)).

[98] ROA.36795 (applying Texas Supreme Court's formulation) (citing *Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 158 (Tex. 2004)); *see also* ROA.36601:1–36602:6 (GLO's agreement that drilling operations are much broader than drilling, include preparing the roads, setting the batteries, and retainage ponds, and that "Drilling operations can take years.").

[99] ROA.36795.

[100] Record evidence shows each activity in this diagram qualifies as a drilling operation. *See e.g.*, ROA.35297:1–15, ROA.35369:19–35370:1 (staking and permitting); ROA.35369:19–35370:1, ROA.35625:3–25 (roads and pads); ROA.35444:17–35445:4, ROA.35460:24–35461:3, ROA.35264:23–35265:3 (pits and reserve pits); ROA.35499:7–9, ROA.35208:9–16, ROA.35712:15–35719:2 (water accumulation); ROA.35411:10–18, ROA.35455:16–35456:23, ROA.35457:17–35458:20 (surface casing); ROA.35471:1–16, ROA.35207:24–35208:8, ROA.35455:16–35458:20, ROA.36107:1–21, ROA.36111:7–23 (drilling); ROA.35460:22–23, ROA.35754:1–35756:7 (fencing and access); ROA.35589:18–35590:2, ROA.35499:22–24, ROA.35625:24–35627:6 (facilities and flowlines); ROA.35288:17–25, ROA.35724:1–35725:9 (diesel and generators).




On appeal, the GLO agrees that Pearl's compliance with the leases turns on whether it was engaged in the broader "continuous drilling activities"—*i.e.,* activities designed to obtain initial production.[101] But that wasn't its position at trial or, more importantly, when it deemed the leases terminated. The bankruptcy court noted that the GLO only tried to determine whether *actual drilling* had occurred and confused actual drilling with "drilling operations."[102] For example, the GLO's mineral specialist—the official who sent the October 2019 termination letter—agreed that the regulation defines a drilling operation as activities designed to obtain initial production, that a drilling permit is a drilling operation, and that spudding a

---

[101] *Appellant's Br.* 35–36.

[102] ROA.36795.

well is a drilling operation.[103] And she acknowledged that Pearl was engaging in drilling operations.[104] Yet she revealed that the October 2019 termination letter went out because the GLO believed Pearl had not *drilled*—not that Pearl had stopped its drilling operations.[105] As the bankruptcy court clarified in its analysis, holding acreage "does not call for drilling; drilling operations is sufficient."[106]

Because the bankruptcy court applied the right standard, its fact-findings that Pearl's activities were designed and conducted in an effort to obtain initial production from a well—*i.e.* continuous drilling operations—are reviewed for clear error.[107] That means its fact-findings deserve great deference and only constitute clear error if they're implausible given the record as a whole.[108] If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.[109]

---

[103] ROA.35297:1–15; ROA.35302:1–8.

[104] ROA.35302:9–35303:10; ROA.36795.

[105] ROA.35304:3–9; *see also* ROA.35266:4–7; ROA.35288:17–25; ROA.35375:12–18; ROA.36795.

[106] ROA.36796.

[107] Fed. R. Civ. P. 52(a)(6); ROA.36794 (applying § 9.31); ROA.36797.

[108] *See Hess Corp. v. Schlumberger Tech. Corp.*, 26 F.4th 229, 233 (5th Cir. 2022).

[109] *Id.*

Through that lens, the Court should affirm the bankruptcy court's fact-findings because they're supported by the evidence admitted at trial.

**(1) Pearl was engaged in continuous drilling operations for the 21 leases with 2018 snapshot dates.**

The bankruptcy court had evidence to find that Pearl was engaged in continuous drilling operations on the snapshot dates between September 1 and November 8, 2018. For 21 of the 27 disputed leases, the snapshot dates are between September 1 and November 8, 2018.[110] Every one of those dates fell during active drilling operations.[111]

The GLO insists the bankruptcy court needed to find qualifying drilling operations at each well on each snapshot date. The record supplied them. By the earliest 2018 snapshot dates—September 1 (Lease DD) and September 7 (Leases A, D, E, F, G, K, L, M, T, and U)—Pearl had spudded and set surface casing on Garnet State 2211HD on July 24, 2018, drilling to roughly 2,002 feet and setting and cementing surface casing, and had spudded and set surface casing on Garnet State 2021HA on July 30, 2018.[112] Pearl spudded the third horizontal well, 2022HA, on November 28, 2018, and set its surface casing on December 21, 2018—confirming

---

[110] ROA.36796.

[111] ROA.36791, 36795–97.

[112] ROA.36786–87; ROA.36055:17–25, 35455:16–35456:23, 36052:18–36053:1.

that operations on the leasehold were advancing, through the end of 2018.[113] And on each of the snapshot dates that followed, Pearl was accumulating and pumping water, purchasing diesel, and renting generators to supply those wells—the very activities the bankruptcy court found Pearl was performing for each of the September 1 through November 8, 2018 snapshot dates.[114]

Before even spudding, Pearl had commenced the staking and permitting process. The evidence shows Pearl had staked the wells before the snapshot dates.[115] Staking is itself a drilling operation because it's an activity in preparation for actually coming in and drilling the well.[116] Also, in late spring 2018, Pearl obtained drilling permits for three horizontal wells—2021HA on Section 20 (May 31, 2018), 2022HA on Section 20 (June 1, 2018), and 2211HD on Section 22 (June 8, 2018)—each accompanied by a plat setting the well's proration unit.[117] Obtaining the drilling permit is itself a drilling operation, and the GLO's own witness agreed.[118] And then,

---

[113] ROA.36029:21–25; ROA.36786–87.

[114] ROA.36795–97; ROA.35747:6–35748:14; ROA.35749:18–35750:3; ROA.35510:25–35511:24.

[115] ROA.36052:11–13; ROA.36054:16–20; ROA.36055:1–11; ROA.36105:18–36106:8; ROA.35822:9–25.

[116] ROA.36028:9–36029:10.

[117] ROA.35710:20–35711:1; ROA.36029:21–25; ROA.36571:24–36572:8; ROA.36786–87.

[118] ROA.35297:1–15.

as discussed, Pearl spudded two of the wells before the first snapshot dates[119] and spudded the third well soon after.[120] The GLO's expert also acknowledged that Pearl brought a spudding rig onto the leased premises, spudded and set surface casing on three wells beyond the producing Garnet State No. 3, and that all three long-lateral horizontal phantom Wolfcamp wells were spudded.[121] All this spudding work is a drilling operation, as the GLO's witnesses confirmed.[122]

So was Pearl's dirt work and work on the reserve and frac pits. Pearl engaged in "infrastructure development" on Sections 20 and 22 with heavy equipment—bulldozers, graders, and excavators—building, repairing, and reconditioning the pits on location.[123] That work is integral to drilling. The reserve pit is plastic-lined and used during the drilling process itself to control the well and to collect the cuttings that come off the bit.[124] For fracking, Pearl built a 600,000-barrel mega-pit and a 140,000-barrel sidecar pit on Section 20 and a 40,000-barrel frac pit on Section 22,

---

[119] ROA.36786–87.

[120] ROA.36786–87.

[121] ROA.35446:13–15; ROA.35411:10–18; ROA.35471:1–16.

[122] ROA.35302:1–8.

[123] ROA.35752:21–35753:1.

[124] ROA.35753:3–11.

so water could be cycled, drained, and refilled.[125] This infrastructure work spanned the operative period: it began with site preparation for the two wells Pearl spudded in July 2018 and continued, as the dirt work on the pits, into 2019.[126] The GLO's own expert conceded that constructing and filling the frac pits was "a convenient step to get to completion," as an alternative to hauling water, which could be financially unfeasible.[127] This dirt and pit work is itself a drilling operation. Dr. Dria in fact testified that staking, building well pads, and activities in preparation for actually drilling the well are drilling operations, and Pearl performed the pad and pit work for the purpose of obtaining production from a well.[128]

So too for Pearl's work accumulating and pumping water. Fracturing a single well requires roughly 600,000 barrels of water—*about 23 million gallons*.[129] Hauling that volume would take some 4,615 truckloads at a cost of about $2.3 million per well, so Pearl drilled its own water wells to pump and accumulate water on site.[130] Accumulating that water is itself a drilling operation, as Pearl accumulated

---

[125] ROA.35719:3–20.

[126] ROA.36786–36787, .35752:14–35753:1, .35759:7–25; 35749:18–35750:3.

[127] ROA.35444:24–35445:4; ROA.35497:17–35498:15.

[128] ROA.36028:9–36029:10; ROA.35743:7–35745:16.

[129] ROA.35712:15–35719:17.

[130] ROA.35714:4–35717:25; ROA.35712:15–35714:3.

the water to obtain production from a well.[131] The GLO's expert agreed that "water is a necessary component to fracking."[132] Dr. Dria placed this water work on the 2018 snapshot dates when walking the Court through a demonstrative chart she prepared and adopted at trial that plots Pearl's activities by date and reflects the water pumping underway from September 1 through November 8, 2018.[133]

In that vein, Pearl also engaged in drilling operations at these snapshot dates through its work obtaining generators and diesel. Pumping water required power, so Pearl ran generators and bought diesel to run them continuously, "I mean literally, continuously," because without diesel Pearl couldn't run the water wells and couldn't frac.[134] Pearl needed the diesel to obtain initial production from a well, making its purchase and use part of the drilling operation.[135] And the GLO's mineral specialist in fact conceded that obtaining a generator may perfectly align with Rule 9.31 preliminary work.[136] Like the water work, the diesel and generator activity is dated to the 2018 snapshot dates by the demonstrative Dr. Dria prepared and adopted

---

[131] ROA.35208:9–16; ROA.35744:22–35745:2.

[132] ROA.35499:7–9.

[133] ROA.35747:6–35748:14; ROA.35749:18–35750:3; ROA.36795–96.

[134] ROA.35739:14–35740:3.

[135] ROA.35745:17–35746:3.

[136] ROA.35288:17–25.

in her testimony.[137] And the bankruptcy court found that on each date from September 1 through November 8, 2018, Pearl was purchasing diesel and renting generators to pump water.[138]

That much of this activity shared water, power, and pit infrastructure rather than a single well bore does not defeat the finding. Pearl's water wells, frac pits, generators, and power lines formed one integrated system serving all three horizontal wells because fracking each well required the same accumulated water, the same pits, and the same power.[139] Work building out that system was a drilling operation directed at obtaining production from *each* of the wells, not just one.

Each of these activities served to obtain production. Dr. Dria testified that a continuous-drilling-operation activity moves forward diligently to get to a well that produces in paying quantities—beginning with staking, platting, and preparing the well site and readying the reserve pit.[140] Against that backdrop, the bankruptcy court made its findings. It set out, lease by lease, the drilling operations Pearl was engaged in on each lease's First Snapshot Date:[141]

---

[137] ROA.35747:6–35748:14; ROA.35749:18–35750:3.

[138] ROA.36795–97.

[139] ROA.35712:15–35719:20; ROA.35724:1–35725:9; ROA.35744:22–35745:2.

[140] ROA.35728:14–35729:13.

[141] ROA.36795–96.

| Lease | First Snapshot Date | Pearl's drilling operations as of the First Snapshot Date |
|---|---|---|
| DD; E, L, A, T, G, D, M, U, F, K | 9/1/2018; 9/7/2018 | Infrastructure development for Sections 20 and 22, including dirt work, fencing, pumping water; purchasing diesel fuel for generators for pumping water; renting generators for pumping water; repair frac tank for 2021HA. |
| P, R, Q, Y, C, X, W, V, J | 9/13/2018; 10/4/2018; 10/5/2018; 10/6/2018; 10/8/2018 | Infrastructure development for Sections 20 and 22, including dirt work, fencing, pumping water; purchasing diesel fuel for generators for pumping water; renting generators for pumping water; repair frac tank for 2021HA; drill conductor hole for 2022HA. |
| S | 11/8/2018 | Infrastructure development for Sections 20 and 22, including dirt work and fencing, pump water, purchase diesel fuel, drill at 2021HA, install water pumps, prepare for larger rig on Section 22. |

On those findings, the court concluded that the listed activities "are drilling operations and were continuing drilling operations on the applicable dates because each activity was designed to, and being conducted for the purpose of obtaining, initial production from a well."[142] It rejected the GLO's "maintenance" characterization, finding that "some maintenance, especially when paired with other activities such as spudding, is certainly essential and expected as part of continuous

[142] ROA.36797.

drilling operations."[143] And it determined that "the GLO has failed to meet its burden" to prove the leases had terminated under Paragraph 16(A).[144]

The GLO argues the bankruptcy court's findings were improperly based on a demonstrative, not substantive evidence.[145] But they weren't. They rested on Dr. Dria's testimony, the well permits and completion forms, the GLO's own witnesses, and the deep-rights-retention payments—all of which are in evidence.[146] The GLO concedes the court relied on Dr. Dria's testimony, and the court's findings cite the trial transcript directly.[147]

In any event, Dr. Dria adopted and incorporated the demonstrative chart, testifying she prepared the chart and that it was based on her knowledge, offering it as a convenient way to visualize the many drilling-operation activities underway on

---

[143] ROA.36797.

[144] ROA.36797.

[145] *Appellant's Br.* 39 (citing ROA.37919:2–7).

[146] ROA.36796 nn.80–83 (citing Dr. Dria's trial testimony); ROA.35728:14–35746:11 (Dria detailing the drilling-operations activities Pearl performed in 2018–2019); ROA.35302:1–35303:10 (GLO's witness Draughn conceding that spudding is a drilling operation and that drilling operations were occurring); ROA.35269:1–16 (deep-rights-retention payments made by Pearl and accepted by the GLO covering all 955.22 acres); ROA.35684:5–10, 35707:11–16, 35711:10–17 (drilling permits for Garnet State 3, 2021HA, 2022HA, and 2211HD).

[147] ROA.36796 & nn.80–83 (citing the transcript volumes); see *Appellant's Br.* 39 (conceding the court "also cited to large swaths of Dr. Dria's trial testimony").

the leasehold over time.[148] She also testified that the chart, organized by well and phase, shows all the activities that were occurring on the lease—including activities happening in 2018 or earlier.[149] In other words, even though the chart itself wasn't admitted into evidence, the substance reflected on it was admitted through Dr. Dria's testimony adopting it.

And even if the GLO suggests the testimony adopting the chart deserves no credit because Pearl prepared it for litigation, that argument goes to weight, not admissibility. The bankruptcy court heard the chart was prepared for trial, heard Dr. Dria testify to its contents, and credited her testimony.[150] Reweighing that credibility determination is precisely what clear-error review forbids.[151]

The evidence supports the bankruptcy court's fact-finding that Pearl was engaged in continuous drilling activities on the 2018 snapshot dates. Thus, that fact-finding should go undisturbed on appeal.

---

[148] ROA.35747:6–18; ROA.35748:9–14; ROA.35748:19–35749:1.

[149] *Compare* ROA.36796 (summarizing Case No. 4:20-AP-3169, Doc. 279-2, at 2–9) *to* ROA.35749:5–11; ROA.35749:18–35750:3; ROA.35750:20–35751:15; ROA.35752:14–35753:1; ROA.35754:1–22; ROA.35757:2–35758:14; ROA.35758:18–35759:25; ROA.35760:1–35761:1; ROA.36108:14–19.

[150] ROA.36788.

[151] Fed. R. Civ. P. 52(a)(6); *Hess Corp.*, 26 F.4th at 233.

**(2) The evidence shows that Pearl was engaged in continuous drilling operations for the remaining six leases with 2019 snapshot dates.**

The bankruptcy court also had evidence to find that Pearl was engaged in continuous drilling operations in the snapshot dates between July 26 and September 9, 2019. The remaining six leases—OO, PP, RR, QQ, SS, and TT—carry First Snapshot Dates between these dates.[152] As with the 2018 leases, Pearl was engaged in continuous drilling operations on each.[153]

That includes Pearl's dirt work and well-pad-repair work. Through September 2019, Pearl performed infrastructure dirt work on Sections 20 and 22—fixing roads, repairing the frac pits, and repairing well pads to bring in the rig—work made necessary because weather caused damage that had to be repaired to be able to bring in a rig and drill a well.[154] Pearl also purchased caliche in 2019 (think pavement) for the well pad to flatten the site so water would not accumulate near the well.[155] And it did this pad preparation to obtain production from a well.[156]

---

[152] ROA.36791–92, .36796.

[153] ROA.36795–97.

[154] ROA.35759:2–25.

[155] ROA.35738:19–24; ROA.35730:6–35733:18.

[156] ROA.35745:3–16.

Pearl also continued to work on its water infrastructure. In 2019 Pearl built out the system to move water to the wells for fracking. For instance, it set 13 poles to run electric lines out to the 600,000-barrel mega-pit so the water wells and transfer pumps could run on electricity.[157] It also built and reconditioned the mega-pit along with the 140,000 barrel pit and the 40,000 barrel pit.[158] Accumulating and moving that water is itself a drilling operation and Pearl did this work to obtain production.[159]

Pearl also added fencing in 2019, prompted by repeated trespass and vandalism—people cutting fences to drive cattle through, drilling through flow lines, and stealing gates, supplies, and copper—which threatened the delicate pit liners and the water supply Pearl needed to frac.[160] If the liners were damaged and water leaked, it would take longer to get to drilling.[161] The GLO's expert conceded that mending fences and fixing the frac-pit liners are operations, and the court even credited Pearl with painting the fences purple to reduce vandalism.[162] Indeed, fencing is an express drill-site obligation under the leases: Section 25 requires the lessee to build and

---

[157] ROA.35725:2–9.

[158] ROA.35757:2–17; ROA.35463:2–11.

[159] ROA.35208:9–16; ROA.35744:22–35745:2; ROA.35463:2–11.

[160] ROA.35754:1–35755:8; ROA.35755:15–35756:7.

[161] *Id.*

[162] ROA.35460:22–35461:3, .36796, .36797.

maintain fences around its slush, sump, and drainage pits and tank batteries.[163] Pearl's fencing thus continued its operations through the final snapshot dates under the leases separate and apart from the administrative code or caselaw.[164]

In 2019, Pearl also worked on generators and diesel fuel. To power the water wells and pumps, Pearl ran generators and bought diesel starting in January 2019.[165] It purchased and used the diesel to obtain production.[166]

Pearl also worked to bring the larger rig to the field, preparing authorizations for expenditure and taking bids—including a November 16, 2019 AFE for a 10,000-foot Wolfcamp lateral—and it had been accumulating produced oil in tanks at all three wells until some work stopped in December 2019 because the GLO repudiated the leases.[167]

The GLO's own evidence confirms that these leases were Pearl's to develop on their snapshot dates. Its mineral specialist testified to a document, marked "deep right[s] retained," reciting that lease OO was "good to" July 26, leases PP and RR to August 16, lease QQ to August 17, lease SS to August 25, and lease TT to

[163] ROA.20990.

[164] ROA.35754:1–22; ROA.36795–36796.

[165] ROA.35757:18–35759:1; ROA.35288:17–25.

[166] ROA.35745:17–35746:3.

[167] ROA.35803:13–35804:3; ROA.35735:11–35736:25.

September 9—the same dates that appear as each lease's snapshot date—meaning Pearl had paid to develop, and could develop, each lease through that date.[168] This of course, supports that at the relevant time the GLO itself believed that Pearl had taken the necessary steps to retain its acreage under these leases.[169]

With this evidence, the bankruptcy court made its fact-findings for the 2019 leases, detailing the drilling operations Pearl was engaged in on each lease's First Snapshot Date:[170]

<table>
<tr><th>Lease</th><th>First Snapshot Date</th><th>Pearl's drilling operations as of the First Snapshot Date</th></tr>
<tr><td>OO</td><td>7/26/2019</td><td rowspan="5">Infrastructure development for Sections 20 and 22, including dirt work and fencing, painting fences purple to reduce vandalism, pumping water, purchasing diesel fuel.</td></tr>
<tr><td>PP, RR</td><td>8/16/2019</td></tr>
<tr><td>QQ</td><td>8/17/2019</td></tr>
<tr><td>SS</td><td>8/25/2019</td></tr>
<tr><td>TT</td><td>9/9/2019</td></tr>
</table>

On those findings, as with the 2018 leases, the bankruptcy court held that the listed activities "are drilling operations and were continuing drilling operations on

---

[168] ROA.35346:3–35348:6.

[169] *See* ROA.35640:6–35641:9 (showing that the GLO's own conduct—in accepting Pearl's deep-rights-retention payments covering the disputed leases, which are owed only on acreage retained under the lease—supports that the GLO at the time considered the acreage retained.); ROA.25888–25894; ROA.35214:19–35215:4.

[170] ROA.36795–96.

the applicable dates because each activity was designed to, and being conducted for the purpose of obtaining, initial production from a well," and that "the GLO has failed to meet its burden."[171]

**(3) The GLO's contrary arguments fail.**

The GLO's contrary themes in its brief can't be reconciled with the record. It argues that Pearl's work was mere "maintenance," that Pearl couldn't afford to drill, that it never had a rig under contract, and that neighboring operators drilled faster. None survives the record.

As to the GLO's maintenance point, the activities it labels maintenance were the steps that make production possible. As the evidence showed, reserve pits control the well during drilling; water is indispensable to drilling and fracking, and trucking in the necessary volume was not economical; fencing protected the water and the pit liners so Pearl could frac.[172] The bankruptcy court, applying the regulatory standard, found these were drilling operations, as "some maintenance, especially when paired with other activities such as spudding, is certainly essential and expected as part of continuous drilling operations."[173]

---

[171] ROA.36797. For reasons already discussed, the Court should reject the GLO's argument about the demonstrative.

[172] ROA.35753:3–24; ROA.35712:15–35719:2; ROA.35754:9–35755:8.

[173] ROA.36797.

The evidence likewise belies the GLO's argument that Pearl was facing financial difficulties and couldn't drill. Pearl spent between $31 and $33 million operating Sections 20 and 22, funded its operations through a working-capital account (the financing model Dr. Dria had used when she ran the successful drilling operation for Opal Resources), and paid every lease-bonus, extension, and deep-rights fee through February 2020.[174] The evidence also showed that Pearl had the funds to finance a rig for 2211HD.[175] It solicited bids for the completion rig in May 2019 and again in December 2019—the very month of the repudiation.[176] The court could infer that a company does not seek rig bids it cannot pay for and does not intend to use. And the GLO's own witness admitted she never discussed Pearl's financing and did not know whether a rig was coming.[177] Simply put, the bankruptcy court had evidence to reject the GLO's financial-strain argument.

The GLO's legal cites don't move the needle either. For instance, the GLO cites *Haby* for the proposition that economic impracticability is no excuse for failure to perform. Perhaps. But the bankruptcy court didn't excuse Pearl's performance for

---

[174] ROA.35652:20–35654:11; ROA.35648:18–35650:24; *see also* ROA.35624:22–35631:14 (discussing running Goldman Sachs subsidiary, Opal Resources); ROA.35653:10–35654:11.

[175] ROA.36577:3–10.

[176] ROA.35761:2–10; ROA.35800:18–35802:16; ROA.37335:23–37336:10.

[177] ROA.35266:17–22; ROA.35761:2–10; ROA.35800:18–35802:16.

economic impracticability. It found that Pearl performed its duties by engaging in continuous drilling operations. This is unlike *Haby* where the lessee did *nothing*: it commenced no drilling or reworking operations at all within the lease's window.[178] Likewise, *Masterson*, only makes the point for Pearl. There, the lessee kept its lease in part because of its diligence, even though economic difficulty was no excuse.[179] In other words, a lessee that performs with diligence keeps its lease, regardless of economic circumstances. Pearl did. And the bankruptcy court agreed.

The evidence also undermines the GLO's no-rig argument. Pearl spudded all three wells and was mid-process—preparing AFEs (expense estimates for budgeting), finalizing the drilling design, and taking rig bids—when the GLO repudiated.[180] And Pearl in fact had an active spudder rig on site when the September 13 (P, R, Q), October 4 (Y, C), October 5 (X, W), October 6 (V), October 8 (J), and November 8 (S) snapshot dates passed—a fact the GLO's expert conceded.[181] Development proceeds in stages, and a spud rig sets surface casing without the large

---

[178] *Haby v. Stanolind Oil & Gas Co.*, 228 F.2d 298, 306 (5th Cir. 1955).

[179] *Masterson v. Amarillo Oil Co*., 253 S.W. 908, 912–16 (Tex. App.—Amarillo 1923, writ dism'd w.o.j.).

[180] ROA.35471:1–16; ROA.35761:2–35762:15; ROA.36582:14–20.

[181] ROA.35510:25–35511:24.

rig, as the GLO's expert agreed.[182] So the absence of a large rig doesn't answer whether Pearl was engaged in continuous-drilling operations.

Likewise, the GLO's diligence argument that neighboring wells were drilled faster than Pearl's ignores the evidence before the Court on how those wells sat on differently situated land. Dr. Dria testified that taking a horizontal well from raw ground to completion takes six to eight months at a minimum even with county-road access, and that the leasehold here had none—it's split by the Pecos River, sits on a flood plain, is crossed by an irrigation ditch, and required negotiated easements and built-up caliche roads before a rig could even reach it.[183] As Dr. Dria testified, 450 days wouldn't be unusual to go from actual drilling to production under the circumstances.[184] The GLO even conceded the point at closing: developing these fields "would have been difficult for anyone," and "[i]t was a hard play."[185]

And that answers the GLO's deeper premise. The GLO frames the continuous-operations question in terms of reasonable diligence and the conduct of a reasonably prudent operator. On that framing the record is Pearl's. Dr. Dria, a

---

[182] ROA.35827:18–35828:19; ROA.35446:4–8.

[183] ROA.35823:21–35824:8; ROA.36101:2–36102:20; ROA.35628:17–25; ROA.36588:1–15.

[184] ROA.36101:2–12, 36102:20.

[185] ROA.36633:17–36635:7.

professional engineer with a storied career in drilling operations,[186] testified that Pearl conducted continuous drilling operations diligently as a reasonably prudent operator until the repudiation, and that Pearl acted as a reasonably prudent operator would under similar circumstances.[187] She explained what the standard demands and testified that Pearl met it, drilling the offset well and carrying its operations forward in a timely, diligent, and reasonably prudent manner until the GLO intervened.[188] Asked directly whether Pearl was diligent in developing the leases in 2019, she answered: "Incredibly so."[189] The point also cuts the other way. For instance, Dr. Dria explained that it wouldn't have been prudent to spud in January 2019 because Pearl did not yet have the water needed to frac.[190] In other words, the staged pace the GLO criticizes as a lack of diligence was itself the prudent course. The bankruptcy court, hearing this testimony unrebutted, found Pearl had been engaged in activities designed to obtain production.[191] None of the GLO's cases involved

---

[186] ROA.35612:24–35613:13; ROA.35613:14–35624:22; ROA.35612:24–35613:13; ROA.35613:14–35624:22; ROA.36634–35.

[187] ROA.35820:10–16; ROA.35821:17–21.

[188] ROA.35820:17–35823:8; ROA.35821:22–35822:2.

[189] ROA.35812:4–7; *see also Appellant's Br.* 5 (quoting the same "incredibly so" diligence testimony, ROA.37979:4–7).

[190] ROA.35829:4–14.

[191] ROA.36797.

what the bankruptcy court did here—a factfinder that weighed competing evidence, credited Pearl's diligent, production-directed operations, and made findings reviewed only for clear error.[192] Nor did any of them apply the standard that governs here, under which "continuous drilling operations" encompass all activities designed and conducted to obtain initial production from a well.[193]

**B. Because the leases did not partially terminate, the GLO's DTAD was unauthorized, and the leases entered the estate.**

The GLO's last point is that it acted within its discretion when filing the Designation of Terminated Acreages and Depths. But that discretion presupposes the very thing the bankruptcy court found did not happen—a partial termination.[194]

Under Section 16(A), a lease terminates automatically, by operation of law, on the snapshot date if the acreage is neither producing nor subject to continuous

---

[192] *See, e.g., Hall v. McWilliams*, 404 S.W.2d 606, 609 (Tex. App.—Austin 1966, writ ref'd n.r.e.) (holding on undisputed facts that routinely starting the pump to keep it from sticking was not drilling or reworking operations); *Bargsley v. Pryor Petroleum Corp.*, 196 S.W.3d 823, 829–30 (Tex. App.—Eastland 2006, pet. denied) (reversing where trial court misplaced on the lessee the burden to prove production in paying quantities, which belonged to the party asserting termination); *Valence Operating Co. v. Anadarko Petroleum Corp.*, 303 S.W.3d 435, 440–41 (Tex. App.—Texarkana 2010, no pet.) (affirming a jury finding against the operator where preliminary backroom preparations, permits, and staking were found insufficient to establish commencement of operations).

[193] *Compare* ROA.36795 (bankruptcy court applying definition in 31 Tex. Admin. Code § 9.31(b)(2)) *with* cases in prior footnote.

[194] ROA.36798, 36800–01, 36806.

drilling operations. Section 16(C) does something narrower: it lets the GLO record a termination *that has occurred already*. The text confirms it. Section 16(C), titled "Identification and Filing," is triggered only "after partial termination of this lease," and authorizes the GLO to designate acreage by written instrument only if the lessee "fails or refuses" to record a release within 90 days of a request.[195] The "sole discretion" the provision grants is therefore discretion over *which* acreage to designate once a termination has occurred—not over *whether* a termination in fact occurred. Section 16(C) is a recording mechanism, not a termination mechanism.

Here, no termination occurred because—as the evidence shows and the bankruptcy court found—Pearl was engaged in continuous drilling operations on every snapshot date. Yet the GLO filed the DTAD anyway based on its own determination, applying its mistaken "drilling" standard, without first asking any court to decide whether the leases had terminated.[196] Its witness confirmed that the termination letter did not terminate the leases; the GLO simply proceeded forward with termination anyway.[197]

[195] ROA.20989 (Lease § 16(C)).

[196] ROA.35285:4–12; ROA.35339:19–35340:3; ROA.36587:8–15; ROA.36795.

[197] ROA.35286:12–14; ROA.35367:14–35368:21.

Because the leases had not terminated when Pearl filed for bankruptcy, they were property of Pearl's bankruptcy estate.[198] The GLO's authorities don't change that conclusion. Rather, *In re Trang* and *Jupiter Oil* address only what follows a termination—that a lease terminated before the petition does not enter the estate, and that on termination the mineral estate reverts.[199] So they're beside the point unless the GLO first establishes a termination, which the bankruptcy court's findings foreclose.

**3. The evidence supports the bankruptcy court's finding that the GLO's breach damaged Pearl by over $43 million.**

The bankruptcy court found that the GLO's breach caused Pearl four categories of damages, totaling $43,155,664.[200] The GLO asks this Court to set that award aside as speculative. But a damages finding by the court that heard the evidence is reviewed only for clear error. Whether evidence is reasonably certain is a fact-intensive determination for the factfinder.[201] And here, the bankruptcy court was exacting in its fact-findings. Pearl's expert, Dr. Dria, testified to six categories

---

[198] 11 U.S.C. § 541(a)(1); ROA.36797–98.

[199] *In re Trang*, 58 B.R. 183, 188–89 (Bankr. S.D. Tex. 1985); *Jupiter Oil Co. v. Snow*, 819 S.W.2d 466, 468–69 (Tex. 1991).

[200] ROA.36806.

[201] *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994).

of damages totaling $165,955,664.[202] The bankruptcy court awarded four but rejected the two largest, finding that Pearl "failed to demonstrate how" those figures were "attributable to the GLO."[203] The bankruptcy court thus applied the very screen the GLO invokes and kept only the categories the evidence tied to the breach. The four that remain are what a demanding factfinder retained after discarding the rest:[204]

| Damages category | Amount | Disposition |
|---|---|---|
| Increased drilling costs | $16,293,915 | Awarded |
| Decreased well value | $21,152,000 | Awarded |
| Increased facility costs | $2,206,000 | Awarded |
| Infrastructure repair | $3,504,133 | Awarded |
| **Awarded total** | **$43,155,664** | **Awarded** |

Even so, the GLO challenges causation and the damages amount. Pearl addresses each in turn.

### A. The evidence supports the bankruptcy court's finding that the GLO was the producing cause of Pearl's damages.

The bankruptcy court's fact-findings on causation were supported by the evidence. The bankruptcy court found that the GLO's filing of the DTAD "breached the DTAD Leases because it improperly asserts certain acreage was not retained,

[202] ROA.35478:17–35479:5; ROA.36720.

[203] ROA.36806.

[204] ROA.36806.

which prevented the drilling operations to continue on the three horizontal wells that had been permitted."[205] That caused Pearl to incur increased drilling costs, decreased well value, increased facility costs, and increased infrastructure-repair costs.[206]

Still, the GLO argues that Pearl couldn't have brought the three horizontal wells into *paying production* given its track record and that it lacked the money to finish.[207] As discussed earlier, record evidence showed that Pearl in fact had the finances to continue.[208] Moreover, Dr. Dria testified that, but for the GLO's letters and the DTAD, Pearl would've drilled—the laterals beginning May 2019, the vertical component by December 2019, and the deeper interval by January 2020.[209] Even the GLO's witness agreed that continued operations would have held the lease.[210] So on this record, the bankruptcy court could find that Pearl could continue. That finding is not clear error.

---

[205] ROA.36799–36800, .36805–06.

[206] ROA.36806; ROA.35479:6–15, 35829:19–35832:7; ROA.35480:10–35481:1, 35832:13–35852:24; ROA.35853:1–18; ROA.35477:18–23, 35808:17–35809:3.

[207] *Appellant's Br.* 56–57.

[208] *See Response*, Part 2(A)(3); *see also* ROA.35650:11–24, .35650:25–35652:1, .35652:20–23, .35653:10–35654:11.

[209] ROA.35720:18–35722:10.

[210] ROA.35584:21–35585:25.

The GLO similarly argues that Pearl developed the leases too slowly and already had production issues with Garnet State Well #4, which had been plugged and abandoned. But, as covered earlier, the GLO conceded that development here was "difficult for anyone" and "a hard play."[211] And the evidence was that bringing a horizontal well from raw ground to production on a county road takes six to eight months at a minimum; on the harder parcels, with no county road, 450 days is not unusual.[212] The evidence also showed that Garnet State #4 wasn't a dry hole where no oil and gas was present. Rather, Pearl's turnkey contractor messed up the well when it "didn't put sufficient mud weight on the well bore to keep formation pressures from entering," which ultimately "destroyed that whole well bore."[213] As Dr. Dria put it, "[i]t was a disaster."[214] A terminated contractor's blowout on a vertical well does not evidence that there's no oil and gas. Especially since Pearl drilled the Garnet State #3 well immediately afterward, which is producing.[215] So the court had evidence to determine that the Garnet State #4 fiasco resulted from contractor error and not that area lacked oil and gas. Thus, the GLO's claim that

---

[211] ROA.36633:17–36635:7.

[212] ROA.35823:21–35824:8; ROA.36101:2–36102:20.

[213] ROA.35697:13–35699:16.

[214] ROA.35698:24.

[215] ROA.35699:17–35700:7, 35692:3–35693:7, 36787.

Pearl was incompetent or otherwise couldn't attain production is a quarrel with the factfinder. And the fact-finder is entitled to deference.

But all these production points distract from the bigger problem with the GLO's causation argument. The GLO attacks a theory of causation that's not at issue. The cause of Pearl's damages was the GLO's preventing ongoing operations, which increased Pearl's costs—not a forecast that Pearl would, in the end, have struck oil.[216] Under Texas law, a party faced with an acknowledged repudiation may treat the contract as breached and recover the resulting damages at once; it need not perform to completion first.[217] So Pearl didn't need to prove it would've ultimately produced in paying quantities to recover the costs and lost value the GLO's repudiation caused.

To the extent producing cause is the standard, Pearl meets it. A producing cause is an "efficient, exciting, or contributing cause" that, in the natural sequence, produces the injury.[218] The GLO's repudiation did not merely contribute to the

---

[216] ROA.36806

[217] *Teleresource Corp. v. Accor N. Am., Inc.*, 427 S.W.3d 511, 518–19 (Tex. App.—Fort Worth 2014, pet. denied); *Kothmann v. Boley*, 308 S.W.2d 1, 4 (Tex. 1957); *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 20 (Tex. 2008).

[218] *Marrs & Smith P'ship v. Sombrero Oil & Gas Co.*, 511 S.W.3d 53, 59 (Tex. App.—El Paso 2014, no pet.) (cite omitted).

cessation of operations: it caused it. The bankruptcy court found as much.[219] Because those findings are supported by the evidence, they should be affirmed.

### B. The evidence supports the bankruptcy court's finding that the GLO damaged Pearl by over $43 million.

The Court should likewise affirm the bankruptcy court's findings on damages. The GLO contends that Pearl's damages are barred by sovereign immunity and that it committed no breach. For the reasons covered above, each argument fails.[220] What remains is the GLO's claim that each of the four awarded categories is too speculative to stand. They're not.

#### (1) The drilling-cost and facility-cost numbers rest on industry-standard estimates that the GLO's expert did not meaningfully dispute.

The bankruptcy court had evidence to support the damages it awarded for increased drilling and facility costs.[221] The largest cost number—$16,293,915 in increased drilling costs—is the difference between what it would've cost to drill the three laterals in 2019 and what it would cost in 2022.[222] Dr. Dria built it from

---

[219] ROA.36806.

[220] *See generally Response*, Part 1.

[221] ROA.36806; ROA.35478:17–35479:5; ROA.35761:11–35762:15; ROA.35782:9–35783:6; ROA.35798:25–35802:16; ROA.35803:13–35804:3; ROA.35804:12–35805:25; ROA.35807:24–35808:17; ROA.35829:19–35832:7; ROA.36720.

[222] ROA.35479:6–15; ROA.35829:22–25.

approvals for expenditures, or AFEs.[223] An AFE is the standard industry instrument for defining well services and total cost before drilling—broken into pre-spud, spud, drilling, completion, and facility phases.[224] Her 2019 figures came from AFEs she solicited specific to Sections 20 and 22.[225] The November 16, 2019 AFE for a 10,000-foot Wolfcamp A lateral, with full engineering specifications, came to $9,180,296.[226] Her 2022 figures came from two independent bidders who routinely drill these wells.[227] Each generated a November 2022 AFE for the same acreage.[228] The 10,000-foot lateral had risen to roughly $15 million, the 5,000-foot lateral to about $10 million.[229] The facility number—$2,206,000—was built the same way, from actual bids Pearl received as metal and component prices climbed.[230]

The reliability of the method cuts in Pearl's favor in a way the GLO does not acknowledge. Dr. Dria testified that AFEs are standard in the industry, that she has relied on them to authorize multimillion-dollar projects "countless" times, and that

---

[223] ROA.35761:11–14

[224] ROA.35761:11–35762:9; ROA.35782:9–35783:6.

[225] ROA.35803:13–35804:3.

[226] ROA.35803:13–35804:3.

[227] ROA.35800:18–35801:5.

[228] ROA. 35800:18–35801:5, 35801:22–25

[229] ROA.35800:18–35802:16; ROA.35804:12–35805:25; see also ROA.35805:1–4.

[230] ROA.35853:1–18.

it is *rare* for a well's actual cost to come in *below* its AFE.[231] If her AFE-based estimate errs at all, it will be because the actual costs are higher than the AFEs.[232] So any imprecision favors the GLO, not Pearl.

Nor did the GLO's own expert dispute these numbers. Asked about the increased-cost figure, he agreed "prices have gone up" and he "didn't see anything glaring that stuck out to [him] as being odd."[233] His only stated objection was not to the numbers at all, but to Pearl's diligence: "My only observation would be she could have saved much of this cost by drilling these three laterals in late 2018."[234] That is a causation argument (covered already) not a challenge to the figures, on which his expert agreed. And the GLO offered no competing number of its own.

The GLO quotes Dr. Dria conceding that AFEs are estimates that rarely align exactly with actual costs and that components can be off.[235] That is simply the nature of an AFE, which Dr. Dria explained is a conservative planning instrument. The GLO takes the concession that AFEs are estimates and omits the rest—that they are

---

[231] ROA.35830:4–35831:24.

[232] ROA.35831:20–24.

[233] ROA.35477:14–35478:3.

[234] ROA.35479:25–35480:9.

[235] ROA.37959:2–19; ROA.37997:12–17; ROA.37998:12–24.

reliable enough to authorize real spending and rarely overstate cost.[236] The objection goes to weight, which the factfinder resolved.

The cases the GLO marshals do not reach numbers like these. Those cases police projected income—lost profits offered to prove the market value of an asset. The drilling-and facility-cost numbers are nothing of the kind because they're the incurred and quoted costs of work, drawn from AFEs and actual bids. There's no forecast to doubt.[237] And because the bankruptcy court had these industry-standard quotes to work from to discern the amount of Pearl's increased costs, this Court should defer to its damages findings.

**(2) The infrastructure-repair damages were supported by the evidence.**

The evidence also supported Pearl's infrastructure-repair damages.[238] The GLO also attacks the $3,504,133 infrastructure-repair number in two places that are hard to reconcile. In its damages argument, the GLO says the figure is overstated because Dr. Dria attributed all the damage to the lack of use since December 2019 without deducting routine, ordinary-course repairs Pearl would have made

---

[236] ROA.35830:1–35831:24.

[237] *See Phillips v. Carlton Energy Grp.*, LLC, 475 S.W.3d 265, 279–80 (Tex. 2015).

[238] ROA.36806; ROA.35808:17–35809:3; ROA.35754:1–35755:8; ROA.35755:15–35756:7; ROA.35759:2–25; ROA.35760:13–35761:1; ROA.35853:1–18.

anyway.[239] But in its causation argument, the GLO suggests the opposite—that the repairs were "necessitated by natural forces … vandalism and third-party interference … prior to any purported repudiation."[240] One attack says the damage is post-repudiation idling; the other says it is pre-repudiation third-party harm. The record resolves both by distinguishing two kinds of work.

The first is the protective and development work Pearl did in 2019, which the GLO mislabels as uncompensable "vandalism" damage. That work was part of Pearl's drilling operations. Dr. Dria fenced the site because of repeated trespass and vandalism, to protect the water supply so she'd be able to frack and to protect the delicate pit liners; trespassers had been drilling through her flow lines, with gates being stolen, supplies taken, oil stolen, people taking copper.[241] She repaired the frac pit because it had holes in it and couldn't collect water needed to frack without repairing it.[242] The GLO's own expert agreed that mending fences is a continuous drilling operation, and repairing pit liners damaged by wildlife are examples of lease

---

[239] *Appellant's Br.* 59; ROA.25288.

[240] *Appellant's Br.* 57; ROA.37921:8–37922:1.

[241] ROA.35754:9–22; ROA.35755:15–35756:7.

[242] ROA.35760:13–35761:1.

maintenance operations.[243] The 2019 protective work was Pearl's own operation—part of the continuous operations the repudiation later stopped.

The second kind of work is the deterioration that followed the repudiation—that's the $3.5 million the court awarded. Once the December 2019 repudiation idled the leasehold, there was, as Dr. Dria explained, no point in putting money into maintaining the facilities infrastructure and the roads, especially given the vandalism and how the environment continues to take a toll on the pits.[244] Those repairs flow from the idling the repudiation forced. They are the harm the breach caused.

The GLO's remaining point—that Dr. Dria failed to deduct "routine" repairs—fails for three reasons. First, this is not routine maintenance. It's the cost of restoring infrastructure that deteriorated *because* the repudiation idled it. There's no "routine" baseline to subtract because the infrastructure would have been in use but for the repudiation. Second, the GLO offered no evidence of what "routine" repairs would've cost to show that Pearl's damages included those too. Argument is not evidence. Third, the GLO's own expert found nothing "glaring" in Pearl's numbers.[245] On this record, there's no basis to argue that the bankruptcy court

[243] ROA.35460:22–35461:3; *see also* ROA.35459:3–23.

[244] ROA.35808:17–35809:3.

[245] ROA.35477:14–35478:3.

committed clear error in finding that Pearl incurred these infrastructure-repair damages because of the GLO's repudiation.

**(3) The evidence shows that the decreased-well-value number compares the same wells' value at two points in time.**

The same is true for Pearl's decreased-well-value damages.[246] The main number the GLO contests is the $21,152,000 in decreased well value. It attacks that figure as speculative because Dr. Dria did not adjust for the risk a well might be dry.[247] That attack misunderstands what the number measures.

The number is not a prediction that the wells would produce. It is a comparison of the value of the *same* three wells under two sets of conditions—those of 2019 and those of 2022—with the only difference being time.[248] She valued each well using actual product prices from 2020 through trial, and then NYMEX futures—the standard process in the industry, chosen because they more closely reflect what the market is going to look like, not to maximize the number.[249] She reduced the result to Pearl's net-revenue interest of 70.8% after royalties and

[246] ROA.36806; ROA.35480:10–35481:1; ROA.35832:13–35837:17; ROA.35838:15–35840:10; ROA.35840:11–35843:24; ROA.35844:8–35846:23; ROA.35847:1–35848:16; ROA.35849:8–10; ROA.35850:15–35852:24; ROA.35871:11–35872:18.

[247] *Appellant's Br.* 60.

[248] ROA.35832:17–35853:18.

[249] ROA.35846:1–35849:10.

overriding royalties, and subtracted severance and ad-valorem taxes and operating costs—"a full financial view."[250] The difference between the 2019 value and the 2022 value, summed across the three planned wells, is the $21,152,000.[251]

Understood for what it is, the number answers the GLO's risk objection on its own terms. Because the comparison is between the *same* wells at two points in time, whatever assumption one makes about whether those wells would produce sits on *both* sides of the subtraction and cancels. If there were some risk that a well would not produce, that risk is embedded in the 2019 value and the 2022 value alike. Subtracting one from the other isolates what changed between the two dates—the drilling cost and the price of the product. The number doesn't depend on the wells producing. It measures the value lost to delay. The GLO's demand for a separate dry-hole discount asks Dr. Dria to adjust for a risk that the measure already nets out.

Texas law treats this measure as ordinary. Where projected income establishes the market value of property, the law is no more skeptical of the loss than the market itself is.[252] Reasonable certainty is measured with the market's view in mind: the law doesn't demand greater certainty in projecting profits than the market itself would

[250] ROA.35844:13–35848:16; ROA.35872:5–18.

[251] ROA.35850:1–35852:24, 35832:13–16.

[252] *Phillips*, 475 S.W.3d at 280–81.

in valuing the asset.[253] The loss of value to a mineral interest is a concrete injury, not a speculative one.[254] Pearl's number measures exactly that and asks the Court to view it as the market would.

Even treated as a forecast of lost profits, the number would satisfy the standard—because, unlike the projections in every case the GLO cites, it rests on real production data. Dr. Dria built it from the actual production of the 13 immediate offset horizontal wells, drawn from Railroad Commission data, overlaid on a common start date and averaged, and from that history she derived the expected rate of decline.[255] The GLO concedes that she used this offset-well history.[256] That concession matters because its lead authority, *Ramco*, held a lost-profits model speculative in part because the expert had no production history and the field had never produced.[257] Dr. Dria did the opposite of what made the damages in *Ramco* speculative.

[253] *Id.*

[254] *Coastal*, 268 S.W.3d at 10–11.

[255] ROA.35838:15–35843:24; ROA.35480:10–35481:1.

[256] *Appellant's Br*. 61.

[257] *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 821–25 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

This reality is what distinguishes the GLO's flagship cases because the projections in those cases rested on something that didn't exist or wasn't proven:[258]

| The GLO's case | Why the projection was speculative there | What the record shows here |
|---|---|---|
| ***Tex. Instruments v. Teletron*** | A product (the T-2000) that was never built and never sold; its very viability was "in doubt." | Producing offset wells and a producing well (GS#3) in an established formation. |
| ***Ramco v. Anglo-Dutch*** | A field that never produced; the expert called production history "irrelevant." | Built on the actual production of 13 producing offset wells—which the GLO concedes she used. |
| ***Phillips v. Carlton Energy*** | Profit-based models resting on unverified volume predictions. | A 13-well Railroad Commission production history. |
| ***Barton v. Resort Dev.*** | "Stack[ed] assumption upon assumption" on an asset never acquired and a project never built. | Leases Pearl held, ~$33 million spent operating them, and one well already producing. |

On the other hand, Pearl's number rests on the actual production of real, producing neighboring wells.

The offset-well average also answers the dry-hole objection. Because the type curve averages the actual production of *all* the immediate neighboring wells—not a selected few—any well in that group that underperformed or failed is already in the

[258] *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 280 (Tex. 1994); *Phillips*, 475 S.W.3d at 280–81; *Ramco Oil & Gas Ltd.*, 207 S.W.3d at 821–22, 825; *Barton v. Resort Dev. Latin Am., Inc.*, 413 S.W.3d 232, 238–39 (Tex. App.—Dallas 2013, no pet.).

average. That empirical history substitutes for a theoretical risk of drilling a dry hole. To demand a separate discount on top, as the GLO urges, would double-count a risk the data already captures.[259]And as covered earlier, the GLO's one example of "inherent risk" (Garnet State #4) proves nothing about the formation producing a dry hole because it resulted from a contractor's blowout, not a dry hole.[260]

The standard of review answers what remains. The bankruptcy court credited Dr. Dria, and not the GLO's expert.[261] That expert's substantive criticism—that Dr. Dria should have accounted for expenses, royalties, and taxes—was simply wrong on the facts as her model accounts for all three.[262] The GLO's criticism goes to weight, and the factfinder weighed them. Its finding is not clear error.

That a number like this is provable at all is settled in the oil-and-gas context. The measure of damages for production lost to a breach is the value of the quantity that would have been produced—a quantity-times-value measure.[263] And that may be proven with reasonable certainty through expert opinion, as Dr. Dria did here

---

[259] ROA.35838:15–35843:24.

[260] ROA.35697:13–35699:19; ROA.35699:17–35700:7.

[261] ROA.36806; ROA.36720.

[262] ROA.35872:5–18.

[263] *Tex. Pac. Coal & Oil Co. v. Barker*, 6 S.W.2d 1031, 1037 (Tex. 1928).

using the production of comparable, neighboring wells.[264] Dr. Dria's method is that measure, applied with real data. And with that evidence in hand, the bankruptcy court did not commit clear error in awarding these damages.

Accordingly, the Court should affirm the bankruptcy court's award of $43,155,664 for breach of contract.

## Cross-Appeal

Pearl cross-appeals the part of the judgment holding that it breached the offset-well obligation in Paragraph 17 of the lease and awarding the GLO $2,578,633 in compensatory royalties.[265] In the bankruptcy court's view, Pearl violated Section 17 of the lease because, although Pearl *began drilling* the 2021HA offset well within 100 days of the Whiskey River well's production becoming publicly ascertainable, it did not drill that well to completion as a producing offset well.[266]

That ruling rests on a misreading of what Paragraph 17 requires. Paragraph 17 required Pearl only to *begin* drilling an offset well within 100 days after the neighboring well producing in commercial quantities:[267]

---

[264] *See id.* at 1033–34; *Amoco Prod. Co. v. Alexander*, 594 S.W.2d 467, 477 (Tex. Civ. App.—Houston [1st Dist.] 1979, pet. granted).

[265] ROA.36805–06; ROA.36809; ROA.36965.

[266] ROA.36803–04, .36807.

[267] *See, e.g.,* ROA.20989.

> **17. OFFSET WELLS.** Neither the bonus, delay rentals, nor royalties paid, or to be paid, under this lease shall relieve Lessee of his obligation to protect the oil and gas under the above-described land from being drained. Lessee, sublessee, receiver or other agent in control of the leased premises shall drill as many wells as the facts may justify and shall use appropriate means and drill to a depth necessary to prevent undue drainage of oil and gas from the leased premises. In addition, if oil and/or gas should be produced in commercial quantities within 1,000 feet of the leased premises, or in any case where the leased premises is being drained by production of oil or gas, the Lessee, sublessee, receiver or other agent in control of the leased premises shall in good faith begin the drilling of a well or wells upon the leased premises within 100 days after the draining well or wells or the well or wells completed within 1,000 feet of the leased premises start producing in commercial quantities and shall prosecute such drilling with diligence. Failure to satisfy the statutory offset obligation may subject this lease and the owner of the soil's agency rights to forfeiture Only upon the determination of the Commissioner of the General Land Office and with his written approval may the payment of compensatory royalty under applicable statutory parameters satisfy the obligation to drill an offset well or wells required under this paragraph.

This language reveals two issues in the bankruptcy court's analysis that justify reversal. First, the bankruptcy court should've held that the 100-day clock started on May 17, 2018—when the Whiskey River well was certified to be producing in commercial quantities—instead of November 15, 2017. Second, the bankruptcy court should've held that Pearl satisfied Paragraph 17 because it did in fact "begin the drilling" of the offset well within the 100 days of May 17, 2018. Pearl addresses each in turn.

**1. The 100-day clock started on May 17, 2018, when the Whiskey River well was deemed to be producing in commercial quantities.**

The 100-day clock did not begin until May 17, 2018, when the Railroad Commission validated and made public the completion report (Form W-2) certifying that the Whiskey River well was producing in commercial quantities. That's the date Paragraph 17 keys to.[268]

[268] ROA.36111:24–36112:2; ROA.36107:1–21 ROA.36027:9–17; ROA.72471.

Paragraph 17 starts the 100-day period when the adjacent well "start[s] producing in commercial quantities."[269] The operative phrase is *commercial quantities*—not the first flow of hydrocarbons. Whether a well is producing in commercial quantities is not a fact that exists in the air, observable by a neighbor; it's a determination made through testing and established of record when the operator files, and the Commission approves, the well's completion report. Dr. Dria testified that Paragraph 17 uses testing language, so it's until testing is done that one can verify if the well is producing in commercial quantities.[270] The completion report is the instrument that records that verified result and announces it.

That's why Dr. Dria identified the date of commercial production as May 17, 2018—the date the Whiskey River well's completion report was validated and became public.[271] While the record also mentions earlier dates, none mark when commercial production occurred. The Form W-2 lists November 15, 2017 only as the first date of production—*i.e.* the first flow of any hydrocarbons, not a determination of commercial quantities.[272] And although the report, once filed, recited a test date, that internal date was only reported on the completed validation

---

[269] ROA.20989.

[270] ROA.36026:14–36027:3.

[271] ROA.36111:24–36112:2; ROA.36027:9–17; ROA.72471.

[272] ROA.36112:6–13.

of the W-2, which did not exist until May 17, 2018.[273] The commercial-quantities determination and its public availability are one and the same event—the issuance of the approved W-2. That occurred on May 17, 2018.

Reading Paragraph 17 any other way produces an untenable result. The offset obligation exists so the lessee can protect its acreage from a draining neighbor; it presupposes that the lessee can know drainage is occurring. Yet the undisputed evidence shows Pearl had no way to know the Whiskey River well was producing in commercial quantities before the completion report became public. Dr. Dria testified that the approved W-2 would be the first time Pearl could know the well was producing, and that simply observing the neighboring tract would not have alerted Pearl of production in commercial quantities.[274] Asked directly whether she could tell by observing her neighbor, she answered: "No, I would not be able to tell ... [f]rom visually observing."[275] Rather, only when the announcement has been made publicly, which is the completion report filed in the W-2, would it be possible

[273] ROA.36027:9–17; ROA.72471; ROA.36026:14–36027:3.

[274] ROA.36024:10–36025:25.

[275] ROA.36025:21–36026:2.

to know there's production.[276] So the earliest Pearl could know of commercial production was May 2018 when the report was filed.[277]

A 100-day deadline cannot run from a date the obligated operator has no way to discover. To start the clock at the unknowable moment of first flow—or at an internal test date buried in a report not yet filed—would require Pearl to be clairvoyant. The only construction that gives Paragraph 17 sensible effect keys "commercial quantities" to the public completion report. That occurred on May 17, 2018. The GLO offered no evidence to the contrary—no witness and no document—suggesting Pearl knew or could have known of commercial production any earlier. The testimony fixing May 17, 2018 as the operative date stood unrebutted.

So even if the bankruptcy court's finding was premised on the clock starting on November 15, 2017, that finding was based on an erroneous reading of Paragraph 17's "commercial quantities" standard and cannot be reconciled with the undisputed evidence of when that condition was established and became knowable.

---

[276] ROA.36026:3–7.

[277] ROA.36027:18–36028:1.

**2. Because Pearl "began the drilling" of the offset well within 100 days, it did not breach Paragraph 17 of the lease.**

Measured from May 17, 2018, Pearl complied with Paragraph 17 because it began drilling the offset well on July 27, 2018—71 days later.[278] To be sure, the bankruptcy court also assumed for argument's sake that the 100-day clock started on May 17, 2018, but it then held Pearl breached because it did not actually drill an offset well.[279] This was error because Paragraph 17 only required Pearl to "begin the drilling of a well" within 100 days.[280] The provision didn't require Pearl to *complete* a producing offset well within 100 days. The GLO's offset-well landman testified that operations "would have obviously kept the lease intact" and that so long as the operator kept the operations going by drilling, even though not completed, the operations would have "held the lease."[281] Beginning to drill—not completing a producing well—is what Paragraph 17 demands within the 100 days.

And the undisputed evidence showed that Pearl began drilling the offset well—spudding Garnet State 2021HA on July 27, 2018—within 100 days of May

---

[278] ROA.36107:1–21; ROA.36111:7–23; ROA.34990–91; ROA.35020; ROA.72471; ROA.33723; ROA.35822:3–25.

[279] ROA.36802–04.

[280] ROA.20989.

[281] ROA.35584–85.

17, 2018.[282] Indeed, the bankruptcy court's own findings establish as much: "actual drilling for Well 2021HA began within the prescribed 100-day period."[283] The bankruptcy court's contrary conclusion rests on requiring something Paragraph 17 does not. By faulting Pearl for not drilling the offset well to completion—for the rig's release after spudding and the absence of a producing offset well—the court measured Pearl against a completed-well standard the lease's text forecloses.

Paragraph 17 obligated Pearl to begin drilling within 100 days of commercial production. And the undisputed evidence shows Pearl began drilling the offset well within 100 days of that date. Pearl did what Paragraph 17 required. So the bankruptcy court erred in holding that Pearl breached the lease.

And that error was far from harmless. The breach finding is the sole basis for the $2,578,633 compensatory-royalty award offsetting Pearl's judgment.[284] Because Pearl complied with Paragraph 17 as a matter of law, the breach finding cannot stand, and the compensatory-royalty award premised on it must be reversed.

Reversing the breach finding also clears the way for the drainage damages the bankruptcy court declined to award. Pearl showed lost-revenue damages from

[282] ROA.35456:24–35457:9; ROA.36028:9–36029:10; ROA.36052:18–36053:1; ROA.36107:1–21; ROA.36111:7–23; ROA.72471; ROA.33723.

[283] ROA.36803.

[284] ROA.36807, .36784, .36811.

drainage by the neighboring Whiskey River well,[285] but the bankruptcy court denied that recovery on the theory that Pearl could've prevented the drainage by drilling an offset well.[286] If Pearl complied with Paragraph 17—as the lease's text and the undisputed evidence shows—the bankruptcy court's basis for denying those damages evaporates. The Court should therefore remand the case to the bankruptcy court to determine what drainage damages Pearl is entitled to recover.

* * *

Below, the GLO put on an energetic defense to the merits of Pearl's counterclaim. In that defense, the GLO voluntarily invoked federal jurisdiction and repeatedly asked the bankruptcy court to issue a merits ruling in its favor through pretrial motions and proposed findings and conclusions at trial. The GLO's decision to seek a merits ruling was plainly not an oversight. The State well knows about immunities, and it knows how to raise them. Rather, it was a strategic calculation to focus on the merits instead of avoiding a fight.

The GLO's strategy did not pan out as it expected. But that's no reason for reversal on appeal. If the GLO wanted to raise immunity to suit, it had to raise that

---

[285] ROA.35857:1–35858:23; ROA.35861:11–35866:7; ROA.35869:2–16; ROA.36035:1–36037:25; *see also* ROA.35806:7–25.

[286] ROA.36806 n.137.

argument before it sought to defeat the merits of Pearl's counterclaim. If the GLO wanted to raise immunity to liability, it had to plead that immunity like any other affirmative defense. But the GLO did neither, and it cannot revisit those decisions simply because it's unsatisfied with the factfinder's rulings.

The GLO asked for its day in court, and the bankruptcy court committed no error in ruling on the claims, counterclaims, and defenses that the GLO presented. The Court should affirm in full.

## Conclusion

For these reasons, the judgment should be *affirmed* as to Pearl's counterclaims and the contract damages awarded to Pearl, but *reversed* to the GLO's contract counterclaim and offset, and *remanded* for further proceedings.

Respectfully submitted,

LAWSON & MOSHENBERG PLLC

*<u>/s/ Avi Moshenberg</u>*
Avi Moshenberg
avi.moshenberg@lmbusinesslaw.com
Nick Lawson
nick.lawson@lmbusinesslaw.com
Lawson & Moshenberg PLLC
2301 Commerce Street, Suite 200
Houston, TX 77002
Telephone: (713) 449-9644

***Attorneys for Pearl Resources, LLC and Pearl Resources Operating Co., LLC***

## Certificate of Service

I certify that on May 27, 2026, a copy of the foregoing was filed electronically with the Clerk of the Court using the Court's ECF System. Notice of this filing will be sent electronically by operation of the Court's electronic-filing system to all counsel of record who have appeared.

*/s/ Avi Moshenberg*
Avi Moshenberg

## Certificate of Compliance

1. This brief complies with the type-volume limitation of FED. R. APP. P. 28.1 because it contains 15,295 words, excluding the parts exempted by FED. R. APP. P. 32(f).

2. This brief also complies with the typeface and type-style requirements of FED. R. APP. P. 32(A)(5) and the type requirements of FED. R. APP. P. 32(A)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Avi Moshenberg*
Avi Moshenberg